# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

RONALD KATZ,                                          :
                                                  :   Case No.:
                      Plaintiff,          :

vs.                                                   :
                                                    :

MIAMI DOLPHINS, LTD., a Florida          :
Limited Partnership, FIN ASSOCIATES      :
LLC, a Foreign Limited Liability Company, :
and THE NATIONAL FOOTBALL                :
LEAGUE, a New York corporation,          :
                                                    :

                    Defendants.

_____/

## COMPLAINT

Plaintiff, RONALD KATZ, by and through undersigned counsel, hereby brings this action against defendants, MIAMI DOLPHINS, LTD., a Florida Limited Partnership, FIN ASSOCIATES LLC, a Foreign Limited Liability Company, and THE NATIONAL FOOTBALL LEAGUE, a New York corporation, and alleges as follows:

## INTRODUCTION

1.    Plaintiff, RONALD KATZ ("KATZ") brings this action for unpaid benefits to which he was entitled and did not receive as a result of his misclassification as an independent contractor under § 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA").

2.    KATZ worked for MIAMI DOLPHINS, LTD (the "DOLPHINS"), a franchisee of THE NATIONAL FOOTBALL LEAGE ("NFL"), and FIN ASSOCIATES LLC ("FIN"), an entity affiliated with the DOLPHINS, from 2008 through 2016.

Mansfield Bronstein & Stone, LLP
*500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394*
*Phone (954) 601-5600 Fax (954) 961-4756*

3.      During his time of employment, KATZ was intentionally and improperly misclassified as an independent contractor instead of an employee by the DOLPHINS, FIN and the NFL, so that they could avoid providing him with certain employee benefits provided by the NFL, such as, a pension, supplemental pension benefits, and health insurance.

4.      Under information and belief, the DOLPHINS partially paid KATZ through FIN, so that the DOLPHINS could avoid classifying KATZ as an employee, and therefore, could avoid providing him with the benefits provided to NFL employees.

5.      Under information and belief, the pension plan applicable during KATZ's employment is The National Football League Club Employees' Pension Plan (as Amended and Restated Effective April 1, 2002, including Amendments Adopted through December 2012) (hereinafter referred to as the "Pension Plan"). A copy of the Pension Plan is attached hereto as Exhibit "A."

6.      In 1995, the NFL also established the National Football League Supplemental Employee Retirement Plan ("SERP") to supplement benefits provided under the Pension Plan to top-level employees. Plaintiff is not in possession of a copy of the SERP, but the DOLPHINS and the NFL certainly are.

7.      The DOLPHINS are an Employer under the Pension Plan and SERP and the NFL oversees and administers the Pension Plan and SERP.

8.      KATZ was employed by the DOLPHINS and FIN from 2008 to 2016, a period of nearly 8 years, and therefore, is entitled to payment of 100% of the pension and supplemental benefits, as well as, any other applicable employee benefits that he should have received but did not as a result of the misclassification of his employment by the DOLPHINS and FIN.

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

## JURISDICTION AND VENUE

9.      This is an action for damages in excess of this Court's jurisdictional limit.

10.     Venue is proper in this Circuit pursuant to Fla. Stat. § 47.011 because the DOLPHINS principal place of business is located in this Circuit, a substantial part of the events or omissions giving rise to the claim occurred in this Circuit, and because FIN and the NFL conduct business in this Circuit.

## THE PARTIES

11.     Plaintiff Ronald Katz is a resident of Boca Raton, Florida and is otherwise *sui juris*.

12.     The DOLPHINS' principal place of business is located at 347 Don Shula Drive, Miami Gardens, FL 33056. The DOLPHINS is a limited partnership that operates a professional football franchise in the NFL.

13.     FIN's principal place of business is located at 60 Columbus Circle, New York, NY 10023. Under information and belief, FIN is a holding company for the DOLPHINS, and conducts business in the State of Florida.

14.     The NFL headquarters are located at 345 Park Avenue New York, NY 10154. The NFL is a professional football league consisting of and financed by its 32 member teams, one of which is the DOLPHINS, and conducts business in the State of Florida.

## GENERAL ALLEGATIONS

15.     KATZ was employed by the DOLPHINS and FINS from 2008 to 2016.

16.     During his employment, KATZ held the title of Vice President of the DOLPHINS and was also an officer of South Florida Football Associates, LLC, which is the General Partner

Mansfield Bronstein & Stone, LLP
*500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394*
*Phone (954) 601-5600 Fax (954) 961-4756*

of the DOLPHINS. He also served as an officer of several other entities affiliated with the DOLPHINS such as, Fin Associates LLC and South Florida Stadium LLC.

17.     At the time that KATZ agreed to work for the DOLPHINS, it was agreed that the DOLPHINS would pay KATZ a salary of $600,000 per year in equal monthly payments of $50,000.

18.     While KATZ was employed by the DOLPHINS and completed all services for the DOLPHINS, the DOLPHINS chose to pay KATZ partially from the DOLPHINS and partially from FIN.

19.     As an officer and employee of the DOLPHINS and FIN and under the direction and supervision of the DOLPHINS, KATZ performed a variety of duties including, but not limited to the following:

- Signing checks for the DOLPHINS, and other related entities, for the payment of invoices and player salaries;

- Analyzing budgets and cash flows, including variance analysis;

- Attending quarterly owner and advisor's meetings as required by the owner of the DOLPHINS;

- Reviewing, negotiating and executing contracts for stadium events;

- Reviewing settlement reports for stadium events;

- Meeting with the Miami-Dade County Budget Committee to extend tax exempt bonds;

- Negotiated numerous refinancing transactions for the stadium, including the negotiation of letters of credit for the tax-exempt portion of the debt;

- Review and execution of 2010 NFL financing transaction and swap agreements to convert fixed rate debt to floating rate based upon three-month LIBOR;

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

- Interviewing potential employees for the DOLPHINS accounting department;

- Reviewing construction draws for stadium construction and the LIV Night Club;

- Coordinating the preparation of financial statements and tax returns for the DOLPHINS and affiliated entities;

- Negotiating letters of credit with the bank for the DOLPHINS and the State of Florida for the DOLPHINS' workman's compensation self-insurance;

- Meeting with Miami-Dade County in connection with potential stadium transactions;

- Meeting and negotiating with potential investors;

- Negotiation and execution of the purchase agreement with Wayne Huizenga for the last 5% ownership of the DOLPHINS;

- Meetings with Cisco regarding the purchase and the installation of "Stadium Vision";

- Negotiated settlement with the Internal Revenue Service for the audit of the purchase transaction with Wayne Huizenga;

- Negotiated with the NFL for the stadium renovation financing pursuant to the G-4 program;

- Negotiated with stadium lenders for the financing of the stadium renovation;

- Assisted the incoming CEO to facilitate his transition into the position;

- Reviewed salary cap calculations for effect on team cash flows;

- Worked on various workman's compensation projects; and,

- Was an officer for the South Florida Football Foundation as a representative for the DOLPHINS;

- The coordinating, monitoring and reviewing of financial results for FINS Integrated Media Group LLC and the reporting to Jorge Perez cash flows and tax analysis.

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

20.     The above services rendered by KATZ were an integral part of the DOLPHINS' business that KATZ performed for nearly (8) years. The DOLPHINS/FIN provided KATZ with a permanent office in both Florida and New York. The services performed by KATZ were assigned, directed, supervised, and controlled by the DOLPHINS.

21.     As an employee of the DOLPHINS/FIN, KATZ was provided with a company credit card, and the DOLPHINS paid for his office, supplies, telephone, cellphone, and computer in both Florida and New York as well as all business-related travel. KATZ was required to be available to the DOLPHINS at all hours and was provided with two email addresses by the DOLPHINS for all business to be transacted through: katzr@dolphins.nfl.com and rkatz@dolphins.com. These email addresses were used to provide all services to the DOLPHINS/FIN during KATZ's employment.

22.     Under information and belief, all other DOLPHIN employees received salaries, bonuses, and employees benefits such as pensions, vacation pay, and health insurance, but KATZ was only compensated on a monthly basis as an independent contractor and received no other employee benefits although he was treated as an employee for all other purposes.

23.     KATZ was not engaged in an independently established trade, occupation or business of the same nature as KATZ was a licensed Certified Public Accountant (CPA) by trade and the services provided by KATZ for the DOLPHINS were not services that would have been provided by a CPA. Furthermore, KATZ's ability to take on outside accounting work was severely restricted by the demands placed upon him by the DOLPHINS and the services KATZ was required to perform, and as a result of his full-time employment with the DOLPHINS, KATZ gave up his CPA license while employed with the DOLPHINS/FIN.

Mansfield Bronstein & Stone, LLP
*500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394*
*Phone (954) 601-5600 Fax (954) 961-4756*

24.     Further, KATZ was not required to have nor did he have any workers compensation insurance or other liability insurance typically required for independent contractors further showing that KATZ was an employee of the DOLPHINS/FIN and not an independent contractor.

25.     The Pension Plan was created and maintained for the purpose of enabling eligible Employees of the Employers to participate in a pension plan and was intended for the exclusive benefit of said Employees and their beneficiaries as a plan that qualifies under section 401(a) of the Internal Revenue Code of 1986. See Section 1.2 of Exhibit A.

26.     Section 2.1(q) of the Pension Plan defines Employee as:

Any individual actively employed by an Employer, except that an individual shall not be an employee during any period which he is:
(1) Covered by a collective bargaining agreement that does not require him to be included in the Plan; or
(2) Employed as a football player; or
(3) A lease employee within the meaning of section 414(n) or (o) of the Code, provided that for this purpose, a "leased employee" within the meaning of section 414(n) of the Code means any person who provides services to the Employer but who is not an employee of the Employer if (i) such services are provided pursuant to an agreement between the Employer and any other person, (ii) such person has performed such services for the Employer (or for the Employer and related persons (within the meaning of section 144(a)(3) of the Code)) on a substantially full-time basis for a period of at least one year, and (iii) such services are performed under primary direction or control by the recipient of such services; or
(4) Excluded as an Employee by a Club Modification Certificate executed by the Employer; or
(5) engaged by an Employer pursuant to an agreement that identifies him as an independent contractor; or
(6) not paid directly by the Employer (or by an organization identified in paragraph (1) or (2) of Section 2.1(r) hereof); or
(7) engaged by an Employer pursuant to an agreement providing that he is not eligible to participate in the Plan; or
(8) not treated by the Employer as an employee for federal income tax or federal employment tax purposes,

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

provided that notwithstanding the preceding provisions of this Section 2.1(q), an individual who is a partner in the partnership constituting the Employer and who performs personal services for the Employer shall be deemed to be an Employee unless the Employer's Club Modification Certificate provides otherwise.

27.    Section 2.1(r) of the Pension Plan defines Employer as:

A present member club of the League, any successor thereto, any club previously or hereinafter a member of the League, and any other entity that, with the approval of the Committee, adopts the Plan. Solely for purposes of Sections 2.1(c), 2.1(m), 2.1(o), 2.1(v), 2.1(y), 2.1(ee), 2.1(jj), and 14.8 hereof, and Articles 5, 6, 13, and 15 hereof, the term "Employer" shall include:
(1) all corporations that are members of a controlled group of corporations that includes the Employer and all trades or businesses including the Employer that are under common control (as determined in accordance with section 414(b) and (c) of the Code, and for purposes of the limitation incorporated by Article 15 hereof, as modified by section 415(h) of the Code);
(2) (i) members of an affiliated service group (as defined in section 414(m) of the Code) that includes the Employer and (ii) any entity that is required to be aggregated with the Employer pursuant to the Treasury Regulations under section 414(o) of the Code; and
(3) except to the extent otherwise provided in regulations prescribed by the Secretary of the Treasury, a leasing organization, with respect to periods of service performed by any of its leased employees (as defined in Section 2.1(q)(3) hereof ) for the Employer or a related person (as defined in Section 2.1(q)(3) hereof).

28.    Article 6 of the Pension Plan addresses the payment of the pension when an employee's employment is terminated for any reason other than his Normal Retirement, Postponed Retirement, Early Retirement, total and permanent disability or death, and provides that the employee shall be entitled to receive a deferred pension benefit to commence at his Normal Retirement Date equal to his accrued benefit, multiplied by the applicable percentage determined in accordance with the following schedule:

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

| Years of Service | Percentage Vested |
|---|---|
| Less than 3 | 0% |
| 3 but less than 4 | 60% |
| 4 but less than 5 | 80% |
| 5 or over | 100% |

29.     The NFL Benefit Committee (the "Committee") is the administrator of the Pension

Plan. The Committee consists of not less than three (3) not more than five (5) persons as

determined by the Commissioner of the NFL from time to time.

30.     Section 9.2(f) of the Pension Plan provides that the Committee has the following

powers:

> The Committee shall have all necessary powers incident to the creation,
> implementation and operation of the Plan and the Trust, including but not
> limited to the power, in its discretion:
> (1) To define and amend the terms of the Plan and Trust, to construe the
> Plan and Trust, and to reconcile inconsistencies therein.
> (2) To act in matters related to interpretation of benefits.
> (3) To determine eligibility for all forms of benefit under the Plan, and to
> determine the amount of any benefit under the Plan.
> (4) To supervise the payment of all benefits to former Employees and their
> Beneficiaries.
> (5) To adopt from time to time such By-Laws, procedures and forms as the
> Committee considers appropriate for the transaction of its business.
> (6) To select the Trustee or Trustees.
> (7) To select the actuary or actuaries for the Plan.
> (8) To select outside experts and consultants to provide services for the Plan.
> (9) To select an investment manager or managers for the Plan.
> (10) To determine investment and funding policies for the Plan, which shall
> be communicated to the Trustee and any investment manager or managers.
> (11) To supervise all recordkeeping procedures for the Plan.
> (12) To pay all reasonable and necessary expenses of the Plan from the
> assets of the Trust. Without limiting the generality of the foregoing, the
> Committee shall have the discretionary authority to make rules and
> regulations for the administration of the Plan that are not inconsistent with
> the terms, provisions, conditions and limitations of the Plan; to remedy
> possible ambiguities or omissions by general rule or particular decision; and
> to determine all questions arising out of or in connection with the provisions
> of the Plan or its administration (including questions concerning the

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

eligibility of any Participant or Beneficiary for benefits under the Plan) in any and all cases in which the Committee deems such a determination advisable.

31.     Based upon the foregoing provisions of the Pension Plan, the DOLPHINS are an employer and the NFL oversees the administration of the Pension Plan to all employees of the employers, which includes the DOLPHINS.

32.     The DOLPHINS/FIN misclassified KATZ as an independent contractor when he was clearly an employee and treated as an employee.

33.     The Constitution and Bylaws of the NFL govern the franchise relationship between the NFL and its member teams, such as the DOLPHINS.

34.     The NFL exerts direct control over the member teams and its employees. Indeed, pursuant to the Constitution and Bylaws of the NFL, the Commissioner of the league has the authority to decide disputes between employees and the member teams and even to fire employees of the member teams.

35.     Further, as the NFL also administers the Pension Plan and SERP it is liable for the misclassification of employment by the DOLPHINS/FIN.

36.     Additionally, the NFL provides many other employee benefits to its employees, which includes the employees of its member teams, including, but not limited to, medical, dental and vision insurance, FSAs, short-term and long term disability plans, paid vacation, personal and sick days, paid holidays, and even gym reimbursement. See a full list of Benefits & Employee Rewards at http://www.nfl.com/careers/benefits.

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

37.     KATZ was not afforded any of these employee benefits and rewards but should have been entitled to the same if properly classified as an employee by the DOLPHINS/FIN.

38.     As a result of the conduct set forth above, Plaintiff has been forced to retain the undersigned attorneys to prosecute the instant action and is obligated to pay reasonable attorney's fees.

<strong><u>CAUSES OF ACTION</u></strong>

<strong><u>COUNT I</u></strong><br><strong><u>FOR PENSION BENEFITS UNDER ERISA AGAINST THE DOLPHINS</u></strong>

39.     Plaintiff repeats and reincorporates Paragraphs 1 through 38 as if fully set forth herein.

40.     This action is brought pursuant to the Employment Retirement Income Security Act at 29 U.S.C. § 1132.

41.     The DOLPHINS misclassified Plaintiff as an independent contractor instead of an employee thus depriving him of employee pension benefits to which he was entitled.

42.     As an employee of the DOLPHINS, Plaintiff was eligible to participate in all of the employee pension benefit plans sponsored by the DOLPHINS and the NFL.

43.     KATZ has made a claim to the NFL Committee or is making a claim to the NFL Committee for the pension benefits asserted to be owed herein simultaneously with the filing of this action. However, the exhaustion requirement is believed to be futile here as the DOLPHINS have maintained that Plaintiff was not an employee of the DOLPHINS, and therefore, upon information and belief, the DOLPHINS have no intention of paying Plaintiff benefits under the employee pension plans. Further, as a result of being misclassified as an independent contractor,

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

Plaintiff lacks meaningful access to the review procedures under the pension plans and believes the remedies under the pension plans to be inadequate.

44.     Pursuant to 29 U.S.C. § 1132, Plaintiff seeks damages in an amount to be determined at trial including civil penalties and costs and attorneys' fees.

### COUNT II
### FOR WELFARE BENEFITS UNDER ERISA AGAINT THE DOLPHINS

45.     Plaintiff repeats and reincorporates Paragraphs 1 through 38 as if fully set forth herein.

46.     This action is brought pursuant to the Employment Retirement Income Security Act at 29 U.S.C. § 1132.

47.     The DOLPHINS misclassified Plaintiff as an independent contractor instead of an employee thus depriving him of employee pension benefits to which he was entitled.

48.     As an employee of the DOLPHINS, Plaintiff was eligible to participate in all of the employee benefit policies and plans provided by the DOLPHINS and NFL.

49.     The exhaustion requirement would be futile here as the DOLPHINS have maintained that Plaintiff was not an employee of the DOLPHINS, and therefore, upon information and belief, the DOLPHINS do not intend to pay Plaintiff for the welfare benefits being south herein. Further, as a result of being misclassified as an independent contractor, Plaintiff lacks meaningful access to the review procedures under the pension plans and believes the remedies under the pension plans to be inadequate.

50.     Pursuant to 29 U.S.C. § 1132, Plaintiff seeks damages in an amount to be determined at trial including civil penalties and costs and attorneys' fees.

Mansfield Bronstein & Stone, LLP
*500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394*
*Phone (954) 601-5600 Fax (954) 961-4756*

## COUNT III
## FOR PENSION BENEFITS UNDER ERISA AGAINST THE NFL

51.     Plaintiff repeats and reincorporates Paragraphs 1 through 38 as if fully set forth herein.

52.     This action is brought pursuant to the Employment Retirement Income Security Act at 29 U.S.C. § 1132.

53.     The DOLPHINS misclassified Plaintiff as an independent contractor instead of an employee thus depriving him of employee pension benefits to which he was entitled.

54.     As an employee of the DOLPHINS, Plaintiff was eligible to participate in all of the employee pension benefit plans sponsored by the DOLPHINS and the NFL.

55.     The NFL oversees and administers the Pension Plans on behalf of the DOLPHINS.

56.     The NFL exerts control over the DOLPHINS and its employees and provides revenue to the DOLPHINS used to pay employees, and therefore, was a joint employer of Plaintiff and liable for the DOLPHINS improper misclassification of Plaintiff.

57.     KATZ has made a claim to the NFL Committee for the pension benefits asserted to be owed herein. However, the exhaustion requirement is believed to be futile here as the DOLPHINS have maintained that Plaintiff was not an employee of the DOLPHINS, and therefore, upon information and belief, the DOLPHINS do not intend to pay Plaintiff benefits under the employee pension plans and the NFL would side with the DOLPHINS. Further, as a result of being misclassified as an independent contractor, Plaintiff lacks meaningful access to the review procedures under the pension plans and believes the remedies under the pension plans to be inadequate.

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

58.     Pursuant to 29 U.S.C. § 1132, Plaintiff seeks damages against the NFL in an amount to be determined at trial including civil penalties and costs and attorneys' fees.

## <u>COUNT IV</u>
## <u>FOR WELFARE BENEFITS UNDER ERISA AGAINT THE NFL</u>

59.     Plaintiff repeats and reincorporates Paragraphs 1 through 38 as if fully set forth herein.

60.     This action is brought pursuant to the Employment Retirement Income Security Act at 29 U.S.C. § 1132.

61.     The DOLPHINS misclassified Plaintiff as an independent contractor instead of an employee thus depriving him of employee pension benefits to which he was entitled.

62.     As an employee of the DOLPHINS, Plaintiff was eligible to participate in all of the employee benefit policies and plans provided by the DOLPHINS and NFL.

63.     The NFL oversees and administers the Pension Plans on behalf of the DOLPHINS.

64.     The NFL exerts control over the DOLPHINS and its employees and provides revenue to the DOLPHINS used to pay employees, and therefore, was a joint employer of Plaintiff and liable for the DOLPHINS improper misclassification of Plaintiff.

65.     The exhaustion requirement would be futile here as the DOLPHINS have maintained that Plaintiff was not an employee of the DOLPHINS, and therefore, upon information and belief, the DOLPHINS do not intend to pay Plaintiff the welfare benefits being sought herein and the NFL would side with the DOLPHINS. Further, as a result of being misclassified as an independent contractor, Plaintiff lacks meaningful access to the review procedures for the claim process for welfare benefits, if one even exists.

Mansfield Bronstein & Stone, LLP
*500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394*
*Phone (954) 601-5600 Fax (954) 961-4756*

66.     Pursuant to 29 U.S.C. § 1132, Plaintiff seeks damages against the NFL in an amount to be determined at trial including civil penalties and costs and attorneys' fees.

## COUNT V
## FOR PENSION BENEFITS UNDER ERISA AGAINST FIN

67.     Plaintiff repeats and reincorporates Paragraphs 1 through 38 as if fully set forth herein.

68.     This action is brought pursuant to the Employment Retirement Income Security Act at 29 U.S.C. § 1132.

69.     FIN misclassified Plaintiff as an independent contractor instead of an employee thus depriving him of employee pension benefits to which he was entitled.

70.     As an employee of the DOLPHINS and FIN, Plaintiff was eligible to participate in all of the employee pension benefit plans sponsored by the DOLPHINS and the NFL.

71.     KATZ has made a claim to the NFL Committee or is making a claim to the NFL Committee for the pension benefits asserted to be owed herein simultaneously with the filing of this action. However, the exhaustion requirement is believed be futile here as the DOLPHINS and FIN have maintained that Plaintiff was not an employee of the DOLPHINS, and therefore, upon information and belief, the DOLPHINS and FIN do not intend to pay Plaintiff benefits under the employee pension plans. Further, as a result of being misclassified as an independent contractor, Plaintiff lacks meaningful access to the review procedures under the pension plans and believes the remedies under the pension plans to be inadequate.

72.     Pursuant to 29 U.S.C. § 1132, Plaintiff seeks damages in an amount to be determined at trial including civil penalties and costs and attorneys' fees.

Mansfield Bronstein & Stone, LLP
500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394
Phone (954) 601-5600 Fax (954) 961-4756

<u>**COUNT VI**</u>
<u>**FOR WELFARE BENEFITS UNDER ERISA AGAINT FIN**</u>

73.    Plaintiff repeats and reincorporates Paragraphs 1 through 38 as if fully set forth herein.

74.    This action is brought pursuant to the Employment Retirement Income Security Act at 29 U.S.C. § 1132.

75.    FIN misclassified Plaintiff as an independent contractor instead of an employee thus depriving him of employee pension benefits to which he was entitled.

76.    As an employee of the DOLPHINS and FIN, Plaintiff was eligible to participate in all of the employee benefit policies and plans provided by the DOLPHINS and NFL.

77.    The exhaustion requirement would be futile here as the DOLPHINS and FIN have maintained that Plaintiff was not an employee of the DOLPHINS, and therefore, upon information and belief, the DOLPHINS do not intend to pay Plaintiff benefits under the employee pension plans. Further, as a result of being misclassified as an independent contractor, Plaintiff lacks meaningful access to the plan documents, review procedures under the pension plans and believes the remedies under the pension plans to be inadequate.

78.    Pursuant to 29 U.S.C. § 1132, Plaintiff seeks damages in an amount to be determined at trial including civil penalties and costs and attorneys' fees.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, RONALD KATZ, respectfully requests that this Court enter judgment against Defendants:

a. Awarding Plaintiff damages in an amount to be determined at trial for all benefits to which he was entitled but did not receive as a result of Defendants misclassification of

Mansfield Bronstein & Stone, LLP
*500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394*
*Phone (954) 601-5600 Fax (954) 961-4756*

Plaintiff as an independent contractor including, but not limited to, pension and welfare benefits, and all costs incurred as a result of Plaintiff obtaining benefits on his own;

b.  Declaring the practices complained of herein as unlawful under the ERISA;

c.  Awarding pre-judgment and post-judgment interest as applicable;

d.  Awarding Plaintiff the expenses incurred in this action, including costs and attorneys' fees; and

e.  All such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury in this action for all Counts so triable.

Dated this 31st day of December 2020.

Respectfully submitted,

  /s/ Gary N. Mansfield, Esq.
MANSFIELD BRONSTEIN & STONE, LLP
*Counsel for Plaintiff*
500 Broward Boulevard, Suite 1450
Fort Lauderdale, Florida 33394
Telephone: (954) 601-5600
Facsimile: (954) 961-4756
Gary N. Mansfield
Florida Bar No. 61913
Gary@mblawpa.com
David Stone
Florida Bar No. 400432
dstone@davidstonelaw.com
david@mblawpa.com
Ariane Wolinsky
Florida Bar No. 51719
Ariane@mblawpa.com
<u>Designated Service Email</u>:
litigation@mblawpa.com

Mansfield Bronstein & Stone, LLP
*500 Broward Boulevard, Suite 1450, Fort Lauderdale, Florida 33394*
*Phone (954) 601-5600 Fax (954) 961-4756*

EXHIBIT A

# THE NATIONAL FOOTBALL LEAGUE

# CLUB EMPLOYEES PENSION PLAN

# (AS AMENDED AND RESTATED EFFECTIVE APRIL 1, 2002,

# INCLUDING AMENDMENTS ADOPTED THROUGH DECEMBER 2012)

**THE NATIONAL FOOTBALL LEAGUE**
**CLUB EMPLOYEES PENSION PLAN**
**(AS AMENDED AND RESTATED EFFECTIVE APRIL 1, 2002,**
**INCLUDING AMENDMENTS ADOPTED THROUGH DECEMBER 2012)**

## Table of Contents

**Page**

ARTICLE 1     NAME, PURPOSE, BACKGROUND, AND APPLICATION ............... 1

1.1     Name. ....................................................................................................... 1
1.2     Purpose. .................................................................................................... 1
1.3     Background. .............................................................................................. 1
1.4     Amendment and Restatement. ................................................................... 2
1.5     Application. ............................................................................................... 2
1.6     Application of Appendix I. ....................................................................... 3

ARTICLE 2     DEFINITIONS AND CONSTRUCTION ............................................. 4

2.1     Definitions. ............................................................................................... 4
2.2     Plurals and Genders ................................................................................ 19

ARTICLE 3     PARTICIPATION AND BENEFICIARY DESIGNATION ................. 20

3.1     Participation ............................................................................................ 20
3.2     Designation of Beneficiary ..................................................................... 20

ARTICLE 4     RETIREMENT BENEFITS ................................................................. 22

4.1     Normal Retirement Benefit ..................................................................... 22
4.2     Postponed Retirement Benefit ................................................................ 23
4.3     Early Retirement Benefit ........................................................................ 24
4.4     Disability Benefit .................................................................................... 25
4.5     Benefit Payment Options ........................................................................ 26
4.6     Limitations on Methods of Distribution ................................................. 33
4.7     Incidental Benefit .................................................................................... 40
4.8     Incompetence .......................................................................................... 40
4.9     Missing Persons ...................................................................................... 40
4.10    Distribution Before Normal Retirement Age .......................................... 41
4.11    Direct Rollover ....................................................................................... 42
4.12    Rollovers for Non-Spouse Beneficiaries ................................................ 44
4.13    Funding-Based Limits on Benefits and Benefit Accruals ....................... 44

ARTICLE 5     DEATH BENEFITS ............................................................................. 60

5.1     No Other Death Benefit .......................................................................... 60
5.2     Requirements .......................................................................................... 60
5.3     Lump-Sum Death Benefit ....................................................................... 61
5.4     Waiver of Spouse's Preretirement Death Benefit ................................... 62

ARTICLE 6      TERMINATION OF EMPLOYMENT ..................................................... 67

   6.1      Deferred Vested Pension.......................................................................67
   6.2      Early Payment.......................................................................................67
   6.3      Payment Method....................................................................................68
   6.4      Termination of Employment Before Vesting .......................................68

ARTICLE 7      APPLICABLE LAW ..................................................................... 69

ARTICLE 8      CONTRIBUTIONS ....................................................................... 70

   8.1      Necessary Contributions.......................................................................70
   8.2      Election to be Treated as Single Employer...........................................70

ARTICLE 9      ADMINISTRATION ..................................................................... 71

**EFFECTIVE BEFORE DECEMBER 10, 2003**
   9.1      Administration ......................................................................................71
   9.2      Committee..............................................................................................71
   9.3      Allocation of Responsibility .................................................................74
   9.4      Delegation .............................................................................................74
   9.5      Investment Managers ............................................................................75
   9.6      Postponement of Action........................................................................75
   9.7      Settlement of Claims .............................................................................76
   9.8      Inspection of Records ...........................................................................76
   9.9      Discretion ..............................................................................................76
   9.10    Reliance on Plan Documents .................................................................76
   9.11    Payment of Expenses ............................................................................76
   9.12    Service in More Than One Capacity......................................................77

**EFFECTIVE ON AND AFTER DECEMBER 10, 2003**
   9.1      In General..............................................................................................77
   9.2      Committee..............................................................................................78
   9.3      Investment Committee ..........................................................................81
   9.4      Supervisory Manager ............................................................................82
   9.5      Allocation of Responsibility .................................................................83
   9.6      Delegation .............................................................................................83
   9.7      Investment Managers ............................................................................84
   9.8      Postponement of Action........................................................................84
   9.9      Settlement of Claims .............................................................................84
   9.10    Inspection of Records ...........................................................................85
   9.11    Reliance on Plan Documents .................................................................85
   9.12    Payment of Expenses ............................................................................85
   9.13    Service in More Than One Capacity......................................................86
   9.14    Named Fiduciaries ................................................................................86

ARTICLE 10    AMENDMENT, CURTAILMENT OR TERMINATION OF THE
               PLAN ........................................................................................ 87

   10.1    Power of Committee to Amend, Curtail or Terminate ....................................87

10.2    Consequences of Termination...................................................87
10.3    Payments on Termination .........................................................87
10.4    Allocation...................................................................................88
10.5    Responsibility for Distribution and Allocation.........................88
10.6    Design Decisions ......................................................................89

ARTICLE 11   MERGER AND RESTATEMENT OF THE  MINIMUM PLAN AND THE COACHES PLAN.....................................................90

11.1    Effect of Merger and Restatement ...........................................90
11.2    Effect of Schedules...................................................................90

ARTICLE 12   MULTIPLE EMPLOYER PROVISIONS ...............................91

12.1    Single Plan ................................................................................91
12.2    Instructions Applicable to Whole Fund ....................................91
12.3    Binding Effect of Amendments ................................................91
12.4    Withdrawal of Employer...........................................................91
12.5    Withdrawal by One Employer ...................................................92
12.6    Separate Application of Certain Provisions ..............................92
12.7    Separate Benefit Formulas .......................................................92

ARTICLE 13   REEMPLOYMENT ...............................................................94

13.1    Reemployment Before Normal Retirement Age.......................94
13.2    Employment After Normal Retirement Age.............................94
13.3    Adjustment of Accruals ............................................................95
13.4    Distribution Requirements ........................................................95
13.5    Notification ...............................................................................96
13.6    Review ......................................................................................96
13.7    Termination After Reemployment ...........................................96
13.8    Report to Participant ................................................................97
13.9    Effect of Lump-Sum Distribution ............................................97
13.10  Military Service ........................................................................98

ARTICLE 14   MISCELLANEOUS ............................................................100

14.1    Qualified Plan .........................................................................100
14.2    Exclusive Benefit ...................................................................100
14.3    Impossibility ...........................................................................101
14.4    Further Acts ............................................................................101
14.5    Binding on Successors ............................................................102
14.6    Inalienability of Benefits........................................................102
14.7    Merger of Plan ........................................................................104
14.8    Pre-Termination Restrictions .................................................105
14.9    No Contractual Effect .............................................................108
14.10  Application of Forfeited Benefits ...........................................109
14.11  Headings and Subheadings .....................................................109
14.12  Illegality..................................................................................109
14.13  Claims for Benefits ................................................................109
14.14  Limitation on Actions ............................................................117

14.15  Booklets and Brochures Subject to Plan Provisions ...................................... 118
14.16  Liability Limited ........................................................................................... 118
14.17  Overpayments ............................................................................................... 118
14.18  PBGC Premiums ........................................................................................... 119
14.19  Withholding Taxes ....................................................................................... 119
14.20  Notice of Process .......................................................................................... 119
14.21  Complete Statement of Plan ......................................................................... 119

ARTICLE 15     LIMITATIONS ON BENEFITS ......................................................... 120

15.1  Maximum Limitation on Benefit Amount ..................................................... 120
15.2  Intent of Article 15 ....................................................................................... 127

ARTICLE 16     TOP-HEAVY REQUIREMENTS ...................................................... 128

16.1  Determination of Top-Heavy Status ............................................................. 128
16.2  Definitions ..................................................................................................... 129
16.3  Determination of Present Value of Accrued Benefit ..................................... 131
16.4  Minimum Benefit Requirements ................................................................... 132
16.5  Vesting Requirements ................................................................................... 133
16.6  Termination of Top-Heavy Status ................................................................ 134
16.7  Intent of Article 16 ....................................................................................... 135

ARTICLE 17     PARTICIPATION BY LEAGUE EMPLOYERS ................................ 136

17.1  Participation Automatic ................................................................................ 136
17.2  Club Modification Certificates ..................................................................... 136

EXHIBIT I: ACTUARIAL ASSUMPTIONS

SCHEDULE I: SPECIAL PROVISIONS RELATING  TO COACHES

SCHEDULE II: SPECIAL PROVISIONS RELATING  TO FRONT OFFICE
            EMPLOYEES

SCHEDULE III: SPECIAL PROVISIONS RELATING TO  CHANGE IN
            COMPENSATION LIMIT

SCHEDULE IV: SCHEDULE OF EFFECTIVE DATES

## ARTICLE 1

## NAME, PURPOSE, BACKGROUND, AND APPLICATION

1.1 <u>Name</u>. This Plan, as amended and restated as of April 1, 2002, including amendments adopted through December 2012, is designated as The National Football League Club Employees Pension Plan (hereinafter referred to as the "Plan").

1.2 <u>Purpose</u>. The Plan is created and shall be maintained for the purpose of enabling eligible Employees of the Employers (hereinafter defined) to participate in a pension plan and is intended for the exclusive benefit of said Employees and their beneficiaries as a plan that qualifies under section 401(a) of the Internal Revenue Code of 1986, as amended.

1.3 <u>Background</u>. Prior to April 1, 1989, certain Employees of the Employers ("Coaches") were participants in The National Football League Coaches Pension Plan (the "Coaches Plan"). The Coaches Plan was a single multiple-employer pension plan that applied uniformly to football coaches employed by all of the member clubs of the National Football League.

Separately, prior to April 1, 1989, certain Employees of the Employers ("Front Office Employees") were participants in The National Football League Front Office Minimum Reciprocal Benefit Plan (the "Minimum Plan"). The Minimum Plan contained provisions uniformly applicable to all Front Office Employees and was funded by The National Football League Reciprocal Trust; however, the Minimum Plan was a single-employer pension plan.

In 1989, the member clubs of the National Football League decided to create one plan for all eligible employees (other than football players) of the member clubs of the National Football League.  Accordingly, the Minimum Plan was merged into the Coaches Plan effective April 1, 1989.  The Coaches Plan was amended and restated as a single multiple-employer pension plan, effective generally as of April 1, 1989, to incorporate provisions required by the Tax Reform Act of 1986 and other applicable law, and was redesignated as The National Football League Club Employees Pension Plan.

1.4 <u>Amendment and Restatement</u>.  This document is an amendment and restatement, effective April 1, 2002, of the Plan as in effect on March 31, 2002 and includes amendments adopted through December 2012.

1.5 <u>Application</u>.  Except as specified by the Schedules hereto, any Employee who has not completed at least one Hour of Service with the Employer after March 31, 2002, shall have his benefit (if any) determined solely in accordance with the provisions of the Plan in effect as of March 31, 2002 (or, if applicable, either the provisions of either the Minimum Plan or the Coaches Plan, whichever applies, as in effect as of March 31, 1989).  Unless it is inconsistent with the terms of the Plan, any action taken or any election, designation, or determination made by the Committee or by a Participant or Beneficiary under the Plan as in effect as of March 31, 2002 (or, if applicable, under either the Minimum Plan or the Coaches Plan, whichever applies) shall be regarded as having been taken or made under the Plan and as in effect hereunder unless and until changed in accordance with the terms of the Plan.  Notwithstanding any other provisions of the Plan, this amendment and restatement of the Plan shall not cause (a) any Participant's Accrued Benefit under the Plan as of April 1, 2002, to be less than

- 3 -

his Accrued Benefit under the Plan as of March 31, 2002, or (b) any Participant's vested percentage under the Plan as of April 1, 2002, to be less than the Participant's vested percentage under the Plan as of March 31, 2002.  Except as provided in Schedule I or Schedule II hereto, or as otherwise provided herein, the right to a benefit under the Plan of any person who terminates employment as an Employee for any reason on or after April 1, 2002, shall be determined by the terms of the Plan in effect on the date of such termination of employment.

> 1.6 Application of Appendix I.   Pursuant to Section 12.7 hereof, each Employer may freeze benefit accruals or establish a separate benefit formula or other terms that apply to its employees.  Separate benefit formulas or other terms established by an Employer (including resolutions freezing benefit accruals) are included in Appendix I for that Employer.  The terms of the Plan (other than Appendix I) shall apply to the employees of an Employer except to the extent that those terms are modified in Appendix I.  In the case of any conflict between the terms of Appendix I and the terms of the Plan other than Appendix I, the terms of Appendix I shall govern.

- 4 -

ARTICLE 2

DEFINITIONS AND CONSTRUCTION

2.1 Definitions.  The following words and phrases used in the Plan shall have the following meanings, unless a different meaning is clearly required by the context:

(a) Accrued Benefit - The monthly pension benefit determined in accordance with Section 4.1 (or, if applicable, Section 16.4(a)) hereof, and Schedule I or Schedule II hereto, if applicable, as of any particular date, payable solely for the life of the Participant beginning as of the Participant's Normal Retirement Date.

(b) Act - The Employee Retirement Income Security Act of 1974, as it may be amended from time to time, or any successor statute.

(c) Active Service - The employment of a Participant, after his pension benefit under the Plan has commenced or would have commenced if the Participant had not remained in or returned to employment, for each calendar month during which the Participant is an Employee who completes forty (40) or more Hours of Service (as defined in 29 C.F.R. § 2530.200b-2(a)(1) and (2)) for the Employer.

(d) Basic Option - In the case of a Participant who is not married on his Benefit Commencement Date, the payment option described in Section 4.5(a)(1) hereof.  In the case of a Participant who is married on his Benefit Commencement Date, the payment option described in Section 4.5(a)(2) hereof.

(e) Beneficiary - Any person, estate, or trust entitled to receive any payments due under the Plan upon the death of a Participant or former Participant.

- 5 -

(f) <u>Benefit Commencement Date</u> - The first day of the first period for which an amount (other than a disability benefit that is paid as an annuity pursuant to Section 4.4 hereof) is paid under the Plan as an annuity or in any other form.

(g) <u>Club Modification Certificate</u> - Each member club may, with the written approval of the Committee, adopt or modify a Club Modification Certificate that provides for benefits in addition to those provided by the Plan.  To the extent a Club Modification Certificate provides for any such additional benefits, the applicable provisions of the Club Modification Certificate shall prevail over any conflicting provisions of the Plan.  Unless it is inconsistent with applicable law, any Club Modification Certificate adopted or modified by a member club and in effect on March 31, 2002, shall be regarded as having been adopted or modified under the Plan and in effect hereunder unless and until changed.  For purposes of this Section 2.1(g), the term "Club Modification Certificate" shall include any "Adoption Certificate" as that term was used in either the Minimum Plan or the Coaches Plan, and which was adopted and/or modified by any Employer with respect to either the Minimum Plan or the Coaches Plan, whichever is applicable, and which was in effect on March 31, 1989.

(h) <u>Coaches Plan</u> - The National Football League Coaches Pension Plan, as amended, as it existed and remained in force from the effective date of its adoption by the Employer until March 31, 1989.

(i) <u>Code</u> - The Internal Revenue Code of 1986, as amended from time to time, or any successor statute.

(i-1)   <u>Commissioner</u> - The Commissioner of the National Football League.

- 6 -

(j)  <u>Committee</u> - The NFL Employee Benefit Committee as constituted under Article 9 hereof, which shall be the administrator of the Plan for purposes of the Act.

(k) <u>Compensation</u> - The total compensation paid to an Employee by the Employer during any calendar year, as reported on Internal Revenue Service Form W-2, plus any elective contributions under any cafeteria plan that is intended to meet the requirements of section 125 of the Code, elective deferrals under any salary reduction plan that is intended to meet the requirements of sections 401(a) and 401(k) of the Code, and any qualified transportation fringe described in section 132(f)(4) of the Code, but not including Employer reimbursements for work-related expenses or any deferred compensation earned in a previous calendar year; provided that for Plan Years beginning after March 31, 1989, and before April 1, 1992, "Compensation" shall include any deferred compensation in respect of a previous calendar year and paid to an Employee during the calendar year, but only to the extent that such previously deferred compensation (i) does not exceed the amount of any compensation deferred by the Employee in respect of the current calendar year and (ii) the previously deferred compensation is paid to the Employee by the member club with which the Employee currently is employed.  "Compensation" includes the earned income derived by an Employee as a partner in a partnership constituting the Employer.  For this purpose, "earned income" means net earnings from self-employment (as defined in section 1402(a) of the Code), but such net earnings shall be determined:

(1) only with respect to a trade or business in which personal services of the individual was a material income-producing factor,

(2) without regard to paragraphs (4) and (5) of section 1402(c) of the Code,

(3) in the case of any individual who is treated as an employee under section 3121(d)(3)(A), (C), or (D) of the Code, without regard to section 1402(c)(2) of the Code,

(4) without regard to items that are not included in gross income and the deductions properly allocable to or chargeable against such items,

(5) with regard to the deductions allowed to the taxpayer by section 404 of the Code, and

(6) for taxable years beginning after December 31, 1989, with regard to the deduction allowed to the taxpayer by section 164(f) of the Code.

Differential wage payments paid to an Employee by the Employer on or after January 1, 2009, with respect to an absence for military service shall not be considered "Compensation" in accordance with Section 13.10(c).

- 8 -

In no event shall "Compensation" as defined herein exceed $200,000, as such amount is adjusted pursuant to section 401(a)(17) of the Code; provided that effective April 1, 1994, and ending March 31, 2002, "Compensation" as defined herein shall not exceed $150,000, as such amount is adjusted pursuant to section 401(a)(17)(B) of the Code.  If a Participant's Accrued Benefit as of a date on or after April 1, 1994, and before April 1, 2002, is determined using Compensation in excess of $150,000 (as adjusted pursuant to section 401(a)(17)(B) of the Code) for any Plan Year beginning before April 1, 1994, the Participant's Accrued Benefit shall be determined as set forth in Schedule III.

The annual Compensation for each Employee taken into account during a Plan Year beginning on or after April 1, 2002, shall not exceed $200,000.  For this purpose, annual Compensation means Compensation during the calendar year.  For purposes of determining benefit accruals in a Plan Year beginning on or after April 1, 2002, the annual Compensation limit for calendar years beginning before April 1, 2002, shall be $200,000.  The $200,000 limit on annual Compensation shall be adjusted for cost-of-living increases in accordance with section 401(a)(17)(B) of the Code.  The cost-of-living adjustment in effect for a calendar year shall apply to the annual Compensation for that calendar year.

In determining the Compensation of an Employee for a Plan Year that begins before January 1, 1997, the family aggregation rules of section 414(q)(6) of the Code shall apply, except that, for this purpose, an Employee's "family" shall include only the Employee's spouse and any lineal descendants who have not attained age 19 before the close of the Plan Year in question.

For purposes of applying Section 15.1 hereof, effective for limitation years beginning on and after January 1, 1997, annual compensation paid or made available during such years shall include any elective deferral (as defined in section 402(g)(3) of the Code) and any amount that is contributed or deferred by the Employer at the election of the Employee and that is not includible in the Employee's gross income by reason of section 125 or 457 of the Code.

Effective for Plan Years and limitation years beginning on and after January 1, 1998, annual compensation paid or made available during such years shall include any elective amounts that are not included in the Employee's gross income by reason of section 132(f)(4) of the Code.

Effective for Plan Years and limitation years beginning on and after July 1, 2007, Compensation for purposes of Sections 15.1, 16.2(b), and 16.2(e) shall mean "compensation" as defined in Treasury Regulations section 1.415(c)-2(d)(4) or, for an employee within the meaning of Code section 401(c)(1), earned income as described in section 401(c)(2) of the Code and Treasury Regulations thereunder; provided that such compensation shall not exceed the annual compensation limit described above and shall include amounts that would be included in gross income but for the rules described in Code sections 125(a), 132(f)(4), 402(e)(3), 402(h)(1)(B), 402(k), or 457(b).

For purposes of applying Sections 15.1, 16.2(b), and 16.2(e) hereof, effective for Plan Years and limitation years beginning on and after July 1, 2007, compensation shall not include compensation described in this Section 2.1(k) paid after the Participant's severance from employment with the Employer other than (i) regular pay for the

- 10 -

performance of services (i.e., compensation for service during regular working hours, overtime, shift differential, commissions, bonuses, and other similar payments) and amounts paid in lieu of unused accrued leave that are paid no later than the later of 2-1/2 months following the Participant's severance from employment or the end of the limitation year in which the Participant's severance from employment occurs and (ii) amounts paid while the Participant is absent due to qualified military service (as defined in section 414(u)(1) of the Code) that do not exceed the pay the Participant would have received if he had continued to perform services.

(l)  Covered Compensation - Effective April 1, 1994, with respect to any Participant, the average (without indexing) of the taxable wage bases in effect for each calendar year during the 35-year period ending with the calendar year in which the Participant attains (or will attain) social security retirement age (as defined in section 415(b)(8) of the Code.  In determining a Participant's Covered Compensation for any Plan Year, it shall be assumed that the Social Security taxable wage base in effect at the beginning of the Plan Year shall remain the same for all future years.  A Participant's Covered Compensation shall be adjusted for each Plan Year.

(m) Disability Retirement - Retirement from employment with the Employers by a Participant due to total and permanent disability as determined in accordance with Section 4.4 hereof.

(n) Earliest Retirement Date - The earliest date as of which a Participant could elect to receive a benefit under the Plan.

(o) <u>Early Retirement</u> - Retirement from employment with the Employers by a Participant before his Normal Retirement Date and after his fifty-fifth (55th) birthday and his completion of at least five (5) Years of Credited Service.

(p) <u>Early Retirement Date</u> - The first day of any month prior to the Normal Retirement Date of a Participant and coincident with or following his Early Retirement.

(q) <u>Employee</u> - Any individual actively employed by an Employer, except that an individual shall not be an Employee during any period in which he is:

(1) covered by a collective bargaining agreement that does not require him to be included in the Plan; or

(2) employed as a football player; or

(3) a leased employee within the meaning of section 414(n) or (o) of the Code, provided that for this purpose, a "leased employee" within the meaning of section 414(n) of the Code means any person who provides services to the Employer but who is not an employee of the Employer if (i) such services are provided pursuant to an agreement between the Employer and any other person, (ii) such person has performed such services for the Employer (or for the Employer and related persons (within the meaning of section 144(a)(3) of the Code)) on a substantially full-time basis for a period of at least one year, and (iii) such services are performed under primary direction or control by the recipient of such services; or

(4) excluded as an Employee by a Club Modification Certificate executed by the Employer; or

- 12 -

(5) engaged by an Employer pursuant to an agreement that identifies him as an independent contractor; or

(6) not paid directly by the Employer (or by an organization identified in paragraph (1) or (2) of Section 2.1(r) hereof); or

(7) engaged by an Employer pursuant to an agreement providing that he is not eligible to participate in the Plan; or

(8) not treated by the Employer as an employee for federal income tax or federal employment tax purposes,

provided that notwithstanding the preceding provisions of this Section 2.1(q), an individual who is a partner in the partnership constituting the Employer and who performs personal services for the Employer shall be deemed to be an Employee unless the Employer's Club Modification Certificate provides otherwise.

(r) <u>Employer</u> - A present member club of the League, any successor thereto, any club previously or hereinafter a member of the League, and any other entity that, with the approval of the Committee, adopts the Plan.  Solely for purposes of Sections 2.1(c), 2.1(m), 2.1(o), 2.1(v), 2.1(y), 2.1(ee), 2.1(jj), and 14.8 hereof, and Articles 5, 6, 13, and 15 hereof, the term "Employer" shall include:

(1) all corporations that are members of a controlled group of corporations that includes the Employer and all trades or businesses including the Employer that are under common control (as determined in accordance with section 414(b) and (c) of the Code, and for purposes of the limitation incorporated by Article 15 hereof, as modified by section 415(h) of the Code);

- 13 -

(2) (i) members of an affiliated service group (as defined in section 414(m) of the Code) that includes the Employer and (ii) any entity that is required to be aggregated with the Employer pursuant to the Treasury Regulations under section 414(o) of the Code; and

(3) except to the extent otherwise provided in regulations prescribed by the Secretary of the Treasury, a leasing organization, with respect to periods of service performed by any of its leased employees (as defined in Section 2.1(q)(3) hereof ) for the Employer or a related person (as defined in Section 2.1(q)(3) hereof).

(s) <u>Equivalent Actuarial Value or Actuarial Equivalent</u> - The actuarially equivalent value of any benefits on a specified date, computed on the basis of the actuarial assumptions as set forth in Exhibit I hereto.

(t) <u>Final Average Compensation</u> - A Participant's average Compensation received for the five (5) consecutive calendar years during the Participant's Years of Credited Service that produce the highest average; provided that if the Participant had less than five (5) consecutive calendar years in which he received compensation from the Employer, the average Compensation received from the Employer for the Participant's total Years of Credited Service (not in excess of five (5)).

(u) <u>Fund or Trust Fund</u> - All money and property paid to the Trustee pursuant to the Plan, adjusted to reflect distributions, expenses, and investment experience.

(v) <u>Hour of Service</u> -

- 14 -

(1) Any hour for which an Employee is directly or indirectly paid or entitled to payment by his Employer for the performance of duties or on account of a period of time during which no duties are performed (up to a maximum of five hundred one (501) hours in any continuous period in which no duties are performed) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence. An Hour of Service also shall include any hour for which back pay, irrespective of mitigation of damages, has been awarded or agreed to by the Employee and his Employer. However, no hours shall be credited for back pay if such hours were previously credited for the performance or nonperformance of duties. Hours of Service shall not be credited for any payment made or due under a plan maintained solely for the purpose of complying with applicable worker's compensation or disability insurance laws or for any payment that solely reimburses an Employee for medical or medically related expenses incurred by the Employee. Hours of Service shall be credited to the Plan Year or other relevant period during which the services were performed or the non-working time occurred, regardless of the time when compensation therefor may be paid. In computing and crediting Hours of Service for an employee under this Section, the rules set forth in 29 C.F.R. §§2530.200b-2(a), (b), and (c) shall apply, said sections being incorporated herein by reference.

(2) Solely for purposes of determining whether an Employee has incurred a Break in Service for purposes of Section 13.9 hereof, an Employee who is absent from work for any period:

      (i)      by reason of the pregnancy of the Employee,

      (ii)     by reason of the birth of a child of the Employee,

      (iii)    by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

      (iv)    for purposes of caring for such child for a period beginning immediately following such birth or placement,

also shall be credited with the number of Hours of Service that the Employee otherwise normally would receive but for the absence or, if the Committee cannot determine such Hours of Service, eight (8) Hours of Service for each working day of absence.  The total Hours of Service credited under the preceding sentence shall not exceed five hundred one (501) Hours of Service.  The Hours of Service shall be credited to the Plan Year in which the absence begins, if the crediting would prevent the Employee from incurring a Break in Service (as defined in Section 13.9 hereof) in that Plan Year, or, in all other cases, to the succeeding Plan Year.  Hours of Service shall not be credited pursuant to this Paragraph (2) unless the Employee furnishes to the Committee, at such time and in such manner as the Committee may reasonably determine, information sufficient to establish that the absence is for one of the reasons set forth in

clauses (i) through (iv), above, and the number of days for which there was such an absence, except that credit shall not be withheld if the Committee otherwise has access to the relevant information.

(v-1)   Investment Committee - The NFL Investment Committee as constituted under Article 9 hereof.

(w) League - The National Football League, an unincorporated association of professional football clubs, as now, previously, or hereafter duly constituted; the American Football League prior to February 1, 1970; NFL Enterprises L.P.; NFL Productions LLC (formerly NFL Films, Inc.); NFL Properties LLC; NFL Management Council; any NFL Scouting Organization; and any other entity approved by the Committee.

(x) Minimum Plan - The National Football League Front Office Minimum Reciprocal Benefit Plan, as amended, as it existed and remained in force from the effective date of its adoption by the Employer until March 31, 1989.

(y) Normal Retirement - Retirement by a Participant from employment as an Employee of the Employers on his Normal Retirement Date.

(z) Normal Retirement Age - Age sixty-five (65).

(aa)   Normal Retirement Date - The first day of the month coincident with or next following the date the Participant attained (or, if not living, would have attained) his Normal Retirement Age.

(bb)   Participant - An Employee or former Employee who becomes a Participant in the Plan as provided in Section 3.1 hereof.

- 17 -

(cc)   Plan - The National Football League Club Employees Pension Plan as amended and restated by this instrument and as it may subsequently be amended from time to time.

(dd)   Plan Year - The twelve (12) month period beginning on April 1st of each year and ending on March 31st of the following year, both of the dates included therein.

(ee)   Postponed Retirement - Retirement by a Participant from employment with the Employers after his Normal Retirement Date.

(ff)   Qualified Domestic Relations Order - A qualified domestic relations order as defined in section 414(p) of the Code.

(ff-1)   Supervisory Manager - A Plan fiduciary identified by the Employers as a fiduciary pursuant to action of the Investment Committee in accordance with Article 9 hereof.

(gg)   Trust or Trust Agreement - The National Football League Reciprocal Trust, as amended from time to time.

(hh)   Trustee - The Mercantile-Safe Deposit and Trust Company, a Maryland corporation, or any successor hereafter chosen to serve as the trustee of the Trust.

(ii)   Year of Credited Service - Subject to the provisions of Section 13.9 hereof, a Year of Credited Service shall be:

(1)   A Plan Year in which an Employee completes one thousand (1000) Hours of Service as an Employee.

- 18 -

(2) A Plan Year that the Family and Medical Leave Act of 1993 requires to be treated as a Year of Credited Service.

Except as otherwise provided in Section 4.1(b)(1)(B)(ii)(I) hereof, no Year of Credited Service shall be credited with respect to any Plan Year commencing before April 1, 1989, and not more than one (1) Year of Credited Service shall be credited with respect to any Plan Year.  By way of further explanation and not limitation, it is specifically recognized that no Year of Credited Service shall be credited with respect to service with any employer, including the League, other than the Employer or for service with the Employer in a capacity other than that of an Employee.

No Year of Credited Service shall be credited for any purpose (including with respect to another plan that references this definition) for any period with respect to an Employee of an Employer if, during that period, the benefit formula is frozen pursuant to an instrument adopted by the Employer pursuant to Section 12.7, except that a Year of Credited Service shall be credited pursuant to this definition during such period for the following purposes:

(A) vesting under this Plan;

(B) eligibility for an early retirement benefit under this Plan;

(C) eligibility for an early payment under Section 6.2;

(D) the calculation under Section 12.7(c) with respect to employment with an Employer other than the Employer that froze the benefit formula (including, for example, to determine eligibility

to participate and the amount of benefits which the Participant is assumed to have accrued with respect to another Employer);

(E) qualifying for the NFL Medigap supplement; and

(F) qualifying for the League's post-retirement medical benefit.

(jj) <u>Year of Service</u> - A Year of Service shall be:

(1) Any Year of Credited Service; and

(2) Any Plan Year in which an employee completes one thousand (1000) Hours of Service for the Employer in any capacity; and

(3) Any Plan Year in which an Employee completes one thousand (1000) Hours of Service for the League;

provided that not more than one (1) Year of Service shall be credited with respect to any Plan Year.

2.2 <u>Plurals and Genders</u>.  For purposes of the Plan, the masculine gender shall include the feminine and neuter genders, and the singular, the plural, and vice versa, unless the context clearly indicates otherwise.

- 20 -

ARTICLE 3

PARTICIPATION AND BENEFICIARY DESIGNATION

3.1 Participation.  Effective July 24, 1995, every Employee automatically shall become a Participant in the Plan on the first day of the calendar quarter following the completion of 500 Hours of Service in a computation period (even if that day occurs before the end of the computation period).  For purposes of this Section, the initial computation period shall be the 12-month period beginning on the date the Employee completes his first Hour of Service; subsequent computation periods shall be the Plan Year (beginning with the Plan Year that includes the first anniversary of the commencement of the initial computation period); and an Employee's Hours of Service shall include Hours of Service with all Employers and the League.

3.2 Designation of Beneficiary.  Subject to Section 4.5(a)(3) hereof, and in the manner and form specified by the Committee, a Participant may designate or change the designation of the primary or contingent Beneficiary or Beneficiaries to receive benefits, if any, payable under the Plan upon the death of the Participant.  If a Participant fails to designate a Beneficiary, or if such Beneficiary is not living on the date of the Participant's death, the Participant's designated Beneficiary shall be the person or persons in the first of the following classes then living: (1) spouse, (2) children, (3) parents, and (4) estate of the Participant.  Neither an Employer nor the Trust shall be named a Beneficiary.

If a Participant designates the Participant's spouse as a Beneficiary, and the Participant and the Participant's spouse subsequently are divorced, the Participant's prior designation of the Participant's spouse as a Beneficiary automatically shall be void

except to the extent provided in a Qualified Domestic Relations Order; provided that, except as provided in a Qualified Domestic Relations Order, a Participant's spouse on the Participant's Benefit Commencement Date shall continue to be treated as the Participant's spouse notwithstanding any divorce after such Benefit Commencement Date.

- 22 -

ARTICLE 4

RETIREMENT BENEFITS

4.1 Normal Retirement Benefit.  Each Participant who retires upon attaining his Normal Retirement Age shall be entitled to receive, under the Plan, a monthly pension, commencing at his Normal Retirement Date, and payable in accordance with Section 4.5(a)(1) hereof, in an amount equal to the sum of:

(a)  The Participant's accrued benefit, if any, as of March 31, 1989, under either the Minimum Plan or the Coaches Plan, whichever is applicable; and

(b)  One-twelfth (1/12th) of the greater of:

(1)  The sum of

(A) three and one-half percent (3.5%) of the Participant's Final Average Compensation, multiplied by the lesser of (i) the Participant's aggregate Years of Credited Service with the Employers completed after March 31, 1989, or (ii) fifteen (15); and

(B) one-half of one percent (0.5%) of the Participant's Final Average Compensation in excess of Covered Compensation, multiplied by the lesser of (i) the Participant's aggregate Years of Credited Service with the Employers completed after March 31, 1989, or (ii) the lesser of (I) thirty-five (35) minus the Participant's Years of Credited Service completed prior to April 1, 1989, or (II) fifteen (15); or

(2)  Five percent (5%) of the Participant's Compensation (excluding Compensation in excess of $30,000) for the calendar year ending within

- 23 -

each of the Participant's Years of Credited Service beginning after March 31, 1989.

Notwithstanding the foregoing, the additional benefit earned by a Participant in any Plan Year shall not cause the Participant's Accrued Benefit at that time to exceed one-twelfth (1/12th) of seventy-five percent (75%) of the Participant's Final Average Compensation determined as of the end of such Plan Year.

If a Participant is employed by more than one Employer during his Years of Credited Service, and if the Participant's Final Average Compensation as of the end of his Years of Credited Service with an Employer is less than his Final Average Compensation as of the end of his Years of Credited Service with his immediately preceding Employer, the amount determined under Subsection (b), above, shall be the sum of (i) the amount determined under Subsection (b) for his Years of Credited Service with the immediately preceding Employer and (ii) the amount determined under Subsection (b) for his Years of Credited Service with his subsequent Employer.  The procedure described in the preceding sentence also shall be applied with respect to every subsequent period of employment with an Employer in which the Participant's Final Average Compensation as determined with respect to his Years of Credited Service with such Employer is less than his Final Average Compensation as of the end of his Years of Credited Service with his immediately preceding Employer.

4.2 Postponed Retirement Benefit.  Except as otherwise provided in Section 4.6 hereof, if a Participant continues in Active Service beyond his Normal Retirement Date, he shall receive a pension commencing as of the first day of the month coincident with or next following his termination of Active Service in an amount

- 24 -

determined in accordance with the provisions of Section 4.1 hereof on the basis of his Years of Credited Service and Compensation earned both before and after his Normal Retirement Date and payable in accordance with the provisions of Section 4.5 hereof, provided that the amount of the Participant's benefit shall not be less than the Participant's Accrued Benefit as of his Normal Retirement Date, actuarially adjusted to reflect the fact that it commences after the Participant's Normal Retirement Date, and provided further that the Participant's Accrued Benefit shall be actuarially increased to the extent required by Section 4.6(c) hereof.  Any deferral of benefits pursuant to this Section 4.2 shall be administered in accordance with the applicable provisions of Article 13 hereof.

4.3 Early Retirement Benefit.  If a Participant retires during the period within which he is eligible for Early Retirement, he shall be entitled to receive his Accrued Benefit beginning as of his Normal Retirement Date and payable in accordance with the provisions of Section 4.5 hereof.

Alternatively, a Participant who retires during the period in which he is eligible for Early Retirement may receive an Early Retirement benefit (payable in accordance with the provisions of Section 4.5 hereof) that shall commence on the first day of any month coincident with or following his Early Retirement Date and before his Normal Retirement Date (as elected by the Participant, by written notice to the Committee, in accordance with Sections 4.5(a)(3) and 4.11 hereof and in accordance with any rules adopted by the Committee), equal to his Accrued Benefit multiplied by the applicable percentage appearing in the Table set forth at the end of this Article 4.

        4.4 <u>Disability Benefit</u>.  An Employee (or a Participant with a vested interest in his Accrued Benefit), who prior to his Normal Retirement Date is determined by the Committee upon written application to be totally and permanently disabled, shall be entitled to receive, at the Employee's or Participant's election, either (i) a monthly benefit in an amount that is equal to the benefit determined in accordance with Section 4.1 hereof and payable in accordance with the provisions of Section 4.5 hereof, and that is not reduced to reflect the commencement of benefits prior to the Participant's Normal Retirement Date, or (ii) a lump sum that is the Actuarial Equivalent of the benefit that the Participant would have received if the Participant had terminated his employment with the Employers on the earlier of his actual date of separation from service or the date of disability, and who retired with his monthly pension payable in accordance with the provisions of Section 4.5 hereof and scheduled to commence on his Normal Retirement Date; provided that the Benefit Commencement Date shall be determined in accordance with Sections 4.5(a)(3) and 4.10 hereof.  The monthly benefit pursuant to clause (i), above, shall be retroactive to the date of disability and shall be payable only for the Participant's life; provided that the benefit shall be payable only until the cessation of the disability and only for the period of time that the Participant either (x) is eligible for and receives disability benefits under the Social Security Act or (y) would be eligible to receive disability benefits under the Social Security Act but for the service requirements prescribed by the Social Security Act.  Notwithstanding the foregoing, upon reaching his Normal Retirement Date, a Participant who is receiving a monthly benefit pursuant to clause (i), above, shall cease to receive such monthly benefit and shall begin to receive a monthly pension pursuant to the provisions of Sections 4.1 and 4.5 hereof.

- 26 -

4.5 Benefit Payment Options.

(a)  The Basic Option for payment of a benefit to a Participant who takes Normal Retirement, Early Retirement, or Postponed Retirement, or who terminates employment with a vested right to a benefit pursuant to Article 6 hereof shall be as follows:

(1)  Unmarried Participant.  Subject to Paragraph (3), below, if a Participant is unmarried on the Participant's Benefit Commencement Date, his monthly benefit, as computed in accordance with Section 4.1, 4.2, 4.3, 6.1, or 6.2 hereof, shall be paid during his lifetime and, upon his death, all payments shall cease.

(2)  Married Participant.  Subject to Paragraph (3), below, if the Participant is married on his Benefit Commencement Date, a joint and survivor annuity of Equivalent Actuarial Value to the monthly benefit described by Paragraph (1), above, shall be payable with a reduced monthly benefit payable to and during the lifetime of the retired Participant and, after the retired Participant's death, one-half (1/2) of such reduced monthly benefit shall be payable to and during the lifetime of the spouse to whom the Participant was married on his Benefit Commencement Date.

(3)  Election procedure.  At any time during the election period of ninety (90) days ending on the Participant's Benefit Commencement Date, a Participant may elect to receive a benefit payable in accordance with one of the options set forth in Section 4.5(b) hereof in lieu of the Basic Option

- 27 -

or may revoke any such election. The elections or revocations described in the preceding sentence shall be subject to the following terms and conditions, and shall be valid only if made after the Participant has received the general written explanation described in Section 4.5(a)(4) hereof:

> (A)     Any election or revocation shall be made not more than ninety (90) days prior to the Participant's Benefit Commencement Date by giving written notice on the form provided by the Committee.

> (B)     If the Participant is married on his Benefit Commencement Date and the Equivalent Actuarial Value of the Participant's Accrued Benefit exceeds $5,000, the election of any optional form of benefit by the Participant shall be ineffective unless the Participant's spouse consents in writing to such election. The spouse's consent must acknowledge the effect of such election and must be witnessed by a notary public.  The consent must also acknowledge the Beneficiary, including any class of Beneficiaries or contingent Beneficiaries (unless the spouse has executed a general written consent to the Participant's future designation of a Beneficiary or Beneficiaries without further spousal consent).  If the spouse has executed a general written consent, such consent also must acknowledge (i) the effect of the general written consent and (ii) the spouse's option to elect a more limited form of consent.

- 28 -

Notwithstanding the preceding provisions of this Subparagraph (B), the Participant may elect, during the election period, without obtaining spousal consent, to receive an optional benefit that is in the form of a qualified joint and survivor annuity as defined in section 417(b) of the Code.  If the Participant elects to receive his benefit in a form other than a qualified joint and survivor annuity as defined in section 417(b) of the Code with a Benefit Commencement Date preceding his Normal Retirement Date, and the Equivalent Actuarial Value of the Participant's Accrued Benefit exceeds $5,000, the election shall not be effective unless the Participant's spouse consents to the Benefit Commencement Date elected by the Participant.

(C)     Subparagraph (B), above, shall not apply if it is established to the satisfaction of the Committee that the consent required therein cannot be obtained because there is no spouse, because the spouse cannot be located, or because of any other circumstances described in regulations issued under section 417 of the Code.

(D)     Any consent by a spouse pursuant to Subparagraph (B) shall be effective only with respect to such spouse and only with respect to the Beneficiary, class of Beneficiaries, and contingent Beneficiaries designated therein, unless the spouse has executed a general written consent to the Participant's future

designation of a Beneficiary or Beneficiaries without further spousal consent.  Similarly, any establishment that the consent of a spouse cannot be obtained for the reasons described in Subparagraph (C), above, shall be effective only with respect to that spouse.

(E)     The revocation of a Participant's election to waive the Basic Option may be made by the Participant without the consent of the Participant's spouse.  The Participant's spouse may not revoke any consent given pursuant to Subparagraph (B), above.

(F)     For purposes of this Section 4.5, a Participant's former spouse shall not be treated as his spouse or surviving spouse except to the extent provided in a Qualified Domestic Relations Order.

(G)     The election of any option permitted under this Section 4.5 shall be null and void if either the Participant or his Beneficiary dies before the Participant's Benefit Commencement Date, except that the election of a life benefit with payments guaranteed shall not become ineffective merely because the Beneficiary dies before the Benefit Commencement Date.

(H)     A Participant may not revoke an election on or after the Participant's Benefit Commencement Date.

(4) Notice Requirements.  At least thirty (30) days (but not more than ninety (90) days) before the Participant's Benefit Commencement

Date, the Committee shall provide such Participant with a written explanation that includes the following:

(A)     the terms and conditions of the Basic Option described in this Section 4.5(a);

(B)     the Participant's right to make, and the financial effect of making, an election to waive the Basic Option described in this Section 4.5(a);

(C)     a general description of the eligibility conditions, the relative values (as compared with the normal form of benefit), and other material features of the optional forms of benefit;

(D)     the rights of the Participant's spouse, if any, with respect to such election; and

(E)     the right of a Participant to revoke and the effect of revoking a prior election to waive the Basic Option described in this Section 4.5(a);

provided that the Committee may provide such written explanation less than thirty (30) days before the Participant's Benefit Commencement Date if the Participant elects to waive the thirty (30) day notice requirement (and the Participant's spouse's consents to such waiver if the Participant is married on his Benefit Commencement Date) and if the distribution begins more than seven (7) days after such written explanation is provided to the Participant.

(b) In lieu of receiving the monthly benefit provided in Section 4.5(a) hereof and subject to Section 4.5(a)(3) hereof, a Participant may elect to receive his benefit in accordance with any other option permitted by the Plan that is of Equivalent Actuarial Value to the benefit to which he is entitled.  Such options are as follows:

(1) A reduced monthly benefit payable to and during the lifetime of the retired Participant with the provision that after his death, a pension of one hundred percent (100%), sixty-six and two-thirds percent (66-2/3%), or fifty percent (50%) of his reduced benefit shall then be paid to and during the lifetime of his designated Beneficiary.

(2) A reduced monthly benefit paid during the lifetime of the retired Participant with a minimum of one hundred twenty (120) monthly payments to be paid to him and/or his designated Beneficiary.

(3) Effective April 1, 1990, a lump-sum payment, provided that (i) the Participant is eligible for Early Retirement, Disability Retirement, or Normal Retirement before the Participant's Benefit Commencement Date and (ii) if the Participant has not attained Normal Retirement Age, the Participant has not been employed professionally in football for at least six (6) months before his Benefit Commencement Date.  Notwithstanding the foregoing, a Participant may elect a lump-sum distribution of the Equivalent Actuarial Value of his Accrued Benefit (determined without regard to any Years of Credited Service completed as a Coach) if a lump-sum distribution in excess of $3,500 customarily was permitted by the Participant's Employer before April 1, 1990 under the Minimum Plan.

(4) Effective August 1, 2004, a reduced monthly benefit payable during the lifetime of the Participant, with the provision that after the Participant's death, a lump-sum payment shall be made to the Participant's Beneficiary, which payment shall be equal to the excess (if any) of (i) an amount equal to the Equivalent Actuarial Value of the Participant's Accrued Benefit as of the Participant's Benefit Commencement Date over (ii) the sum of the monthly benefit payments made to or in respect of the Participant pursuant to this paragraph; provided that the actuarial assumptions used to calculate both the reduced monthly benefit and the amount in clause (i) shall be those that apply to lump-sum distributions in accordance with Exhibit I hereto.

(5) Effective with respect to Benefit Commencement Dates occurring in Plan Years beginning on or after April 1, 2008, a reduced monthly benefit payable to and during the lifetime of the retired Participant with the provision that after his death, a pension of seventy-five percent (75%) of his reduced benefit shall then be paid to and during the lifetime of (i) the Participant's spouse to whom the Participant was married on his Benefit Commencement Date or (ii) another individual Beneficiary designated by the Participant.  This is intended to be the "qualified optional survivor annuity" within the meaning of section 417(g) of the Code.

Notwithstanding anything herein to the contrary, unless the option is a qualified joint and survivor annuity, as defined in section 417(b) of the Code, the present

value of the payments to be made to the Participant under any option must exceed fifty percent (50%) of the present value of the total payments to be made to the Participant and his Beneficiaries under that option, determined in accordance with the actuarial assumptions specified in Exhibit I hereto.

(c)  Notwithstanding any other provision of the Plan, if a Participant retires from, or otherwise terminates employment with, the Employer with a nonforfeitable right to a benefit under the Plan, and the immediate lump-sum payment that is the Actuarial Equivalent of such benefit does not exceed $5,000 ($1,000 for distributions on or after March 28, 2005), such benefit shall be paid in a lump sum to the Participant as soon as administratively practicable following such retirement or termination.  For the purpose of the preceding sentence, the interest rate used to determine the amount of the lump-sum payment shall be the interest rate specified by Exhibit I hereof.

4.6 Limitations on Methods of Distribution.

(a)  Notwithstanding any other provision of the Plan, no benefit shall be distributed under the Plan pursuant to any schedule unless the amount, timing, and recipient of each distribution under the schedule satisfy section 401(a)(9) of the Code and the regulations thereunder, including the incidental benefit requirement imposed by section 401(a)(9)(G) of the Code.

(b) Except to the extent earlier commencement is required under another provision of the Plan, the Participant's Benefit Commencement Date shall occur not later than April 1 of the calendar year following the later of (1) the calendar year in which he attains age seventy and one-half (70-1/2) or (2) the calendar year in which he

- 34 -

retires.  Clause (2) of the preceding sentence shall not apply to a Participant who is a five

percent (5%) owner (as defined in section 416(i)(1)(B) of the Code) with respect to the

Plan Year ending with or within a calendar year in which he reaches age seventy and one-

half (70-1/2).  In addition, a Participant who became a Participant before April 1, 2002,

and attains age seventy and one-half (70-1/2) before April 1, 2002, may irrevocably elect,

at the time and in the manner prescribed by the Committee, to disregard such clause (2).

Participants who were receiving benefit distributions as of March 31, 1997, that were

required by this Section 4.6 as in effect on that date may, based on such clause (2),

irrevocably elect, at the time and manner prescribed by the Committee, to stop such

distributions.

       (c)  If the Participant's Benefit Commencement Date occurs after

the calendar year in which the Participant attains age seventy and one-half (70-1/2), the

Participant's Accrued Benefit shall be actuarially increased to take into account the

period after age seventy and one-half (70-1/2) in which the Participant did not receive

benefits under the Plan.

       (d)  With respect to distributions under the Plan made on or after

October 1, 2001, and before January 1, 2003, the Plan shall apply the minimum

distribution requirements of section 401(a)(9) of the Code in accordance with the

regulations under section 401(a)(9) that were proposed on January 17, 2001,

notwithstanding any provision of the Plan to the contrary.

       (e)  The rules described in this Subsection (e), which are intended

to reflect the requirements of final Treasury Regulations under Code section 401(a)(9),

shall apply to distributions in calendar years beginning on or after January 1, 2003, and

shall take precedence over any inconsistent provision of the Plan; provided, however, that a distribution in calendar year 2003, 2004, or 2005 which does not satisfy all of the requirements of this Subsection (e) or final Treasury Regulations but is otherwise based on a reasonable good faith interpretation of the provisions of Code section 401(a)(9) shall not constitute a failure to operate the Plan in accordance with its terms or Code section 401(a)(9) and Treasury Regulations thereunder.

      (1)  Unless the Participant's benefit is distributed in the form of a lump sum on or before the date described in the preceding Subsection (b), distribution shall be made to the Participant in any annuity form of payment set forth in Section 4.5, subject to the following restrictions (in addition to any restrictions otherwise set forth in Section 4.5):

      (A)  Annuity payments shall be made at uniform intervals not longer than one year and shall be nonincreasing or increase only as permitted under Q&A-14 of Treas. Reg. § 1.401(a)(9)-6.

      (B)  Annuity payments must commence on or before the required starting date described in the preceding Subsection (b). The first payment, which must be made on or before the required starting date, must be the payment that is required for one payment interval.  All benefits accrued as of the last day of the first distribution calendar year (i.e., the calendar year immediately preceding the calendar year containing the participant's required starting date) must be included in the amount of any annuity

payments for payment intervals ending on or after the Participant's required starting date.

(C) Annuity payments may be for the Participant's life or for the joint lives of the Participant and a designated beneficiary.

(i)     Payments may be made in the form of an annuity for the Participant's life with a period certain provided that: (a) the period certain for any distribution with a Benefit Commencement Date that occurs during or after the calendar year containing the Participant's 70th birthday does not exceed the applicable distribution period for the Participant, determined in accordance with the Uniform Lifetime Table in Q&A-2 of Treas. Reg. § 1.401(a)(9)-9, for the calendar year that contains the Benefit Commencement Date and (b) the period certain for any distribution with a Benefit Commencement Date that occurs during a calendar year before the year containing the Participant's 70th birthday does not exceed the distribution period for age seventy (70), determined using the Table described in (a), plus the excess of 70 over the age of the Participant as of the Participant's birthday in the calendar year that contains the Benefit Commencement Date.

(ii)     If payments to the Participant are made in the form of a joint and survivor annuity for the life of the

Participant and a designated beneficiary, and the Participant has named a beneficiary other than his spouse, annuity payments to be made to the beneficiary after the Participant's death must not at any time exceed the applicable percentage of the annuity payment for such period that would have been payable to the Participant, with the applicable percentage determined using: (a) for Benefit Commencement Dates occurring before January 1, 2006, the table set forth in Q&A-6 of Proposed Treas. Reg. § 1.401(a)(9)-2, and (b) for Benefit Commencement Dates occurring on or after January 1, 2006, the table set forth in Q&A-2 of Treas. Reg. § 1.401(a)(9)-6 based on the adjusted employee/beneficiary age difference (as determined under Q&A-2(c)(1)).  If a form of payment combines a joint and survivor annuity for the joint lives of the Participant and a non-spouse beneficiary and a period certain, the requirement in this clause (ii) shall apply to payments to be made to the designated beneficiary after the period certain expires.

(iii)    Once annuity payments have started, the period over which payments are made may not be changed, except as permitted under Q&A-13 of Treas. Reg. § 1.401(a)(9)-6.

- 38 -

(iv)      If a Participant dies on or after his Benefit Commencement Date, any benefit payable under the Plan after his death shall be distributed at least as rapidly as benefits were distributed under the method of distribution being used as of the date of the Participant's death.

(2)  Any additional benefits accruing to a Participant in a calendar year after the first distribution calendar year shall be distributed beginning with the first payment interval ending in the calendar year immediately following the calendar year in which such amount accrues, in accordance with Q&A-5 of Treas. Reg. § 1.401(a)(9)-6.

(3)  If a Participant dies before his Benefit Commencement Date and:

(A) The Participant has no designated beneficiary as of September 30 of the calendar year following the calendar year of the Participant's death, the death benefit (if any) payable under the terms of the Plan following his death shall be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(B) The Participant's designated beneficiary for purposes of any death benefit payable pursuant to the terms of the Plan following the Participant's death is a person other than or in addition to the Participant's spouse, distribution to such beneficiary or beneficiaries shall commence in the form of a lump

sum or an annuity for the life of the beneficiary (if an individual) as prescribed by any applicable provision of the Plan; provided, however, that in no event shall distribution commence later than December 31 of the calendar year immediately following the calendar year in which the Participant died.

(C) The Participant's sole designated beneficiary for purposes of any death benefit payable pursuant to the terms of the Plan following the Participant's death is the Participant's spouse, distribution to the spouse shall commence in the form of a lump sum or an annuity for the life of the spouse as prescribed by any applicable provision of the Plan; provided, however, that in no event shall distribution commence later than December 31 of the calendar year immediately following the calendar year in which the Participant died, or December 31 of the calendar year in which the Participant would have attained age seventy and one-half (70-1/2), if later.  If the spouse dies before distribution commences to the spouse, Subparagraphs (A) and (B) of this Paragraph (3) shall apply as if the spouse were the Participant.

Annuity payments for the life of a Participant's spouse or individual beneficiary shall be made at uniform intervals of one year or less and shall be nonincreasing or increase only as permitted under Q&A-14 of Treas. Reg. § 1.401(a)(9)-6.

(f)  This Section 4.6 shall not override any distribution option elected by an employee before January 1, 1984, in accordance with section 242(b)(2) of

- 40 -

the Tax Equity and Fiscal Responsibility Act of 1982 (as in effect before the amendments made by the Tax Reform Act of 1984).

(g) This Section 4.6 shall apply notwithstanding any other provision of the Plan.  The sole purpose of this Section 4.6 is to limit the manner in which benefit payments may be made under the Plan in accordance with section 401(a)(9) of the Code.  This Section 4.6 does not confer any rights or benefits upon any Participant, spouse, Beneficiary, or any other person.

4.7 Incidental Benefit.  Any distribution required under the incidental death benefit requirements of section 401(a) of the Code shall be treated as a distribution required under section 401(a)(9) of the Code.  The provisions of this Section 4.7 shall override any distribution options in the Plan that are inconsistent with section 401(a)(9) of the Code.

4.8 Incompetence.  If the Committee receives evidence satisfactory to it that a Participant or Beneficiary entitled to receive any benefit under the Plan is, at the time when such benefit becomes payable, adjudicated incompetent to receive such benefit and to give a valid release therefor, and that another person or an institution is then maintaining or has custody of such Participant or Beneficiary, and that no guardian, committee or other representative of the estate of such Participant or Beneficiary shall have been duly appointed, the Committee may authorize the Trustee to distribute such benefit to such other person or institution, and the release of such other person or institution shall be valid and complete discharge for the payment of such benefit.

4.9 Missing Persons.  The Committee shall make a reasonable effort to locate all persons entitled to benefits under the Plan.  Should the Committee be unable to

- 41 -

locate any person entitled to benefits, such benefits shall be forfeited, but such benefits shall be reinstated and be payable to such person at any future date that such person is located by the Committee but in no case later than sixty (60) days after the date any person entitled to benefits is located.  Before the Committee may deem that a person cannot be located, the Committee shall send a certified letter to such person at his last known address advising him that benefit payments shall be forfeited unless the person responds to such certified letter.

4.10    Distribution Before Normal Retirement Age.

(a)  Notwithstanding any other provision in the Plan, if the Equivalent Actuarial Value of a benefit that is payable to a Participant (or his surviving spouse, in the case of a benefit payable under Article 5 hereof) exceeds $5,000, the distribution of that benefit may not be made or commence before the Participant attains (or, if not living, would have attained) his Normal Retirement Age unless the Participant (or his surviving spouse, in the case of a benefit payable under Article 5 hereof) so elects not more than ninety (90) days before the Benefit Commencement Date in writing on the form provided by the Committee.  An election pursuant to this Section 4.10 shall not be effective unless, not less than thirty (30) days, and not more than ninety (90) days, before the Benefit Commencement Date, and before the Participant makes the election, the Committee provides the Participant (or, if applicable, the Participant's spouse)  with a written explanation of the material features of the optional forms of benefit available under the Plan and of the right to defer the Benefit Commencement Date, and for explanations provided on or after April 1, 2007, the consequences of failing to defer commencement; provided that the Committee may provide such description less than

- 42 -

thirty (30) days before the Benefit Commencement Date if the Participant (or, if applicable, the Participant's spouse) elects to waive the thirty (30) day notice requirement and if the distribution begins more than seven (7) days after such written explanation is provided to the Participant (or, if applicable, the Participant's spouse).

(b) Unless a Participant elects otherwise, and except as otherwise provided in Section 4.6 hereof, a benefit that is payable to a Participant shall be distributed or commence not later than the 60th day after the end of the Plan Year in which the latest of the following events occurs: (1) the Participant attains Normal Retirement Age; (2) the Participant's termination of service with the Employer; or (3) the Participant's tenth (10th) anniversary of initial participation in the Plan (or, if applicable, the Coaches Plan or the Minimum Plan).  For purposes of this Subsection (b), a Participant shall be deemed to have elected to defer payment if the Participant fails to apply for distribution of his benefit, in the form and manner prescribed by the Committee, before the date described in the immediately preceding sentence.

4.11    Direct Rollover.  If a Participant, a surviving spouse, or a spouse alternate payee named in a Qualified Domestic Relations Order is entitled to receive an "eligible rollover distribution" from the Plan, the Plan shall, at the election of the recipient, make a direct rollover of the distribution to an "eligible retirement plan." Notwithstanding the foregoing, the recipient may not make a direct rollover if the Committee reasonably expects the total of such "eligible rollover distributions" from the Plan to the recipient to be less than $200 in the Plan Year.  For purposes of this Section 4.11, an "eligible rollover distribution" is a distribution of all or any portion of the balance to the credit of the distributee except that an eligible rollover distribution does

not include (i) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; (ii) any distribution to the extent such distribution is required under section 401(a)(9) of the Code; (iii) any distribution that is not includible in gross income, determined without regard to the exclusion for net unrealized appreciation set forth in section 402(e)(4) of the Code (except that this clause (iii) shall not apply to such distribution to the extent that such portion is transferred in a direct trustee-to-trustee transfer to an IRA or a qualified trust that is part of a plan that is a defined contribution plan and that agrees to account separately for amounts so transferred, including accounting separately for the portion of such distribution that is includible in gross income and the portion that is not so includible); and (iv) any distribution that is made upon the hardship of the distributee. For purposes of this Section 4.11, an "eligible retirement plan" is a plan described in section 402(c)(8)(B) of the Code (as modified by section 402(c)(9) and (10) of the Code) and, effective January 1, 2008, section 408A(b) of the Code, except that a qualified trust shall be considered an eligible retirement plan only if its terms permit the acceptance of rollover distributions.  This Section 4.11 is intended, and shall be construed, solely to satisfy the direct rollover requirements of section 401(a)(31) of the Code; except to the extent specifically provided above in the definition of "eligible retirement plan," it shall not confer any rights other than those required under section 401(a)(31) of the Code and the regulations thereunder.

- 44 -

4.12    Rollovers for Non-Spouse Beneficiaries.   To the extent permitted under Code section 402(c)(11) and related guidance issued by the Secretary of the Treasury, a non-spouse Beneficiary (qualifying as a designated beneficiary under Code section 401(a)(9)(E)) who is receiving a distribution as a result of a Participant's death on or after April 1, 2008 that would be an "eligible rollover distribution" under Section 4.11 if the Beneficiary were the Participant's spouse may elect, in the manner prescribed by the Committee, to have all or part of such distribution transferred in a direct trustee-to-trustee transfer to an individual retirement account described in section 408(a) of the Code,  an individual retirement annuity (other than an endowment contract) described in section 408(b) of the Code, or a Roth IRA described in section 408A(b) of the Code that is established to receive such distribution and will be treated as an "inherited IRA" for the Beneficiary.

4.13    Funding-Based Limits on Benefits and Benefit Accruals.  Effective for Plan Years beginning after December 31, 2007, in accordance with section 401(a)(29) of the Code and to the extent applicable, the Plan shall comply with the funding-based limitations on benefits and benefit accruals described in section 436 of the Code and guidance issued thereunder (including, for example, the limitation on the payment of lump sums from underfunded plans).  The limitations described in this Section 4.13 shall be determined separately with respect to the benefits attributable to each Employer.  For this purpose, the benefits attributable to an Employer are the benefits under the Plan that are provided to employees of the Employer because of service with that Employer (including, but not limited to, any benefits attributable to an increase in

- 45 -

Final Average Compensation earned for service with that Employer, as applied to Years of Credited Service earned or deemed to have earned with a previous Employer.)

(a) Limitations Applicable If the Plan's Adjusted Funding Target Attainment Percentage Is Less Than 80 Percent, But Not Less Than 60 Percent. Notwithstanding any other provisions of the Plan, if the Plan's adjusted funding target attainment percentage for a Plan Year is less than 80 percent (or would be less than 80 percent to the extent described in Paragraph (2), below) but is not less than 60 percent, then the limitations set forth in this Subsection (a) apply.

(1) 50 Percent Limitation on Single Sum Payments, Other Accelerated Forms of Distribution, and Other Prohibited Payments. A Participant or beneficiary is not permitted to elect, and the Plan shall not pay, a single sum payment or other optional form of benefit that includes a prohibited payment with an annuity starting date on or after the applicable section 436 measurement date, and the Plan shall not make any payment for the purchase of an irrevocable commitment from an insurer to pay benefits or any other payment or transfer that is a prohibited payment, unless the present value of the portion of the benefit that is being paid in a prohibited payment does not exceed the lesser of:

(A) 50 percent of the present value of the benefit payable in the optional form of benefit that includes the prohibited payment; or

(B) 100 percent of the PBGC maximum benefit guarantee amount (as defined in Treas. Reg. § 1.436-1(d)(3)(iii)(C)).

The limitation set forth in this Paragraph (1) does not apply to any payment of a benefit which under section 411(a)(11) of the Code may be immediately distributed without the consent of the Participant.  If an optional form of benefit that is otherwise available under the terms of the Plan is not available to a Participant or beneficiary as of the annuity starting date because of the application of the requirements of this Paragraph (1), the Participant or beneficiary is permitted to elect to bifurcate the benefit into unrestricted and restricted portions (as described in Treas. Reg. § 1.436-1(d)(3)(iii)(D)).  The Participant or beneficiary may also elect any other optional form of benefit otherwise available under the Plan at that annuity starting date that would satisfy the 50 percent/PBGC maximum benefit guarantee amount limitation described in this Paragraph (1), or may elect to defer the benefit in accordance with any general right to defer commencement of benefits under the Plan.

(2) <u>Plan Amendments Increasing Liability for Benefits</u>.  No amendment to the Plan that has the effect of increasing liabilities of the Plan by reason of increases in benefits, establishment of new benefits, changing the rate of benefit accrual, or changing the rate at which benefits become nonforfeitable shall take effect in a Plan Year if the adjusted funding target attainment percentage for the Plan Year is:

(A) Less than 80 percent; or

(B) 80 percent or more, but would be less than 80 percent if the benefits attributable to the amendment were taken into account in determining the adjusted funding target attainment percentage.

The limitation set forth in this Paragraph (2) does not apply to any amendment to the Plan that provides a benefit under a Plan formula that is not based on compensation, provided that the rate of such increase does not exceed the contemporaneous rate of increase in the average wages of Participants covered by the amendment.

(b) <u>Limitations Applicable If the Plan's Adjusted Funding Target Attainment Percentage Is Less Than 60 Percent</u>.  Notwithstanding any other provisions of the Plan, if the Plan's adjusted funding target attainment percentage for a Plan Year is less than 60 percent (or would be less than 60 percent to the extent described in Paragraph (2), below), then the limitations in this Subsection (b) apply.

(1) <u>Single Sum Payments, Other Accelerated Forms of Distribution, and Other Prohibited Payments Not Permitted</u>.  A Participant or beneficiary is not permitted to elect, and the Plan shall not pay, a single sum payment or other optional form of benefit that includes a prohibited payment with an annuity starting date on or after the applicable section 436 measurement date, and the Plan shall not make any payment for the purchase of an irrevocable commitment from an insurer to pay benefits or any other payment or transfer that is a prohibited payment.  The limitation set forth in this Paragraph (1) does not apply to any payment of a benefit

- 48 -

which under section 411(a)(11) of the Code  may be immediately distributed without the consent of the Participant.

(2) <u>Shutdown Benefits and Other Unpredictable Contingent Event Benefits Not Permitted to Be Paid</u>.  An unpredictable contingent event benefit with respect to an unpredictable contingent event occurring during a Plan Year shall not be paid if the adjusted funding target attainment percentage for the Plan Year is:

(A) Less than 60 percent; or

(B) 60 percent or more, but would be less than 60 percent if the adjusted funding target attainment percentage were redetermined applying an actuarial assumption that the likelihood of occurrence of the unpredictable contingent event benefit during the Plan Year is 100 percent.

(3) <u>Benefit Accruals Frozen</u>.  Benefit accruals under the Plan shall cease as of the applicable section 436 measurement date.  In addition, if the Plan is required to cease benefit accruals under this Paragraph (3), then the Plan is not permitted to be amended in a manner that would increase the liabilities of the Plan by reason of an increase in benefits or the establishment of new benefits.

(c) <u>Limitations Applicable if the Employer Is In Bankruptcy</u>. Notwithstanding any other provisions of the Plan, a Participant or beneficiary is not permitted to elect, and the Plan shall not pay, a single sum payment or other optional form of benefit that includes a prohibited payment with an annuity starting date that

- 49 -

occurs during any period in which the Employer is a debtor in a case under title 11, United States Code, or similar Federal or State law, except for payments made within a Plan Year with an annuity starting date that occurs on or after the date on which the Plan's enrolled actuary certifies that the Plan's adjusted funding target attainment percentage for that Plan Year is not less than 100 percent.  In addition, during such period in which the Employer is a debtor, the Plan shall not make any payment for the purchase of an irrevocable commitment from an insurer to pay benefits or any other payment or transfer that is a prohibited payment, except for payments that occur on a date within a Plan Year that is on or after the date on which the Plan's enrolled actuary certifies that the Plan's adjusted funding target attainment percentage for that Plan Year is not less than 100 percent.  The limitation set forth in this Subsection (c) does not apply to any payment of a benefit which under section 411(a)(11) of the Code  may be immediately distributed without the consent of the Participant.

(d) <u>Provisions Applicable After Limitations Cease to Apply</u>.

(1) <u>Resumption of Prohibited Payments</u>.  If a limitation on prohibited payments under Section 4.13(a)(1), 4.13(b)(1), or 4.13(c) applied to the Plan as of a section 436 measurement date, but that limit no longer applies to the Plan as of a later section 436 measurement date, then that limitation does not apply to benefits with annuity starting dates that are on or after that later section 436 measurement date.

(2) <u>Resumption of Benefit Accruals</u>.  If a limitation on benefit accruals under Section 4.13(b)(3) applied to the Plan as of a section 436 measurement date, but that limitation no longer applies to the Plan as of a

later section 436 measurement date, then benefit accruals shall resume prospectively and that limitation does not apply to benefit accruals that are based on service on or after that later section 436 measurement date, except as otherwise provided under the Plan.  The Plan shall comply with the rules relating to partial years of participation and the prohibition on double proration under Section 2530.204-2(c) and (d) of the regulations prescribed by the Secretary of Labor.

(3) <u>Shutdown and Other Unpredictable Contingent Event Benefits</u>.  If an unpredictable contingent event benefit with respect to an unpredictable contingent event that occurs during the Plan Year is not permitted to be paid after the occurrence of the event because of the limitation of Section 4.13(b)(2), but is permitted to be paid later in the same Plan Year (as a result of additional contributions or pursuant to the enrolled actuary's certification of the adjusted funding target attainment percentage for the Plan Year that meets the requirements of Treas. Reg. § 1.436-1(g)(5)(ii)(B)), then that unpredictable contingent event benefit shall be paid, retroactive to the period that benefit would have been payable under the terms of the Plan (determined without regard to Section 4.13(b)(2)).  If the unpredictable contingent event benefit does not become payable during the Plan Year in accordance with the preceding sentence, then the Plan is treated as if it does not provide for that benefit.

(4) <u>Treatment of Plan Amendments That Do Not Take Effect</u>.  If a Plan amendment does not take effect as of the effective date of the

- 51 -

amendment because of the limitation of Section 4.13(a)(2) or 4.13(b)(3),

but is permitted to take effect later in the same Plan Year (as a result of

additional contributions or pursuant to the enrolled actuary's certification

of the adjusted funding target attainment percentage for the Plan Year that

meets the requirements of Treas. Reg. § 1.436-1(g)(5)(ii)(C)), then the

Plan amendment must automatically take effect as of the first day of the

Plan Year (or, if later, the original effective date of the amendment).  If the

Plan amendment cannot take effect during the same Plan Year, then it

shall be treated as if it were never adopted, unless the Plan amendment

provides otherwise.

      (e)  <u>Notice Requirement</u>.  See Section 101(j) of the Employee

Retirement Income Security Act of 1974, as amended, for rules requiring the plan

administrator of a single employer defined benefit pension plan to provide a written

notice to participants and beneficiaries within 30 days after certain specified dates if the

Plan has become subject to a limitation described in Section 4.13(a)(1), 4.13(b), or

4.13(c).

      (f)  <u>Methods to Avoid or Terminate Benefit Limitations</u>.  See

sections 436(b)(2), (c)(2), (e)(2), and (f) of the Code and Treas. Reg. § 1.436-1(f) for

rules relating to employer contributions and other methods to avoid or terminate the

application of the limitations set forth in Subsections (a), (b) and (c), above, for a Plan

Year.  In general, the methods a plan sponsor may use to avoid or terminate one or more

of the benefit limitations under Subsections (a) through (c), above, for a Plan Year

include employer contributions and elections to increase the amount of plan assets which

are taken into account in determining the adjusted funding target attainment percentage, making an employer contribution that is specifically designated as a current year contribution that is made to avoid or terminate application of certain of the benefit limitations, or providing security to the Plan.

(g) Special Rules.

(1) Rules of Operation for Periods Prior to and After Certification of Plan's Adjusted Funding Target Attainment Percentage.

(A) In General.  Section 436(h) of the Code and Treas. Reg. § 1.436-1(h) set forth a series of presumptions that apply (i) before the Plan's enrolled actuary issues a certification of the Plan's adjusted funding target attainment percentage for the Plan Year and (ii) if the Plan's enrolled actuary does not issue a certification of the Plan's adjusted funding target attainment percentage for the Plan Year before the first day of the 10th month of the Plan Year (or if the Plan's enrolled actuary issues a range certification for the Plan Year pursuant to Treas. Reg. § 1.436-1(h)(4)(ii) but does not issue a certification of the specific adjusted funding target attainment percentage for the Plan by the last day of the Plan Year).  For any period during which a presumption under section 436(h) of the Code and Treas. Reg. § 1.436-1(h) applies to the Plan, the limitations under Subsections (a) through (c), above, are applied to the Plan as if the adjusted funding target attainment percentage for the Plan Year were the presumed adjusted funding

target attainment percentage determined under the rules of section 436(h) of the Code and Treas. Reg. § 1.436-1(h)(1), (2) or (3). These presumptions are set forth in Subparagraphs (B) through (D), below.

(B) <u>Presumption of Continued Underfunding Beginning First Day of Plan Year</u>.  If a limitation under Subsection (a), (b), or (c), above, applied to the Plan on the last day of the preceding Plan Year, then, commencing on the first day of the current Plan Year and continuing until the Plan's enrolled actuary issues a certification of the adjusted funding target attainment percentage for the Plan for the current Plan Year, or, if earlier, the date Subparagraph (C) or (D), below, applies to the Plan:

> (i)     The adjusted funding target attainment percentage of the Plan for the current Plan Year is presumed to be the adjusted funding target attainment percentage in effect on the last day of the preceding Plan Year; and

> (ii)    The first day of the current Plan Year is a section 436 measurement date.

(C) <u>Presumption of Underfunding Beginning First Day of 4th Month</u>.  If the Plan's enrolled actuary has not issued a certification of the adjusted funding target attainment percentage for the Plan Year before the first day of the 4th month of the Plan

- 54 -

Year and the Plan's adjusted funding target attainment percentage
for the preceding Plan Year was either at least 60 percent but less
than 70 percent or at least 80 percent but less than 90 percent, or is
described in Treas. Reg. § 1.436-1(h)(2)(ii), then, commencing on
the first day of the 4th month of the current Plan Year and
continuing until the Plan's enrolled actuary issues a certification of
the adjusted funding target attainment percentage for the Plan for
the current Plan Year, or, if earlier, the date Subparagraph (D),
below, applies to the Plan:

(i)     The adjusted funding target attainment
percentage of the Plan for the current Plan
Year is presumed to be the Plan's adjusted
funding target attainment percentage for the
preceding Plan Year reduced by 10
percentage points; and

(ii)    The first day of the 4th month of the current
Plan Year is a section 436 measurement
date.

(D) Presumption of Underfunding On and After the First
Day of 10th Month. If the Plan's enrolled actuary has not issued a
certification of the adjusted funding target attainment percentage
for the Plan Year before the first day of the 10th month of the Plan
Year (or if the Plan's enrolled actuary has issued a range

certification for the Plan Year pursuant to Treas. Reg. § 1.436-1(h)(4)(ii) but has not issued a certification of the specific adjusted funding target attainment percentage for the Plan by the last day of the Plan Year), then, commencing on the first day of the 10th month of the current Plan Year and continuing through the end of the Plan Year:

      (i)    The adjusted funding target attainment percentage of the Plan for the current Plan Year is presumed to be less than 60 percent; and

      (ii)    The first day of the 10th month of the current Plan Year is a section 436 measurement date.

(2) <u>New Plans, Plan Termination, Certain Frozen Plans, and Other Special Rules</u>.

(A) <u>First 5 Plan Years</u>.  The limitations in Sections 4.13(a)(2), 4.13(b)(2), and 4.13(b)(3) do  not apply to a new plan for the first 5 plan years of the plan, determined under the rules of section 436(i) of the Code and Treas. Reg. § 1.436-1(a)(3)(i).

(B) <u>Plan Termination</u>.  The limitations on prohibited payments in Sections 4.13(a)(1), 4.13(b)(1), and 4.13(c) do not apply to prohibited payments that are made to carry out the termination of the Plan in accordance with applicable law.  Any

other limitations under this Section 4.13 do not cease to apply as a result of termination of the Plan.

(C) <u>Exception to Limitations on Prohibited Payments Under Certain Frozen Plans</u>.  The limitations on prohibited payments set forth in Sections 4.13(a)(1), 4.13(b)(1), and 4.13(c) do not apply for a Plan Year if the terms of the Plan, as in effect for the period beginning on September 1, 2005, and continuing through the end of the Plan Year, provide for no benefit accruals with respect to any Participants.  This Subparagraph (C) shall cease to apply as of the date any benefits accrue under the Plan or the date on which a Plan amendment that increases benefits takes effect.

(D) <u>Special Rules Relating to Unpredictable Contingent Event Benefits and Plan Amendments Increasing Benefit Liability</u>. During any period in which none of the presumptions under Section 4.13(g)(1) apply to the Plan and the Plan's enrolled actuary has not yet issued a certification of the Plan's adjusted funding target attainment percentage for the Plan Year, the limitations under Sections 4.13(a)(2) and 4.13(b)(2) shall be based on the inclusive presumed adjusted funding target attainment percentage for the Plan, calculated in accordance with the rules of Treas. Reg. § 1.436-1(g)(2)(iii).

(3) <u>Special Rules Under PRA 2010</u>.

(A) Payments Under Social Security Leveling Options.  For purposes of determining whether the limitations under Section 4.13(a)(1) or (b)(1) apply to payments under a social security leveling option, within the meaning of section 436(j)(3)(C)(i) of the Code, the adjusted funding target attainment percentage for a Plan Year shall be determined in accordance with the "Special Rule for Certain Years" under section 436(j)(3) of the Code and any Treasury Regulations or other published guidance thereunder issued by the Internal Revenue Service.

(B) Limitation on Benefit Accruals.  For purposes of determining whether the accrual limitation under Section 4.13(b)(3) applies to the Plan, the adjusted funding target attainment percentage for a Plan Year shall be determined in accordance with the "Special Rule for Certain Years" under section 436(j)(3) of the Code (except as provided under section 203(b) of the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010, if applicable).

(4)  Interpretation of Provisions.  The limitations imposed by this Section 4.13 shall be interpreted and administered in accordance with section 436 of the Code and Treas. Reg. § 1.436-1.

(h)  Definitions.  The definitions in the following Treasury Regulations apply for purposes of Subsections (a) through (g), above: Treas. Reg. § 1.436-1(j)(1) defining adjusted funding target attainment percentage; Treas. Reg. § 1.436-

- 58 -

1(j)(2) defining annuity starting date; Treas. Reg. § 1.436-1(j)(6) defining prohibited payment; Treas. Reg. § 1.436-1(j)(8) defining section 436 measurement date; and Treas. Reg. § 1.436-1(j)(9) defining an unpredictable contingent event and an unpredictable contingent event benefit.

(i)  Effective Date.  The rules in Subsections (a) through (h), above, are effective for Plan Years beginning after December 31, 2007.

(j)  No Obligations.  No Employer shall be required to (1) make additional contributions or (2) provide security to the Plan, and no fiduciary of the Plan shall be required to alter the method or timing of any actuarial valuation, in order to avoid, reduce, or trigger the application of any of the limitations described in this Section 4.13.

- 59 -

TABLE

MONTHLY PERCENTAGES TO BE APPLIED WHEN
BENEFIT COMMENCES PRIOR TO NORMAL RETIREMENT DATE

| Month | % | Month | % | Month | % | Month | % |
|-------|------|-------|------|-------|------|-------|------|
| 1 | 99.4 | 31 | 82.8 | 61 | 66.4 | 91 | 58.1 |
| 2 | 98.9 | 32 | 82.2 | 62 | 66.1 | 92 | 57.8 |
| 3 | 98.3 | 33 | 81.7 | 63 | 65.8 | 93 | 57.5 |
| 4 | 97.8 | 34 | 81.1 | 64 | 65.6 | 94 | 57.2 |
| 5 | 97.2 | 35 | 80.6 | 65 | 65.3 | 95 | 56.9 |
| 6 | 96.7 | 36 | 80.0 | 66 | 65.0 | 96 | 56.7 |
| 7 | 96.1 | 37 | 79.4 | 67 | 64.7 | 97 | 56.4 |
| 8 | 95.6 | 38 | 78.9 | 68 | 64.4 | 98 | 56.1 |
| 9 | 95.0 | 39 | 78.3 | 69 | 64.2 | 99 | 55.8 |
| 10 | 94.4 | 40 | 77.8 | 70 | 63.9 | 100 | 55.6 |
| 11 | 93.9 | 41 | 77.2 | 71 | 63.6 | 101 | 55.3 |
| 12 | 93.3 | 42 | 76.7 | 72 | 63.3 | 102 | 55.0 |
| 13 | 92.8 | 43 | 76.1 | 73 | 63.1 | 103 | 54.7 |
| 14 | 92.2 | 44 | 75.6 | 74 | 62.8 | 104 | 54.4 |
| 15 | 91.7 | 45 | 75.0 | 75 | 62.5 | 105 | 54.2 |
| 16 | 91.1 | 46 | 74.4 | 76 | 62.2 | 106 | 53.9 |
| 17 | 90.6 | 47 | 73.9 | 77 | 61.9 | 107 | 53.6 |
| 18 | 90.0 | 48 | 73.3 | 78 | 61.7 | 108 | 53.3 |
| 19 | 89.4 | 49 | 72.8 | 79 | 61.4 | 109 | 53.1 |
| 20 | 88.9 | 50 | 72.2 | 80 | 61.1 | 110 | 52.8 |
| 21 | 88.3 | 51 | 71.7 | 81 | 60.8 | 111 | 52.5 |
| 22 | 87.8 | 52 | 71.1 | 82 | 60.6 | 112 | 52.2 |
| 23 | 87.2 | 53 | 70.6 | 83 | 60.3 | 113 | 51.9 |
| 24 | 86.7 | 54 | 70.0 | 84 | 60.0 | 114 | 51.7 |
| 25 | 86.1 | 55 | 69.4 | 85 | 59.7 | 115 | 51.4 |
| 26 | 85.6 | 56 | 68.9 | 86 | 59.4 | 116 | 51.1 |
| 27 | 85.0 | 57 | 68.3 | 87 | 59.2 | 117 | 50.8 |
| 28 | 84.4 | 58 | 67.8 | 88 | 58.9 | 118 | 50.6 |
| 29 | 83.9 | 59 | 67.2 | 89 | 58.6 | 119 | 50.3 |
| 30 | 83.3 | 60 | 66.7 | 90 | 58.3 | 120 | 50.0 |

ARTICLE 5

<u>DEATH BENEFITS</u>

     **5.1** <u>No Other Death Benefit</u>.  Except to the extent provided by any option selected in accordance with Section 4.5(a)(3) hereof, or as otherwise provided in this Article 5, no death benefits shall be payable to any Beneficiary of a Participant.

     **5.2** <u>Requirements</u>.

     (a)  Subject to the provisions of Section 5.4 hereof, if a vested Participant dies on or after his Earliest Retirement Date and before his Benefit Commencement Date, the Participant's surviving spouse (if any) shall receive, beginning as of the Participant's Normal Retirement Date, the same monthly benefit that the spouse would have received if the Participant had terminated employment on the day before he died (or, if earlier, on the date on which his employment with the Employers actually terminated) with his monthly pension benefit payable in accordance with Section 4.5(a)(2) hereof and scheduled to commence on his Normal Retirement Date.

     (b)  Subject to the provisions of Section 5.4 hereof, if a vested Participant dies before his Earliest Retirement Date, the Participant's surviving spouse (if any) shall receive, beginning as of the Participant's Normal Retirement Date, the same monthly benefit that the spouse would have received if the Participant had:

     (1) terminated his employment with the Employers on the date he died (or, if earlier, on the date on which his employment with the Employers actually terminated),

     (2) survived to his Normal Retirement Date,

- 61 -

(3) retired with his monthly pension payable in accordance with Section 4.5(a)(2) hereof and scheduled to commence on his Normal Retirement Date, and

(4) died on has Normal Retirement Date.

(c)  The surviving spouse may elect, in accordance with Section 4.10 hereof, to have the benefit under this Section 5.2 commence as of the first day of any month before the Participant's Normal Retirement Date and on or after the later of the Participant's Earliest Retirement Date or the date of the Participant's death.  If the spouse's benefit is scheduled to commence before the Participant's Normal Retirement Date, the amount of the benefit shall be reduced by multiplying the benefit by the applicable percentage appearing in the Table at the end of Article 4 hereof.

5.3 <u>Lump-Sum Death Benefit</u>.

(a)  If a Participant who has completed at least one (1) Hour of Service on or after April 1, 1989, dies after becoming eligible for Early Retirement or Normal Retirement and before the Participant's Benefit Commencement Date, a lump-sum death benefit shall be paid to the Participant's Beneficiary described in Section 3.2 hereof; provided that the Participant's designation of a Beneficiary for purposes of this Section 5.3 shall not be subject to or governed by the provisions of Section 4.5(a)(3) hereof.

(b)  Unless Subsection (c), below, applies, the Beneficiary of a Participant described in Subsection (a), above, shall receive, a soon as practicable after the Participant's death, a lump-sum payment that is of Equivalent Actuarial Value to the Participant's Accrued Benefit as of the date of the Participant's death.

(c)  Notwithstanding Subsection (b), above, if the Participant described in Subsection (a), above, is married (or treated as married pursuant to a Qualified Domestic Relations Order) on the date of his death, and, on the date of the Participant's death, there is not in effect a waiver of spouse's preretirement death benefit executed by the Participant in accordance with Section 5.4 hereof, the Participant's Beneficiary shall receive, as soon as practicable after the Participant's death, a lump-sum payment equal to the excess, if any, of (i) a lump-sum amount that is of Equivalent Actuarial Value to the Participant's Accrued Benefit as of the date of the Participant's death over (ii) a lump-sum amount that is of Equivalent Actuarial Value to the spouse's preretirement death benefit, if any, provided pursuant to Section 5.2(a) hereof.

(d)  If the Participant's surviving spouse is entitled to a spouse's preretirement death benefit pursuant to Section 5.2(a) hereof, the surviving spouse may, before the date on which the spouse's preretirement death benefit is scheduled to commence, waive the spouse's preretirement death benefit and elect to receive, as soon as practicable after the election, in lieu of the spouse's preretirement death benefit, a lump-sum payment that is of Equivalent Actuarial Value to the spouse's preretirement death benefit on the date as of which the lump-sum payment is made.  Any such election must be in writing and prepared in a manner and form specified by the Committee.

5.4 Waiver of Spouse's Preretirement Death Benefit.

(a)  Subject to the provisions of Subsection (b), below, at any time during the election period beginning on the first day of the Plan Year in which the Participant attains age fifty five (55) (or, in the case of a Participant whose employment with the Employers terminates before he attains age fifty five (55), beginning on the date

of termination), and ending on his date of death, a Participant may elect to waive, in writing and in a manner and form specified by the Committee, the spouse's preretirement death benefit provided pursuant to Section 5.2(a) hereof.

(b) The Participant's waiver of the spouse's preretirement death benefit in accordance with Subsection (a), above, shall be effective only if made after the Participant has received the written explanation described in Subsection (c), below. During the election period described in Subsection (a), above, a Participant may revoke any election to waive the spouse's preretirement death benefit provided pursuant to Section 5.2(a) hereof.  Any such election or revocation shall be subject to the following terms and conditions:

(1) The Participant's election to waive the spouse's preretirement death benefit provided pursuant to Section 5.2(a) hereof shall be ineffective unless the Participant's spouse consents in writing to the election.  The spouse's consent must acknowledge the effect of the election and must be witnessed by a notary public.  The consent also must acknowledge the non-spouse Beneficiary, including any class of Beneficiaries or contingent Beneficiaries (unless the spouse has executed a general written consent to the Participant's future designation of a Beneficiary or Beneficiaries without further spousal consent).  If the spouse executes a general written consent, the consent also must acknowledge (i) the effect of the general written consent and (ii) the spouse's option to elect a more limited form of consent.

- 64 -

(2) Paragraph (1), above, shall not apply if it is established to the satisfaction of the Committee that the consent required thereby cannot be obtained because there is no spouse, because the spouse cannot be located, or because of any other circumstances described in regulations issued under section 417 of the Code.

(3) Any consent by a spouse pursuant to Paragraph (1), above, shall be effective only with respect to that spouse and only with respect to the Beneficiary, class of Beneficiaries, and contingent Beneficiaries designated therein, unless the spouse has executed a general written consent to the Participant's future designation of a Beneficiary or Beneficiaries without further spousal consent.  Similarly, any establishment that the consent of a spouse cannot be obtained for the reasons described in Paragraph (2), above, shall be effective only with respect to that spouse.

(4) The revocation of a Participant's election to waive the spouse's preretirement death benefit may be made by the Participant without the consent of the Participant's spouse.  The Participant's spouse may not revoke any consent given pursuant to Paragraph (1), above.

(5) For purposes of this Section 5.4, a Participant's former spouse shall not be treated as his spouse or surviving spouse except to the extent provided in a Qualified Domestic Relations Order.

(c)  (1) The Committee shall provide to each Participant a written notice setting forth an explanation of:

(A)     the spouse's preretirement death benefit provided pursuant to Section 5.2(a) hereof;

(B)     the lump-sum death benefit provided pursuant to Section 5.3 hereof;

(C)     the Participant's right to waive the spouse's preretirement death benefit;

(D)     the requirements regarding spousal consent to the waiver; and

(E)     the Participant's right to revoke the waiver.

(2) The Committee shall provide the notice described in Paragraph (1), above, within the later to end of:

(A)     the 12-month period beginning on the Participant's 55th birthday, or

(B)     the 12-month period beginning on the Participant's first day of participation in the Plan;

provided that in the case of a Participant whose employment with the Employers terminates before he attains age thirty five (35), the Committee shall provide the notice described in Paragraph (1), above, within the period beginning twelve (12) months before, and ending twelve (12) months after, the Participant's termination of employment with the Employers.  In the case of a Participant whose employment with the Employers terminates upon or after attaining age thirty five (35) but before attaining age fifty five (55), the Committee shall provide the notice described in Paragraph (1), above, both (i) within the period beginning twelve (12) months before, and ending twelve (12) months

after, the Participant's termination of employment with the Employers and (ii) during the

twelve (12) month period beginning on the Participant's fifty-fifth (55th) birthday.

- 67 -

## ARTICLE 6

## TERMINATION OF EMPLOYMENT

6.1 Deferred Vested Pension.  A Participant eligible for Normal Retirement (by attaining age sixty-five (65) while an Employee of an Employer), Postponed Retirement, or Early Retirement shall be one hundred percent (100%) vested in his Accrued Benefit.  If the employment of a Participant terminates for any reason other than his Normal Retirement, Postponed Retirement, Early Retirement, total and permanent disability or death, he shall be entitled to receive a deferred pension benefit to commence at his Normal Retirement Date equal to his Accrued Benefit, multiplied by the applicable percentage determined in accordance with the following schedule:

| Years of Service | Percentage Vested |
|---|---|
| Less than 3 | 0% |
| 3 but less than 4 | 60% |
| 4 but less than 5 | 80% |
| 5 or over | 100% |

6.2 Early Payment.  In lieu of a deferred pension benefit beginning at his Normal Retirement Date, a terminated Participant may elect to have his benefit commence as of the first day of any month coincident with or following his fifty-fifth (55th) birthday if he has completed five (5) Years of Credited Service as of his date of termination of employment with the Employers; such Benefit Commencement Date shall be determined by the Participant, in accordance with Sections 4.5(a)(3) and 4.10 hereof, by submitting written notice to the Committee in accordance with the rules adopted by the Committee.  If such benefit commences before the Participant's Normal Retirement Date, such benefit shall be equal to the deferred vested pension benefit, determined in

accordance with Section 6.1 hereof, multiplied by the applicable percentage appearing in the Table at the end of Article 4 hereof.

       6.3 <u>Payment Method</u>.  Provision for the payment of the benefit payable in accordance with this Article 6 shall be made in accordance with Section 4.5 hereof.

       6.4 <u>Termination of Employment Before Vesting</u>.  Effective April 1, 1995, if a Participant terminates employment with the Employers for any reason other than his Normal Retirement, Postponed Retirement, Early Retirement, total and permanent disability, or death, and before he has become vested in any portion of a deferred pension benefit as provided in Section 6.1 hereof (or Section 16.5 hereof, if applicable), the Participant shall be deemed to have received, as of his termination date, a distribution equal to the nonforfeitable portion of his Accrued Benefit (i.e., zero), and the forfeitable portion of his Accrued Benefit (i.e., his entire Accrued Benefit) shall be forfeited as of his termination date.  If such a former Participant is subsequently reemployed by an Employer, he (i) shall be deemed to have repurchased the nonforfeitable portion of his previous Accrued Benefit (which was deemed distributed pursuant to the preceding sentence) and (ii) shall have restored to him the forfeitable portion of his previous Accrued Benefit (which was forfeited pursuant to the preceding sentence).

- 69 -

ARTICLE 7

APPLICABLE LAW

The Plan shall be construed according to the Act and, to the extent not preempted thereby, in accordance with the laws of the State of Maryland (disregarding its choice of law rules).

- 70 -

# ARTICLE 8

## CONTRIBUTIONS

8.1 <u>Necessary Contributions</u>.  Subject to the provisions of Article 10 hereof, the Employers shall make contributions to the Trust from time to time sufficient to satisfy the minimum funding standards of the Act, and no contributions shall be required of any of the Participants. The contributions of each Employer shall be payable at such intervals and in such amounts as may be determined by the Committee. In this connection, the Committee, as often as necessary but at least once a year, shall have actuarial computations made in order to determine the amount that each Employer should contribute to the Trust.  The Committee shall engage the services of an actuary to propose such contributions. Such actuary shall determine the proposed contributions on the basis of actuarial assumptions that, in the aggregate, are reasonable, including a valuation of the assets of the Trust Fund based on a reasonable actuarial valuation that takes into account the fair market value of the assets of the Fund.  The Committee shall in its discretion approve, disapprove, or modify the proposed contributions determined by the actuary.

8.2 <u>Election to be Treated as Single Employer</u>.  The Committee has made the election described in section 413(c)(4)(B) of the Code, and the Plan shall be operated for purposes of this Article 8 as if it were maintained separately by each Employer. In determining the proposed amount of Employer contributions in accordance with Section 8.1 hereof, the actuary engaged by the Committee shall make all such determinations in accordance with the election described in the preceding sentence.

- 71 -

ARTICLE 9

<u>ADMINISTRATION</u>

**THE FOLLOWING PROVISIONS ARE EFFECTIVE**

**BEFORE DECEMBER 10, 2003**

9.1 <u>Administration</u>.  The administration of the Plan, as provided herein, including the supervision of the payment of all benefits to former Employees and their Beneficiaries, shall be vested in and be the responsibility of the Committee.

9.2 <u>Committee</u>.

(a)  The Committee shall consist of such number of persons, not less than three (3) nor more than five (5), as shall from time to time be determined by the Commissioner of the National Football League (the "Commissioner").  The members of the Committee and their successors shall be appointed from time to time by the Commissioner and shall serve at the pleasure of the Commissioner, without compensation, unless otherwise determined by the Commissioner.

(b)  A majority of the members of the Committee then serving shall constitute a quorum for the transaction of business.

(c)  Any act that the Plan authorizes or requires the Committee to do may be done by a majority of its members in office.

(d)  Members of the Committee may make decisions to take any action without calling a meeting, but any decision so made or action so taken shall be evidenced by a written instrument signed by a majority of the members of the Committee in office.  A majority of the members of the Committee in office may delegate to any one

- 72 -

of their number authority to sign documents on behalf of the Committee or to perform ministerial acts.

(e)  If at any time there shall be a vacancy on the Committee, then pending the appointment of a successor to fill such vacancy, the remaining members shall have the power to act on behalf of the Committee.

(f)  Subject to the restrictions set forth in Subsection (g), below, the Committee shall have all necessary powers incident to the creation, implementation and operation of the Plan and the Trust, including but not limited to the power, in its discretion:

(1)  To define and amend the terms of the Plan and Trust, to construe the Plan and Trust, and to reconcile inconsistencies therein.

(2)  To act in matters related to interpretation of benefits.

(3)  To determine eligibility for all forms of benefit under the Plan, and to determine the amount of any benefit under the Plan.

(4)  To supervise the payment of all benefits to former Employees and their Beneficiaries.

(5)  To adopt from time to time such By-Laws, procedures and forms as the Committee considers appropriate for the transaction of its business.

(6)  To select the Trustee or Trustees.

(7)  To select the actuary or actuaries for the Plan.

(8)  To select outside experts and consultants to provide services for the Plan.

- 73 -

(9) To select an investment manager or managers for the Plan.

(10)    To determine investment and funding policies for the Plan, which shall be communicated to the Trustee and any investment manager or managers.

(11)    To supervise all recordkeeping procedures for the Plan.

(12)    To pay all reasonable and necessary expenses of the Plan from the assets of the Trust.

Without limiting the generality of the foregoing, the Committee shall have the discretionary authority to make rules and regulations for the administration of the Plan that are not inconsistent with the terms, provisions, conditions and limitations of the Plan; to remedy possible ambiguities or omissions by general rule or particular decision; and to determine all questions arising out of or in connection with the provisions of the Plan or its administration (including questions concerning the eligibility of any Participant or Beneficiary for benefits under the Plan) in any and all cases in which the Committee deems such a determination advisable.

(b) No action of the Committee shall:

(1) Cause the Plan and Trust to fail to qualify under sections 401(a) and 501(a) of the Code, or cause any portion of contributions to the Plan to fail to be currently deductible by the Employers under section 404(a) of the Code, or

(2) Reduce, as a direct result of an amendment, any accrued benefit under the Plan.

- 74 -

(c)  The Committee shall provide appropriate written instructions to the Trustee signed by an authorized member or members of the Committee (or its authorized agent or representative) to enable the Trustee to make the distributions provided for in the Plan.  The Trustee shall make payment only upon receipt of such instructions and shall be entitled to rely upon any written notice, instruction, direction, certificate or other communication reasonably believed by the Trustee to be genuine and to be signed by an authorized member of the Committee (or its authorized agent or representative) or by an investment manager(s).

(d)  The Committee shall keep records of the operation of the Plan and all such records as may be necessary to determine each Participant's Compensation, Years of Credited Service, and Years of Service under the Plan. Any Participant may, upon reasonable demand, receive a copy of the Committee's records with respect to his status under the Plan, but shall have no right to information concerning any other person.

9.3  <u>Allocation of Responsibility</u>.  The duties, powers and responsibilities reserved to the Committee may be allocated among its respective members so long as such allocation is pursuant to action of a majority of its respective members, or by written agreement executed by a majority of its respective members, in which case, except as may be required by the Act, no member of the Committee shall have any responsibility or liability with respect to any duties, powers or responsibilities not allocated to him, for the acts or omissions of any other member.

9.4  <u>Delegation</u>.  The Committee shall have full power and authority to delegate its powers and duties to others and to appoint and delegate authority to any person or firms (including but not limited to accountants, investment manager(s),

counsel, actuaries, physicians, Trustee or Trustees, appraisers, consultants, professional

plan administrators and other specialists).  In addition, the Committee may act to secure

such specialized advice or assistance, as it deems necessary or desirable in connection

with the management of the Plan.  To the extent not prohibited by the Act, the Committee

shall be entitled to rely conclusively upon, and shall be fully protected in relying in good

faith upon, the actions, advice, or opinion of such persons or firms, provided that such

persons or firms were prudently chosen by the Committee, taking into account the

interests of the Participants and Beneficiaries and with due regard to the ability of the

persons or firms to perform their assigned functions.

      9.5 Investment Managers.  The Committee may appoint as an investment

manager, for the management (including the power to manage, acquire, or dispose) of all

or any part of the Trust assets, a person or firm described in section 3(38)(B) of the Act,

provided that such person or firm acknowledges to the Committee and the Trustee in

writing that it is a fiduciary with respect to the Plan.  If an investment manager has been

appointed, the investment manager shall have the investment powers and duties of the

Trustee with respect to the assets under its management, and the Trustee shall not be

liable for the acts or omissions of the investment manager, nor shall it be under any

obligation to invest or otherwise manage any Trust assets that are subject to the

management of the investment manager.

      9.6 Postponement of Action.  If any dispute arises as to any act to be

performed by the Committee, the members of the Committee may postpone the

performance of such act until actual adjudication of such dispute shall have been made by

a court of competent jurisdiction or until they shall be indemnified by the Employers

- 76 -

against any liability.  However, nothing herein shall be construed in a manner inconsistent with the Act.

9.7 Settlement of Claims.  The Committee shall have the power to accept, compromise, arbitrate or otherwise settle any obligation, liability, or claim by appropriate legal proceedings or measures.

9.8 Inspection of Records.   The Committee may inspect the records of any Employer to the extent that it may reasonably be necessary to determine any fact in connection with the acts to be performed under the Plan and the Trust.  The Committee shall not be required to make such inspection, but may rely on the written statement of such Employer, which statement, if the Committee so demands, shall be certified by a certified public accountant designated by the Employer.

9.9 Discretion.  Whenever in the Plan and the Trust discretionary powers are given to the Committee, it shall exercise its discretion in accordance with the Act.

9.10   Reliance on Plan Documents.  Any person dealing with the Committee may rely upon a copy of the Plan and the Trust and any amendments thereto that are certified by the Committee to be true and correct.

9.11   Payment of Expenses.  Unless otherwise determined by the Commissioner of the National Football League, the Committee shall serve without compensation for services as such.  However, the reasonable expenses of administering and operating the Plan, including the printing of literature and forms related thereto, the disbursement of benefits thereunder, the compensation of professional plan administrative organizations, agents, appraisers, actuaries, consultants, counsel, investment managers, the Trustee or other specialists may be paid from the assets of the

Trust Fund.  The Employer may initially pay any expense that would normally be paid by the Trust Fund and later obtain reimbursement from the Trust Fund.  The Employer may be reimbursed by the Trust Fund even where, at the time of the Employer's payment of the expense, it is not clear that the Trust Fund many lawfully reimburse the Employer, but the Trust Fund's ability to reimburse the Employer is later clarified.  Nothing in the Plan shall preclude the Employers from indemnifying the members of the Committee for all actions under the Plan, or from purchasing liability insurance to protect such persons with respect to their duties under the Plan.

> 9.12   <u>Service in More Than One Capacity</u>.  Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.

### THE FOLLOWING PROVISIONS ARE EFFECTIVE ON AND AFTER DECEMBER 10, 2003

> 9.1   <u>In General</u>.  The Committee shall be responsible for the administration of the Plan, including the supervision of the payment of all benefits to Participant and Beneficiaries, as provided herein and in the Trust Agreement.  The Investment Committee shall be responsible for oversight of the management of Plan assets, as provided herein and in the Trust Agreement.  Except as otherwise provided by the Act, the Committee shall not be responsible or liable for matters for which the Investment Committee is responsible hereunder and under the Trust Agreement, and the Investment Committee shall not be responsible or liable for matters for which the Committee is responsible hereunder and under the Trust Agreement.  Actions taken by the Committee in accordance with the Plan with respect to the management of Plan assets before the Investment Committee was made responsible for oversight of the management

- 78 -

of Plan assets shall remain valid and in effect until changed by the Investment Committee or until they expire by their terms.

9.2    <u>Committee</u>.

(a)  The members of the Committee and their successors shall be appointed from time to time by the Commissioner and shall serve at the pleasure of the Commissioner, without compensation, unless otherwise determined by the Commissioner.

(b)  A majority of the members of the Committee then serving shall constitute a quorum for the transaction of business.

(c)  Any act that the Plan authorizes or requires the Committee to do may be done by a majority of its members in office.

(d)  Members of the Committee may make decisions to take any action without calling a meeting, but any decision so made or action so taken shall be evidenced by a written instrument signed by a majority of the members of the Committee in office. A majority of the members of the Committee in office may delegate to any one of their number authority to sign documents on behalf of the Committee or to perform ministerial acts.

(e)  If at any time there shall be a vacancy on the Committee, then pending the appointment of a successor to fill such vacancy, the remaining members shall have the power to act on behalf of the Committee.

(f)  Subject to the restrictions set forth in Subsection (g), below, and in addition to any implied powers and duties that may be necessary to carry out the

- 79 -

provisions of the Plan, the Committee shall have all necessary powers incident to the creation, implementation and operation of the Plan, including but not limited to the power, in its discretion:

(1) To amend the Plan.

(2) To make rules and regulations for the administration of the Plan that are not inconsistent with the terms of the Plan.

(3) To interpret the Plan.

(4) To determine in its discretion all questions arising out of or in connection with the provisions of the Plan or the administration thereof (including questions concerning the eligibility of any participant or beneficiary for benefits under the Plan) in any and all cases in which the Committee deems such a determination advisable.  The Committee shall determine conclusively in its discretion all factual issues and all interpretive questions arising out of the interpretation or administration of the Plan.

(5) To enter into and amend the Trust Agreement, to construe the Trust Agreement, and to remedy any ambiguities and reconcile any inconsistencies therein.

(6) To appoint the Trustee or Trustees.

(7) To adopt from time to time such by-laws, procedures and forms as the Committee considers appropriate.

(8) To engage the actuary or actuaries for the Plan.

(9) To engage outside experts and consultants to provide services for the Plan.

(10)    To determine the funding policies for the Plan.

(11)    To supervise all recordkeeping procedures for the Plan.

(12)    To cause reasonable and necessary expenses of administering the Plan to be paid from the assets of the Trust (to the extent that such expenses are not paid by the Employer).

Without limiting the generality of the foregoing, the Committee shall have the discretionary authority to determine all questions (both factual and interpretive) relating to the application and interpretation of the terms of the Plan, or in connection with the administration thereof, including without limitation the right to remedy possible ambiguities, inconsistencies, or omissions by general rule or particular decision.

(g) No action of the Committee shall:

(1) Cause the Plan and Trust to fail to qualify under sections 401(a) and 501(a) of the Code, or cause any portion of contributions to the Plan to fail to be currently deductible by the Employers under section 404(a) of the Code, or

(2) Reduce, as a direct result of an amendment, any accrued benefit under the Plan.

(h) The Committee shall provide appropriate written instructions to the Trustee signed by an authorized member or members of the Committee (or its authorized agent or representative) to enable the Trustee to make the distributions provided for in the Plan.

(i)  The Committee shall keep records of the operation of the Plan and all such records as may be necessary to determine each Participant's Compensation, Years of Credited Service, and Years of Service under the Plan. Any Participant may, upon reasonable demand, receive a copy of the Committee's records with respect to his status under the Plan, but shall have no right to information concerning any other person.

9.3  <u>Investment Committee</u>.

(a)  The members of the Investment Committee and their successors shall be appointed from time to time by the Commissioner and shall serve at the pleasure of the Commissioner, without compensation, unless otherwise determined by the Commissioner.

(b)  A majority of the members of the Investment Committee then serving shall constitute a quorum for the transaction of business.

(c)  Any act that the Plan authorizes or requires the Investment Committee to do may be done by a majority of its members in office.

(d)  Members of the Investment Committee may make decisions to take any action without calling a meeting, but any decision so made or action so taken shall be evidenced by a written instrument signed by a majority of the members of the Investment Committee in office.  A majority of the members of the Investment Committee in office may delegate to any one of their number authority to sign documents on behalf of the Investment Committee or to perform ministerial acts.

(e) If at any time there shall be a vacancy on the Investment Committee, then pending the appointment of a successor to fill such vacancy, the remaining members shall have the power to act on behalf of the Investment Committee.

(f) The Investment Committee shall have all necessary powers incident to the management and supervision of the assets of the Plan and the Trust, including but not limited to the power, in its discretion:

(1) To appoint one or more Supervisory Managers for the Plan.

(2) To appoint one or more investment managers for the Plan.

(3) To determine the investment policies for the Plan, which shall be communicated to the Trustee or Trustees, any Supervisory Manager, and any investment manager or managers.

(4) To adopt from time to time such by-laws, procedures and forms as the Investment Committee considers appropriate.

(5) To engage outside experts and consultants to provide services for the Plan.

(6) To cause reasonable and necessary expenses of administering the Plan to be paid from the assets of the Trust (to the extent that such expenses are not paid by the Employer).

9.4    Supervisory Manager.

(a) Subject to such restrictions as the Investment Committee may impose, a Supervisory Manager shall be entitled to appoint one or more investment managers for the Plan. Any such appointment shall be made in accordance with the terms of the Trust Agreement and the requirements of the Act.

(b) A Supervisory Manager shall have the authority to take all actions necessary or appropriate to discharge its obligations under Section 9.4(a) hereof.

9.5     <u>Allocation of Responsibility</u>.  The duties, powers and responsibilities reserved to each of the Committee or the Investment Committee may be allocated among its respective members so long as such allocation is pursuant to action of a majority of its respective members, or by written agreement executed by a majority of its respective members, in which case, except as may be required by the Act, no member of the Committee or the Investment Committee shall have any responsibility or liability with respect to any duties, powers or responsibilities not allocated to him, for the acts or omissions of any other member.

9.6     <u>Delegation</u>.  The Committee and the Investment Committee shall each have full power and authority to delegate its powers and duties to others and to appoint and delegate authority to any person or firms (including but not limited to accountants, investment manager(s), counsel, actuaries, physicians, Trustee or Trustees, appraisers, consultants, professional plan administrators and other specialists).  In addition, the Committee and the Investment Committee may each act to secure such specialized advice or assistance as it deems necessary or desirable in connection with the management of the Plan.  To the extent not prohibited by the Act, the Committee and the Investment Committee shall each be entitled to rely conclusively upon, and shall each be fully protected in relying in good faith upon, the actions, advice, or opinion of such persons or firms, provided that such persons or firms were prudently chosen by the Committee or the Investment Committee, as the case may be, taking into account the

- 84 -

interests of the Participants and Beneficiaries and with due regard to the ability of the persons or firms to perform their assigned functions.

9.7     Investment Managers.  The Investment Committee or a Supervisory Manager may appoint an investment manager for the management (including the power to manage, acquire, or dispose) of all or any part of the Plan's assets.  Any such investment manager shall meet the requirements of section 3(38)(B) of the Act and shall acknowledge to the Investment Committee (or, if applicable, the Supervisory Manager) and the Trustee in writing that it is a fiduciary with respect to the Plan.  If an investment manager has been appointed, the investment manager shall have the investment powers and duties of the Trustee with respect to the assets under its management, and the Trustee shall not be liable for the acts or omissions of the investment manager, nor shall it be under any obligation to invest or otherwise manage any Trust assets that are subject to the management of the investment manager.

9.8     Postponement of Action.  If any dispute arises as to any act to be performed by the Committee or the Investment Committee, the members of the Committee or the Investment Committee, as the case may be, may postpone the performance of such act until actual adjudication of such dispute shall have been made by a court of competent jurisdiction or until they shall be indemnified by the Employers against any liability.  However, nothing herein shall be construed in a manner inconsistent with the Act.

9.9     Settlement of Claims.  The Committee and the Investment Committee shall each have the power to accept, compromise, arbitrate or otherwise settle

any obligation, liability, or claim within the scope of its responsibilities under the Plan by appropriate legal proceedings or measures.

        9.10   <u>Inspection of Records</u>.  The Committee may inspect the records of any Employer to the extent that it may reasonably be necessary to determine any fact in connection with the acts to be performed under the Plan and the Trust.  The Committee shall not be required to make such inspection, but may rely on the written statement of such Employer, which statement, if the Committee so demands, shall be certified by a certified public accountant designated by the Employer.

        9.11   <u>Reliance on Plan Documents</u>.  Any person dealing with the Committee or the Investment Committee may rely upon a copy of the Plan and the Trust Agreement and any amendments thereto that are certified by the Committee or the Investment Committee, as the case may be, to be true and correct.

        9.12   <u>Payment of Expenses</u>.  The reasonable expenses of administering the Plan, including the printing of literature and forms related thereto, the disbursement of benefits thereunder, the compensation of professional plan administrative organizations, agents, appraisers, actuaries, consultants, counsel, investment managers, the Trustee or other specialists may be paid from the assets of the Trust Fund to the extent that such expense are not paid by the Employer.  Subject to applicable law (including Prohibited Transaction Exemption 80-26 and any related or successor guidance), the Employer may initially pay any expense that would normally be paid by the Trust Fund and later obtain reimbursement from the Trust Fund.  The Employer may be reimbursed by the Trust Fund even where, at the time of the Employer's payment of the expense, it is not clear that the Trust Fund may lawfully reimburse the Employer, but

the Trust Fund's ability to reimburse the Employer is later clarified.  Nothing in the Plan shall preclude the Employers from indemnifying the members of the Committee and the Investment Committee for all actions under the Plan, or from purchasing liability insurance to protect such persons with respect to their duties under the Plan.

9.13   <u>Service in More Than One Capacity</u>.  Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.

9.14   <u>Named Fiduciaries</u>.  The Plan's named fiduciaries shall include the Committee, the Investment Committee, and any Supervisory Managers.  Each named fiduciary shall be responsible solely for the matters for which such fiduciary is responsible hereunder and shall not be responsible for matters that are the responsibility of other fiduciaries.  To the extent that the Committee or the Investment Committee acts in a settlor capacity with respect to the Plan, it shall act on behalf of the Employers and not as a Plan fiduciary.  The Investment Committee and each Supervisory Manager shall each be a named fiduciary with respect to the control and management of Plan assets.

ARTICLE 10

AMENDMENT, CURTAILMENT OR TERMINATION OF THE PLAN

      10.1    Power of Committee to Amend, Curtail or Terminate.  Subject to the provisions of Article 9 and Sections 10.4, 12.3, and 14.2 hereof, the Committee may by duly adopted written resolution amend, curtail, or terminate the Plan; provided that, except as provided in Sections 10.4 and 14.2 hereof, no amendment, curtailment, or termination of the Plan shall provide for any use of assets held under the Trust other than for the benefit of Employees and former Employees and their Beneficiaries, and the payment of the reasonable administration expenses of the Plan, and no assets of the Trust shall revert to or be used or enjoyed by any Employer.  Any such action shall be evidenced by an instrument in writing duly executed by the Committee, and a copy of such instrument shall be filed with the Employers and the Trustee.  Any amendment shall be effective as of the date specified therein and may be made effective retroactively.

      10.2    Consequences of Termination.  In the event of the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of the termination or partial termination shall be nonforfeitable to the extent funded as of such date; provided that, except as otherwise provided by the Act, in the event of such a termination or partial termination, no person shall have any recourse toward satisfaction of any benefits under the Plan from other than Plan assets and the Pension Benefit Guaranty Corporation.

      10.3    Payments on Termination.  Upon termination or partial termination of the Plan as described in Sections 10.1 and 10.2 hereof, the Committee, to the extent necessary, shall make provision for any expenses of the Trust and the Committee, and

shall thereafter allocate the assets attributable to the Employer affected, or all remaining assets of the Trust as appropriate.  After such allocation of assets, the Committee shall have the authority to direct liquidation and distribution of the Trust or to continue operation of the Plan and Trust in accordance with their provisions as from time to time established, including, as necessary, subsequent allocations of the Trust assets among persons entitled to benefits under the Plan in the manner provided in Section 10.4 hereof. In the event of liquidation of the Trust, distributions from the Trust on the basis of the allocation of assets described in Section 10.4 hereof may be made in cash or by means of group annuity contracts or certificates of equivalent value.

> 10.4    Allocation.  Upon the termination of the Plan, and subject to any necessary approval of the Pension Benefit Guaranty Corporation, the assets of the Fund shall be allocated by the Committee, to the extent that they are sufficient, in a manner that is not inconsistent with the order of precedence prescribed by section 4044 of the Act and any administrative regulations or determinations thereunder.  Any residual assets of the Fund that may remain after all liabilities of the Plan have been satisfied shall be distributed to the Employers in accordance with the determination of the Committee and consistent with the requirements of Section 12.1 hereof.

> 10.5    Responsibility for Distribution and Allocation.  Notwithstanding the preceding provision of this Article 10, if the Plan is terminated in whole or in part by the Committee as authorized by section 4041 (or by the Pension Benefit Guaranty Corporation pursuant to section 4042) of the Act (or corresponding provisions of any subsequent applicable law in effect at the time), the Committee shall instruct the Trustee to apply or distribute the Fund in accordance with its written directions (or the written

directions of the trustee appointed upon the application of the Pension Benefit Guaranty Corporation).  To the extent permitted by the Act, when the Fund shall have been so applied or distributed and the accounts of the Trustee shall have been settled, the Committee and Trustee shall be released and discharged from all further accountability or liability respecting the Fund and shall not be responsible in any way for the further disposition of the Fund or any part thereof so applied or distributed.

    10.6 <u>Design Decisions</u>.  Decisions regarding the design of the Plan shall be made in a settlor capacity and shall not be governed by the fiduciary responsibility provisions of the Act.

- 90 -

ARTICLE 11
MERGER AND RESTATEMENT OF THE
MINIMUM PLAN AND THE COACHES PLAN

       11.1    Effect of Merger and Restatement.  Effective as of April 1, 1989, the Minimum Plan and the Coaches Plan shall be continued by their amalgamation and merger into the Plan.  In no event shall the Accrued Benefit under the Plan as of April 1, 1989, of a former participant in either the Minimum Plan or the Coaches Plan, whichever is applicable, be less than the participant's accrued benefit under either the Minimum Plan or the Coaches Plan, whichever is applicable, as of March 31, 1989.

       11.2    Effect of Schedules.  The right to a benefit under the Plan of any person who terminated employment as an Employee for any reason on or after April 1, 1989, shall be determined by the terms of the Plan in effect on the date of such termination of employment; provided that with respect to a former participant in either the Minimum Plan or the Coaches Plan, whichever is applicable, the provisions of the main text of the Plan may be altered by the provisions of the schedules hereto.  The following are the only such schedules in effect as of April 1, 2002:

| | |
|---|---|
| Schedule I | SPECIAL PROVISIONS RELATING TO COACHES |
| Schedule II | SPECIAL PROVISIONS RELATING TO FRONT OFFICE EMPLOYEES |

- 91 -

ARTICLE 12

MULTIPLE EMPLOYER PROVISIONS

12.1     Single Plan.  It is intended that the provisions of the Plan shall be applicable to all of the Employers, that the Plan shall be a single pension plan and not an aggregate of separate plans, and that all Plan assets shall be available for the purpose of providing all Plan benefits and paying Plan administration expenses.

12.2     Instructions Applicable to Whole Fund.  Unless the Committee or the Investment Committee otherwise so states in its instructions to the Trustee, its instructions to the Trustee shall apply to the entire Trust Fund.

12.3     Binding Effect of Amendments.  The Committee shall be vested with the sole power to amend the Plan and Trust in any manner, by an instrument in writing delivered to the Trustee and each participating Employer, which amendment shall be binding on all participating Employers, provided that no such amendment shall bind any participating Employer, that, within ninety (90) days after its receipt of notice of such amendment from the Committee, shall have given notice pursuant to Section 12.4 hereof of its withdrawal from the Plan.

12.4     Withdrawal of Employer.  By an instrument in writing, duly executed and delivered to the Trustee and the Committee, and subject to any applicable provisions of the League's Constitution and By-Laws, resolutions, and any other rules and regulations of the League, a participating Employer shall have the right, without the necessity of obtaining the consent of the Committee, to withdraw from participation in the Plan and Trust.  In such event, said Employer shall forthwith cease to be a party to the Plan and shall no longer be an Employer under the Plan.

12.5   Withdrawal by One Employer.  Any withdrawal from the Plan by any one Employer shall operate only with respect to the Participants then employed by that Employer.

12.6   Separate Application of Certain Provisions.  The provisions of Section 14.8 hereof and Articles 15 and 16 hereof shall apply separately to each participating Employer and to the Employees and former Employees of such participating Employer.

12.7   Separate Benefit Formulas.

(a)  A participating Employer shall have the right, with respect to such Employer's employees, to freeze benefit accruals under the Plan or to modify the Plan's benefit formula, without the necessity of obtaining the consent of the Committee, provided that such freeze or modification is made by an instrument in writing that is (1) prepared at the request of such Employer by legal counsel selected by the Committee and (2) duly adopted and executed by such Employer by a date specified by such legal counsel.

(b)  Each instrument adopted by an Employer pursuant to this Section 12.7 shall be incorporated into the Plan and included in Appendix I for that Employer.

(c)  If an Employer freezes or modifies the Plan's benefit formula in an instrument pursuant to this Section 12.7, such freeze or modification shall not affect the benefits accrued on account of employment with another Employer.  For example, the benefit a Participant accrues under the Plan based on employment with an Employer that has not frozen or modified the Plan's benefit formula pursuant to this Section 12.7 is the

same benefit the Participant would accrue under the Plan on account of employment with that Employer if no other Employer had frozen or modified the Plan's benefit formula. As an illustration, if a Participant was employed for 15 years by Employer A and Employer A had frozen the benefit formula so that the Participant accrued no benefit while working for Employer A, and if the Participant subsequently is employed by Employer B, which has not modified or frozen the Plan's benefit formula, the Participant would earn no additional Years of Credited Service while employed by Employer B for purposes of determining benefit accruals under Section 4.1 because the Participant would be assumed to have already earned the maximum amount of Years of Credited Service (15) while employed by Employer A.  Instead, the Participant would accrue a benefit based on his employment with Employer B, if at all, based solely on any increase in Final Average Compensation above the Final Average Compensation the Participant is assumed to have earned while employed by Employer A.

## ARTICLE 13

### REEMPLOYMENT

13.1     Reemployment Before Normal Retirement Age.  If a Participant whose employment with the Employers has terminated returns to employment with any Employer before his Normal Retirement Age, any benefit being paid to him under the Plan shall cease during the period the Participant is so employed before his Normal Retirement Age.  He may rescind an election of an optional form of benefit and elect a new form of benefit, in accordance with Section 4.5 hereof, prior to the resumption of his benefit.  Except as provided in Section 13.9 hereof, any Years of Credited Service that the Participant accrued under the Plan before he retired or terminated employment shall be restored to him, and upon subsequent retirement, death, or termination of employment, the benefit with respect to the Participant shall be based on his Years of Service, Years of Credited Service, and Compensation before and after the period of prior retirement or termination of employment, and shall be actuarially adjusted to reflect the benefits that he previously received.  If a Participant's benefits are suspended pursuant to this Section 13.1 as of his Normal Retirement Age and the Participant does not remain in Active Service beyond his Normal Retirement Age, he shall be deemed to have retired again as of his Normal Retirement Date for purposes of this Section 13.1 and Section 4.1 hereof.

13.2     Employment After Normal Retirement Age.  Subject to the provisions of Section 13.4 hereof, if any Participant completes any Active Service after his Normal Retirement Date, an amount equal to the suspendable amount (as defined in 29 C.F.R. § 2530.203-3(d)) of his benefit under the Plan shall be discontinued (or shall not commence or recommence) during such period of employment, but in the event of his

death during such period, any survivor payments under a joint and survivor annuity or under an optional benefit, if one has been elected and become effective, shall commence as of the first day of the first month following the date of his death.  The amount of the benefit paid to the Beneficiary of such a deceased Participant shall be determined based on the Participant's Years of Credited Service and Compensation both before and during his Active Service and shall be actuarially adjusted to take into account benefits already received.

13.3    Adjustment of Accruals.  Any Participant who, having attained Normal Retirement Age, receives his benefits under the Plan during any Plan Year while still employed by any Employer shall have the benefit that otherwise would accrue to him under the Plan for each such Plan Year reduced (but not below such Participant's normal retirement benefit for the preceding Plan Year) by the Actuarial Equivalent of the total benefit distributions (taken into account under Proposed Treasury Regulation section 1.411(b)-2(b)(4)(ii), as such proposed regulation may be modified or redesignated upon final adoption) made to such Participant by the close of such Plan Year.

13.4    Distribution Requirements.  Except as otherwise provided in Section 4.6 hereof, and notwithstanding any other provision of the Plan, if a Participant defers his retirement beyond the first date on which he is eligible for a Normal Retirement benefit pursuant to Section 4.1 hereof and, in any month thereafter he is not engaged in Active Service, he shall commence receiving his retirement benefits as of the earlier of (1) the first day of the next succeeding month or (2) April 1 of the calendar year following the calendar year in which he attains age seventy and one-half (70-1/2).

13.5    Notification.  Any Participant whose benefits are discontinued or delayed after the month in which he attains Normal Retirement Age due to the application of this Article 13 shall be notified by personal delivery or first class mail during his first calendar month or payroll period following his attainment of Normal Retirement Age that his benefits are discontinued or delayed.  Such notification shall contain a description of the specific reasons why benefit payments are being discontinued or delayed, a general description of this Article 13, a copy of this Article 13, and a statement to the effect that applicable Department of Labor regulations may be found in section 2530.203-3 of Title 29 of the Code of Federal Regulations.  In addition, the notification shall inform the Participant of the Plan's procedure pursuant to Section 13.6 hereof for affording a review of the discontinuance or delay of benefits.

13.6    Review.  Upon the discontinuance or delay of benefits pursuant to Section 4.2 or 13.2 hereof, the Committee shall afford the Participant a review of such discontinuance or delay pursuant to Section 14.13 hereof, and shall otherwise administer the discontinuance or delay and any subsequent commencement or recommencement of benefit payments in a manner consistent with applicable Department of Labor regulations.

13.7    Termination After Reemployment.  If a Participant whose benefit under the Plan has been discontinued in accordance with Section 13.2 hereof, thereafter terminates his Active Service, his benefit shall resume no later than the first day of the third calendar month after the calendar month in which the Active Service terminates; provided that he must notify the Committee in writing and in a manner to be prescribed by the Committee, that he has ceased such employment and is entitled to the resumption

of benefits.  The amount of his benefit shall be determined in accordance with Section 4.1 hereof on the basis of his Years of Service, Years of Credited Service and Compensation earned before and after his reemployment and shall be actuarially adjusted to take into account benefits already received.  The initial payment to the Participant upon the resumption of his benefit shall include the payment scheduled to occur in the month in which payment resumes and any amounts withheld during the period between the end of his Active Service and the resumption of his benefits, reduced by any amount that may be offset against such initial payment on account of any payments made to him during his Active Service, in accordance with applicable Department of Labor regulations. Subsequent payments also shall be reduced by the amount of any payments previously made during the Participant's Active Service; provided that the reduction may not exceed in any one month twenty-five percent (25%) of the payment that otherwise would have been paid for that month.

   13.8 Report to Participant.  Upon the receipt of a written request by a Participant in such form as the Committee shall require, the Committee shall render a determination of whether specific contemplated employment shall be treated as Active Service for purposes of this Article 13.  The determination shall be made within sixty (60) days of the Committee's receipt of the request.

   13.9 Effect of Lump-Sum Distribution.  If, after termination of employment with the Employers, a Participant receives a distribution of the present value of his entire nonforfeitable benefit, and (i) the amount of such distribution is $5,000 or less, or (ii) the Participant (and his spouse, if any) consent to such distribution, then the Participant's Years of Credited Service as of the date of his termination of employment

- 98 -

shall thereafter be disregarded.  Notwithstanding the foregoing, if the Participant was less than one hundred (100%) vested in his Accrued Benefit and such Participant resumes employment as an Employee with an Employer, then such Participant shall have the right to repay to the Plan, before the earlier of (i) five (5) years from the date he again becomes an Employee or (ii) the close of the first period of five (5) consecutive one (1) year Breaks in Service commencing after the date of the distribution, the full amount previously distributed to him, plus interest at the rate prescribed by section 411(c)(2)(C) of the Code and, immediately after any such repayment, the Participant's prior Years of Credited Service shall be restored in full.  For purposes of the preceding sentence, a "Break in Service" shall mean any Plan Year in which the Participant fails to complete more than five hundred (500) Hours of Service with an Employer.

13.10   Military Service.

(a)  Notwithstanding any provision of the Plan to the contrary, in the case of reemployments initiated on or after December 12, 1994, benefits and service credit with respect to qualified military service shall be provided in accordance with section 414(u) of the Code (excluding section 414(u)(9) of the Code).

(b)  Survivor Benefits.  Effective for deaths occurring on or after January 1, 2007, in accordance with section 401(a)(37) of the Code, the survivors of a Participant who dies while performing qualified military service, within the meaning of section 414(u) of the Code, shall be eligible for any additional benefits (other than additional contributions related to the period of qualified military service) that would have been provided under the Plan if the Participant had resumed employment following

- 99 -

a period of qualified military service and immediately thereafter terminated employment due to death.

        (c)  <u>Recipients of Differential Wage Payments Are Employees</u>. Effective January 1, 2009, to the extent required by section 414(u)(12) of the Code and guidance issued thereunder, an individual receiving differential wage payments (within the meaning of section 3401(h)(2) of the Code) from the Employer shall be treated as an employee and differential wage payments shall be treated as compensation for purposes of Section 15.1 and as otherwise required by law, but differential wage payments shall not be treated as Compensation.

- 100 -

## ARTICLE 14

## <u>MISCELLANEOUS</u>

  14.1 <u>Qualified Plan</u>.  The Plan is created for the exclusive benefit of Employees, former Employees, and their Beneficiaries, and shall be interpreted in a manner consistent with its being a qualified plan under section 401(a) of the Code.

  14.2 <u>Exclusive Benefit</u>.

    (a)  Under no circumstances, except as provided below, shall any funds contributed to the Plan or any assets of the Plan and Trust be used other than for the benefit of Employees and former Employees and their Beneficiaries hereunder and the payment of the reasonable administration expenses of the Plan, and the Fund shall not revert to the Employers prior to the satisfaction of all liabilities to all Employees, former Employees, and their Beneficiaries.

    (b)  If a contribution by an Employer is expressly conditioned on the initial qualification of the Plan under section 401 of the Code, and if the Plan does not initially qualify, then such contribution shall be returned to the Employer at the direction of the Committee within one (1) year after the date of denial of qualification of the Plan.

    (c)  In the case of the termination of the Plan, in accordance with Section 10.4 hereof any residual assets of the Plan shall be distributed to the Employers at the direction of the Committee (or of a trustee appointed upon the application of the Pension Benefit Guaranty Corporation) if all liabilities of the Plan to Employees, former Employees, and their Beneficiaries have been satisfied and the distribution does not contravene any provision of law.  The certificate of an enrolled actuary engaged by the Committee pursuant to the Act stating that there are residual assets of the Plan remaining

in the Fund after all liabilities of the Plan to Employees, former Employees, and their Beneficiaries have been satisfied shall be conclusive evidence of that fact, but in its discretion the Trustee may require other evidence of that fact.

(d)  All contributions by Employers are expressly conditioned upon the current deductibility of the contribution under section 404 of the Code in the taxable year with respect to which the contribution is made and without regard to any subsequent amendment improving benefits under the Plan.  To the extent a deduction is disallowed, such contribution shall be returned to the Employer (to the extent disallowed and adjusted by the amount of any losses, but not by the amount of any gains, attributable thereto) within one (1) year after the disallowance of the deduction.

(e)  In the case of a contribution that is made by an Employer by a mistake of fact, such contribution (adjusted by the amount of any losses, but not by the amount of any gains, attributable thereto) shall be returned to the Employer, at the direction of the Committee, within one (1) year after the payment of the contribution.

14.3    Impossibility.  If it becomes impossible for an Employer, the Trustee, the Committee, or the Investment Committee to perform any act under the Plan, that act shall be performed which in the judgment of the Committee (or, if the matter is within the scope of the Investment Committee's responsibilities under the Plan, the Investment Committee) will most nearly carry out the intent and purpose of the Plan.  All Employers and all persons having any interest in the Plan or in any way interested herein shall be bound by acts performed under such conditions.

14.4    Further Acts.  All Employers and all persons claiming any interest whatsoever hereunder shall perform any and all acts and execute any and all documents

and papers that may be necessary or desirable for the carrying out of the Plan or any of its provisions.

14.5    Binding on Successors.  This Plan shall be binding upon the heirs, executors, administrators, successors and assigns of the Employers, present and future.

14.6    Inalienability of Benefits.

(a)  No Employee, former Employee, or Beneficiary may alienate, assign, transfer, encumber, or otherwise subject to lien any of the benefits provided under the Plan, and the right of any Employee, former Employee, or Beneficiary to any benefit or to any payment hereunder shall not be subject to alienation, transfer, assignment, or encumbrance or otherwise subject to lien, except to the extent provided for by a Qualified Domestic Relations Order entered on or after January 1, 1985 or, to the extent required by law, a federal tax levy made pursuant to section 6331 of the Code, and except as otherwise provided in section 401(a)(13)(C) of the Code (relating to any offset of a participant's benefits provided under a plan against an amount that the participant is ordered or required to pay to the plan).  The Committee shall treat a domestic relations order entered before January 1, 1985, as a Qualified Domestic Relations Order if payment of benefits pursuant to such order has commenced as of such date.  The Committee may, in its sole discretion, treat any other domestic relations order entered before January 1, 1985, as a Qualified Domestic Relations Order.  Notwithstanding anything in this Section to the contrary, this Section 14.6 is intended to address the requirements of section 401(a)(13) of the Code and section 206 of the Act and federal rulings and regulations issued thereunder, and to permit actions by Plan fiduciaries (including, but not limited to, such things as the recovery of benefit overpayments by

reducing Plan benefits or the withholding of taxes from Plan benefits) that do not violate the principles of section 401(a)(13) of the Code or section 206 of the Act as described in such rulings and regulations.

(b) The Committee shall establish written procedures to determine the qualified status of domestic relations orders and to administer distributions under Qualified Domestic Relations Orders. Such procedures shall be consistent with any regulations prescribed under sections 401(a)(13) and 414(p) of the Code and section 206(d) of the Act. In the case of any domestic relations order received by the Plan, the Committee shall promptly notify the Employee or former Employee and any other alternate payee (an defined in section 414(p)(8) of the Code) of the receipt of such order and the procedures for determining the qualified status of domestic relations orders. Within a reasonable period after receipt of such order, the Committee shall determine whether such order is qualified and shall notify the Employee or former Employee and each alternate payee of such determination. During any period in which the qualified status of a domestic relations order is being determined (by the Committee, by a court, or otherwise), the Committee shall separately account for the amounts that would have been payable to each alternate payee if the order had been determined to be a Qualified Domestic Relations Order. If within eighteen (18) months of the receipt of the order, the order (or a modification thereof) is determined to be a Qualified Domestic Relations Order, the Committee shall direct the Trustee to pay the amounts separately accounted for (plus any interest thereon) to the person or persons entitled thereto. If within eighteen (18) months of the receipt of the order, it is determined that the order is not qualified, or the issue as to whether the order is qualified is not resolved, then the Committee shall

direct the Trustee to pay the amounts separately accounted for (plus any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.  Any determination that an order is qualified that is made after the close of the eighteen (18) month period shall apply prospectively only.

(c)  Except as provided in Subsections (a) and (b) of this Section 14.6, if any Employee, former Employee, or Beneficiary shall attempt to alienate or to assign his benefits, or should anyone attempt to subject his benefits to attachment, execution, garnishment or other legal or equitable process, the Committee shall direct the Trustee to take the necessary steps so that such benefits shall not be available to the Employee, former Employee, or Beneficiary, but shall be used by the Trustee for the benefit of the Employee, former Employee, or Beneficiary as the Committee deems necessary for his maintenance, support, comfort, education, medical care, emergency and general welfare.

14.7    Merger of Plan.  In the event of any merger or consolidation of the Plan with, or transfer in whole or in part of the assets or liabilities of the Plan to, another plan, such merger, consolidation or transfer shall be permissible only if, to the extent that section 414(l) of the Code is applicable and in accordance with such section 414(l), each Employee and former Employee would receive a benefit immediately after the merger, consolidation or transfer that is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (determined, in each case, as if the Plan and such transferee plan had then terminated); provided that the foregoing provisions of this Section 14.7 shall not apply if such alternative

requirements that may be imposed by the regulations under section 414(l) of the Code are satisfied.

14.8    <u>Pre-Termination Restrictions</u>.

(a)  Upon termination of the Plan pursuant to Section 10.1 hereof, the benefit of each highly compensated employee and each former highly compensated employee shall be limited to a benefit that is nondiscriminatory under section 401(a)(4) of the Code.  For purposes of this Section 14.8, a "highly compensated employee" shall be any employee of the Employer who --

(1)  was a 5-percent owner (as defined in section 416(i)(1) of the Code) of the Employer at any time during the Plan Year or the preceding Plan Year, or

(2)  had compensation for the preceding Plan Year from the Employer exceeding $80,000 (as adjusted by the Secretary of the Treasury in accordance with section 414(q)(1) of the Code).

For this purpose, an employee shall be treated as a 5-percent owner for any Plan Year if at any time during such Plan Year such employee was a 5-percent owner (as defined in section 416(i)(1) of the Code) of the Employer, and "compensation" shall have the meaning given to such term by Section 15.1 hereof.  For purposes of this Section 14.8, an individual shall be treated as a "former highly compensated employee" if (i) such individual was a highly compensated employee when such individual separated from service with the Employer or (ii) such individual was a highly compensated employee of the Employer at any time after attaining age 55.

(b) The annual pension of a Participant who is a highly compensated employee or a former highly compensated employee shall not exceed the annual payments that would be made on behalf of the Participant under a single life annuity that is the Actuarial Equivalent of the sum of the Participant's Accrued Benefit and other benefits under the Plan.  The preceding sentence, shall not apply to a Participant for a year if

(1)     the Participant is not among the 25 nonexcludable (within the meaning of Treasury Regulations section 1.410(b)-6) employees and former employees of the Employer with the greatest compensation in that year or any prior year, or

(2)     after satisfying all benefits payable under the Plan to the Participant, the value of Plan assets equals or exceeds 110 percent of the Plan's current liabilities (as defined in section 412(l)(7) of the Code or as otherwise required by law), or

(3)     the value of the benefits payable under the Plan with respect to the Participant is less than one (1) percent of the value of the Plan's current liabilities (as defined in section 412(l)(7) of the Code or as otherwise required by law), or

(4)     the value of the benefits payable under the Plan with respect to the Participant does not exceed the amount described in section 411(a)(11)(A) of the Code.

If the Plan is terminated pursuant to Section 10.1 hereof while the restrictions pursuant to this Section 14.8(b) are in effect, amounts in excess of those restrictions shall first be

applied in a nondiscriminatory manner to the satisfaction of any Plan liabilities to Participants who are not subject to the restrictions, and any balance remaining shall then be applied in a nondiscriminatory manner to any Plan liabilities that may be outstanding with respect to Participants who are subject to the restrictions.

(c)  If and when, subsequent to the commencement of payments restricted pursuant to Subsection (b), above, one or more of the conditions set forth in clauses (1) through (4) of Subsection (b), above, becomes applicable with respect to the Participant, an amount that is the Actuarial Equivalent of the payments that were prohibited from being made during the period in which the payments were restricted shall be paid to the Participant or, if the Participant has died, to the estate of the Participant.

(d)  Effective April 1, 1995, a payment that would otherwise be prohibited from being made under Section 14.8(b) hereof may be made to a Participant if the Participant agrees to repay to the Plan so much of the Restricted Amount (as defined below) as is necessary to satisfy Section 14.8(a) hereof if the Plan is terminated pursuant to Section 10.1 hereof.  The preceding sentence shall not apply unless the Participant's obligation is adequately secured at the time of the payment.  A Participant's obligation is adequately secured for this purpose if and only if, at the time of the payment, the Participant has on deposit in an escrow account with a depositary acceptable to the Committee property having a fair market value that is at least 125 percent, or has posted a bond or provided a bank letter of credit equal to at least 100 percent, of the Restricted Amount.  An escrow agreement does not satisfy this requirement unless it prohibits the Participant from making any withdrawal that would cause the value of the property held in the account to fall below 125 percent of the Restricted Amount, and a bond or letter of

credit does not satisfy this requirement if it permits the surety or bank to release any liability, before the Committee certifies to the depositary, surety, or bank that the Participant has satisfied his obligation or that one or more of the conditions specified in clauses (1) through (4) have become applicable with respect to the Participant.  In addition, an escrow agreement does not satisfy this requirement unless it provides that if, at any time, the value of the property held in escrow falls below 110 percent of the Restricted Amount, the property held in the escrow will be paid to the Plan unless the Participant promptly deposits additional property sufficient to increase the value of the property held in escrow to 125 percent of the Restricted Amount.  For purposes of this Subsection (d), "Restricted Amount" means the portion of any scheduled benefit payment in accordance with this Subsection (d) that exceeds the maximum amount that would have been payable under Subsection (b), above.

(e)  This Section 14.8 is intended to satisfy the requirements of Treasury Regulations section 1.401(a)(4)-5(b).  This Section 14.8 shall not be construed in a manner that would impose limitations that are more stringent than those required by Treasury Regulations section 1.401(a)(4)-5(b).  If Congress should provide by statute, or the United States Treasury Department or the Internal Revenue Service should provide by regulation or ruling, that the foregoing restrictions are no longer necessary for the Plan to meet the requirements of section 401(a) of the Code then in effect, such restrictions shall become void and shall no longer apply, without the necessity of further amendment to the Plan.

14.9    No Contractual Effect.  The Plan shall not be construed as creating or changing any contract of employment between the Employer and its Employees,

- 109 -

whether participants hereunder or not; and the Employer retains the right to deal with Employees, and to terminate their respective employment at any time, to the same extent as though the Plan had not been created.

        14.10   <u>Application of Forfeited Benefits.</u>   Any forfeiture arising from severance of employment, death, or for any other reason shall not be applied to increase the benefits that any Employee, former Employee, or Beneficiary would otherwise receive under the Plan.  The amounts so forfeited shall be used as soon as possible to reduce the appropriate Employers (as determined by the Committee in accordance with Article 8 hereof) contributions under the Plan.

        14.11   <u>Headings and Subheadings</u>.  The headings and subheadings in the Plan are inserted for the convenience of reference only, and are to be ignored in any construction of the provisions thereof.

        14.12   <u>Illegality</u>.  If any provision of the Plan shall be held illegal or void, such illegality or invalidity shall not affect the remaining provisions of the Plan, which shall be fully severable, and the Plan shall be construed and enforced as if said illegal or invalid provision had never been inserted herein.

        14.13   <u>Claims for Benefits</u>.

        (a)  Every claim for benefits under the Plan by a person (hereinafter referred to as "Claimant") or by a Claimant's authorized representative shall be submitted to the Committee, which shall process it and approve or disapprove it.  Claims for benefits other than disability benefits under Section 4.4(y) hereof shall be governed by Subsections (b) through (g) of this Section 14.13.  Claims for disability benefits under Section 4.4(y) hereof shall be governed by Subsections (g) and (h) of this Section 14.13.

- 110 -

(b) If a Claimant is denied any benefits under the Plan, either in total or in an amount less than the full benefit to which he claims to be entitled, the Committee shall advise the Claimant of the computation of his benefit, if any, and the specific reasons therefor within ninety (90) days after receipt of the claim by the Committee.  However, if unforeseeable or special administrative problems or circumstances require an extension of time for processing the claim by the Committee, a written notice shall be furnished to the Claimant prior to the termination of this ninety (90)-day period explaining why an extension of time is needed and the approximate date by which the Committee expects to have processed the claim.  Nevertheless, in no event shall the Committee render a final decision on the validity of a claim later than one hundred and eighty (180) days after the claim is initially received by the Committee.  The Committee shall furnish the Claimant whose claim is wholly or partially denied with a written notice setting forth in a manner calculated to be understood by the Claimant:

(1) the specific reason or reasons for the denial;

(2) a specific reference to pertinent Plan provisions on which the denial is based;

(3) a description of any additional material or information necessary for the Claimant to perfect his claim, if possible, and an explanation of why such material or information is needed; and

(4) a description of the Plan's claim review procedures, the time limits under such procedures, and a statement of the Claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on appeal.

- 111 -

(c)  Within sixty (60) days of receipt of the information described in Subsection (b), above, the Claimant or his duly authorized representative, if he desires further review, may file a written appeal of the determination with the Committee.

(d)  As long as the Claimant's appeal is pending (including the sixty (60) day period described in Subsection (c), above), the Claimant or his duly authorized representative (i) shall be provided, upon request and free of charge, access to and copies of all documents, records, and other information relevant to the claim and (ii) may review pertinent Plan documents and may submit issues and comments in writing to the Committee.

(e)  The Committee shall notify the Claimant of the appeals decision (whether or not adverse) in written or electronic form within a reasonable period of time, but no later than sixty (60) days after the Plan's receipt of the appeal unless the Committee determines that special circumstances (for example, the need to hold a hearing) require an extension of time.  If the Committee determines that an extension of time is required, then, before the end of the sixty (60) day period, the Committee shall notify the Claimant of the reason or reasons for the extension and of the date by which it expects to make its decision.  The extended period may not exceed sixty (60) days from the end of the initial sixty (60) day period.

(f)  If the Committee's decision on appeal is adverse, the notice of the Committee's decision shall provide the following information, written in a manner calculated to be understood by the Claimant:

(1) the specific reason or reasons for the adverse determination;

- 112 -

(2) reference to the specific Plan provisions on which the adverse determination is based;

(3) a statement that the Claimant is entitled to receive, upon request and free of charge, access to and copies of all documents, records, and other information relevant to the benefit claim; and

(4) a statement regarding the Claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on appeal.

(g) Any person eligible to receive benefits hereunder shall furnish to the Committee any information or evidence requested by the Committee and reasonably required for the proper administration of the Plan.  Failure on the part of any person to comply with any such request within a reasonable period of time shall be sufficient grounds for delay in the payment of any benefits that may be due under the Plan until such information or evidence is received by the Committee.  If any person claiming benefits under the Plan makes a false statement that is material to the claim for benefits, the Committee may offset against future payments any amount paid to such person to which he was not entitled under the provisions of the Plan.

(h) If the Claimant seeks a disability benefit under Section 4.4(y) hereof, the claim shall be governed by the following provisions:

(1) If the claim is wholly or partially denied, the Committee shall notify the Claimant of the adverse decision within a reasonable time, but no later than forty five (45) days after the Plan's receipt of the claim.  If the Committee determines that an extension of time for processing the

claim is needed due to matters beyond the control of the Plan, the Committee shall notify the Claimant of the reasons for the extension and the extended due date before the end of the forty five (45) day period after the filing of the claim.  The extended period may not exceed seventy five (75) days after the date of the filing of the claim.  If the Committee determines that a second extension of time for processing the claim is needed due to matters beyond the control of the Plan, the Committee shall notify the Claimant of the reasons for the extension and the extended due date before the end of the seventy five (75) day period after the filing of the claim.  The second extended period may not exceed one hundred five (105) days after the date of the filing of the claim.  Any notice of extension shall explain the standards on which an entitlement to a disability benefit under the Plan is based and the unresolved issues that prevent a decision on the claim and also shall describe any additional information that is needed to resolve the issues and give the Claimant at least forty five (45) days from the date of the receipt of such notice to submit the information.  If additional information is requested, the time period for making a benefit decision shall be tolled from the date on which the notice is sent to the Claimant until the date the Claimant responds to the request.

(2) The Committee shall furnish a Claimant whose claim is wholly or partially denied with a written notice setting forth in a manner calculated to be understood by the Claimant:

- 114 -

   i.   the specific reason or reasons for the adverse determination;

   ii.  reference to the specific Plan provisions on which the adverse determination is based;

   iii. a description of any additional information necessary for the claim to be granted and an explanation of why such information is necessary;

   iv.  a description of the Plan's claim review procedures, the time limits under such procedures, and a statement regarding the Claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on appeal; and

   v.   if applicable, a copy of the internal rule, guideline or protocol that was relied on to make the adverse determination or a statement that such a rule was relied on and that a copy of such rule will be provided free of charge to the Claimant upon request.

(3) Within one hundred eighty (180) days following the receipt of the notice of the adverse benefit determination, the Claimant or his duly authorized representative may file a written appeal of the determination.

- 115 -

(4)  As long as the Claimant's appeal is pending (including the one hundred eighty (180) day period described in Subsection (h)(3), above), the Claimant or his duly authorized representative (i) shall be provided, upon request and free of charge, access to and copies of all documents, records, and other information relevant to the claim and (ii) may submit written comments documents, records, and other information related to the claim.

(5)  The Committee's decision on appeal shall be based on all comments, documents, records, and other information submitted by the Claimant, without regard to whether such information was submitted or considered in the initial benefit determination.

(6)  The Committee's decision on appeal shall not defer to the initial adverse benefit determination and may not be conducted by the individual who made the initial adverse determination nor the subordinate of such individual.

(7)  In deciding an appeal of any benefit determination that is based in whole or in part on a medical judgment, the Committee shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment; such health care professional may not be an individual who was consulted in connection with the initial adverse benefit decision nor the subordinate of such individual.

- 116 -

(8) If the Claimant or his representative so requests, the Committee shall notify the Claimant of the medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the adverse benefit determination.

(9) The Committee shall notify the Claimant of the appeals decision (whether or not adverse) in written or electronic form within a reasonable period of time, but no later than forty five (45) days after the Plan's receipt of the appeal unless the Committee determines that special circumstances (for example, the need to hold a hearing) require an extension of time.  If the Committee determines that an extension of time is required, then, before the end of the forty-five (45) day period, the Committee shall notify the Claimant of the reason or reasons for the extension and of the date by which it expects to make its decision.  The extended period may not exceed forty five (45) days from the end of the initial forty-five (45) day period.

(10)    If the Committee's decision on appeal is adverse, the notice of the Committee's decision shall provide the following information, written in a manner calculated to be understood by the Claimant:

     i.    the specific reason or reasons for the adverse determination;

    ii.    reference to the specific Plan provisions on which the adverse determination is based;

- 117 -

iii. a statement that the Claimant is entitled to receive, upon request and free of charge, access to and copies of all documents, records, and other information relevant to the benefit claim;

iv. a statement regarding the Claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on appeal;

v. if applicable, a copy of the internal rule, guideline, or protocol that was relied on to make the adverse determination or a statement that such a rule was relied on and that a copy of such rule will be provided free of charge to the Claimant upon request; and

vi. if the adverse determination is based on a medical judgment, an explanation of the scientific or clinical judgment for the determination or a statement that such explanation will be provided free of charge to the Claimant on request.

14.14   Limitation on Actions.  No claim for non-payment or underpayment of benefits allegedly owed by the Plan (regardless of whether such benefits are allegedly due under the terms of the Plan or by reason of any law) may be filed in court until the claimant has exhausted the claims review procedure set forth in Section 14.13 hereof.  Claims for underpayment of benefits must be filed in a court with

- 118 -

jurisdiction to hear the claim no later than thirty six (36) months after the Benefit Commencement Date.  Claims for non-payment of benefits must be filed in a court with jurisdiction to hear the claim no later than thirty six (36) months after the date when the first payment allegedly was due.  The running of the thirty-six (36) month limitations period shall be suspended during the time that any request for review of the claim pursuant to Section 14.13 hereof is pending before the Committee.  The foregoing limitations period is expressly intended to replace and to supersede any limitations period that might otherwise be deemed applicable under state or federal law in the absence of this Section.  Claims filed after the expiration of the limitations period prescribed by this Section shall be deemed time-barred.

14.15   Booklets and Brochures Subject to Plan Provisions.  In the event of any conflict between the terms of the Plan document and Trust Agreement and the terms of any booklets or brochures that may be issued summarizing the Plan, the terms of the Plan document and Trust Agreement shall control.

14.16   Liability Limited.  Except as and to the extent otherwise provided by applicable law, no liability whatever shall attach to or be incurred by the shareholders, owners, directors, officers, or employees of the Employers under or by reason of any of the terms and conditions contained in the Plan or in any of the contracts procured pursuant thereto or implied therefrom.

14.17   Overpayments.  If any overpayment of benefits is made under the Plan, the amount of the overpayment may be set off against further amounts payable to or on account of the person who received the overpayment until the overpayment has been recovered.  The foregoing remedy is not intended to be exclusive.

- 119 -

14.18   PBGC Premiums.  Any premium payable to the Pension Benefit Guaranty Corporation (or any successor thereto) with respect to the Plan shall be deemed to be a reasonable expense of administering the Plan, and shall be paid from the assets of the Trust Fund in accordance with Section 9.11 (Section 9.12 on or after December 10, 2003) hereof, except to the extent that the Employers shall elect to pay any such premium directly.

14.19   Withholding Taxes.  The Committee may make any appropriate arrangements to deduct from all amounts paid under the Plan any taxes reasonably determined by the Committee to be required to be withheld by any government or government agency.  A Participant, Beneficiary, or alternate payee, as the case may be, shall bear all taxes on amounts paid under the Plan to the extent that no taxes are withheld, irrespective of whether withholding is required.

14.20   Notice of Process.  In any action or proceeding involving the Trust Fund, or any property constituting part or all thereof, or the administration thereof, the Employers, the Committee, and the Trustee shall be the only necessary parties, and no Participant, Beneficiary, alternate payee, or other person having or claiming to have an interest in the Trust Fund or under the Plan shall be entitled to any notice of process unless such notice is required by federal law.

14.21   Complete Statement of Plan.  This document is a complete statement of the Plan as of April 1, 2002, with amendments adopted through December 2012, and supersedes all prior plans, including the prior restatement of the Plan as of April 1, 2002.  The Plan may be amended, curtailed, or terminated only in writing and then only as provided in Section 10.1 hereof.

ARTICLE 15

LIMITATIONS ON BENEFITS

15.1   Maximum Limitation on Benefit Amount.

(a)  In addition to any other limitation set forth in the Plan and notwithstanding any other provision of the Plan, in no event shall the annual amount of a Participant's benefit determined under the provisions of the Plan, together with the aggregate annual amount of such Participant's benefits under all other defined benefit plans required to be aggregated with the Plan under the provisions of section 415 of the Code, increase to an amount in excess of the maximum amount permitted under section 415 of the Code; provided that for this purpose the limitations imposed by section 415(b)(2)(C) and (D) of the Code shall not exceed the limitations imposed by section 415(b)(2)(C) and (D) as in effect before the enactment of the Economic Growth and Tax Relief Reconciliation Act of 2001 (Pub. L. No. 107-16).  For purposes of this Article 15, the limitation year is the calendar year, and the "compensation" used to apply the limitations imposed by this Article 15 shall be "Compensation" as defined in Section 2.1(k) hereof.

(1) Limitations.  Except as provided to the contrary in any other provision of this Article 15, the annual straight life annuity benefit otherwise accrued or payable to a Participant under the Plan (exclusive of any benefits that are not directly related to retirement income benefits or which are attributable to employee contributions) shall not exceed the lesser of (a) $160,000, as adjusted pursuant to section 415(d) of the Code, or (b) 100% of the Participant's average compensation for the three

consecutive calendar years of service (or the Participant's longest consecutive period of service if less than three years) during which his aggregate compensation is highest, payable in the form of a straight life annuity, provided that the limits described in (a) and (b) shall be adjusted as described in (A) through (D), below:

(A) <u>Less Than 10 Years of Participation</u>.  If the Participant has less than ten (10) years of participation in the Plan, the dollar limit described in (a) shall be multiplied by a fraction, the numerator of which is the number of years or part thereof (but not less than one) of participation in the Plan (or the Coaches Plan or the Minimum Plan, if applicable) and the denominator of which is ten (10).

(B) <u>Less Than 10 Years of Service</u>.  If the Participant has not completed ten (10) Years of Service, the compensation limit described in (b) shall be multiplied by the ratio that the Participant's number of Years of Service (but not less than one) bears to ten (10).

(C) <u>Payment Before Social Security Retirement Age</u>.  If payment of the Plan benefit begins before the Participant attains social security retirement age (as defined in section 415(b)(8) of the Code), the dollar limit described in (a) shall be adjusted so that it is the actuarial equivalent of an annual straight life annuity benefit equal to such dollar limit beginning at the Participant's

- 122 -

social security retirement age.  For benefits that begin before the Participant's social security retirement age and on or after age sixty-two (62), the adjustment provided for in this paragraph shall be consistent with the reduction for old-age insurance benefits commencing before the social security retirement age under the Social Security Act.  For benefits that begin before the Participant's social security retirement age and before age sixty-two (62), the dollar limit shall first be adjusted to age sixty-two (62) as described in the second sentence of this Subparagraph (C) and shall be further adjusted so that the dollar limit is the actuarial equivalent of the dollar limit at age sixty-two (62), based on whichever set of assumptions in (i) or (ii) below produces the lower limit:

> (i)      the Plan interest rate and the Plan mortality assumption (or Plan tabular factor) used for determining early retirement benefits; or

> (ii)     five percent (5%) interest and the applicable mortality table prescribed by the Secretary of the Treasury under section 415(b)(2)(E)(v) of the Code (the "applicable mortality table" for purposes of the remainder of this Section 15.1(a)).

(D)  Payment After Social Security Retirement Age.  If payment of the Plan benefit begins after the Participant attains his

social security retirement age, the dollar limit described in (a) shall be adjusted so that it is the actuarial equivalent of an annual straight life annuity benefit equal to such dollar limit beginning at the Participant's social security retirement age.  The adjusted dollar limit shall be the actuarial equivalent of an annual straight life annuity benefit equal to such dollar limit beginning at the Participant's social security retirement age, based on whichever set of assumptions in (i) or (ii) below produces the lower limit:

> (i)      the Plan interest rate and the Plan mortality assumption (or Plan tabular factor) used for determining late retirement benefits; or

> (ii)     five percent (5%) interest and the applicable mortality table.

(2) <u>Adjustment for Payment Form</u>.  A Participant's benefit shall be subject to the following adjustments before the application of the maximum annual benefit limitation in the preceding Paragraph (1):

> (A) If the Participant's benefit is payable as a joint and survivor annuity with the Participant's spouse as the beneficiary, the Participant's benefit shall be adjusted for that form of payment before application of the maximum annual benefit limitation in the preceding Paragraph (1).

> (B) If the Participant's benefit is payable in a form that is neither described in Subparagraph (A), above, nor a straight life

- 124 -

annuity, the Participant's benefit shall be converted to a straight

life annuity benefit as described in Subparagraph (C), below,

before the application of the maximum annual benefit limitation in

the preceding Paragraph (1).

(C) If the form of benefit is not subject to Code section

417(e)(3), the straight life annuity benefit shall equal:

(i)      For limitation years beginning before

January 1, 2008, the greater of the actuarial equivalent, in

the form of a straight life annuity, of the benefit otherwise

payable to the Participant calculating using: (a) the Plan

interest rate and the Plan mortality assumptions (or Plan

tabular factor) used for determining actuarial equivalence;

or (b)  five percent (5%) interest and the applicable

mortality table.

(ii)      For limitation years beginning on or after

January 1, 2008, the greater of: (a) the annual amount of

the straight life annuity (if any) payable to the Participant

under the Plan commencing on the same Benefit

Commencement Date or (b) the actuarial equivalent, in the

form of a straight life annuity, of the benefit otherwise

payable to the Participant calculated using five percent

(5%) interest and the applicable mortality table.

- 125 -

(D)  If the form of benefit is subject to Code section 417(e)(3), the straight life annuity benefit shall equal:

(i)      For Benefit Commencement Dates occurring in Plan Years beginning before January 1, 2004, the greater of the actuarial equivalent, in the form of a straight life annuity, of the benefit otherwise payable to the Participant calculated using: (a) the Plan interest rate and the Plan mortality assumption (or Plan tabular factor) used for determining actuarial equivalence, or (b) the interest rate described in Paragraph 1(b) of Exhibit I and the applicable mortality table.

(ii)      For Benefit Commencement Dates occurring in Plan Years beginning after December 31, 2003, the greater of the actuarial equivalent, in the form of a straight life annuity, of the benefit otherwise payable to the Participant calculated using: (a) the Plan interest rate and the Plan mortality assumption (or Plan tabular factor) used for determining actuarial equivalence, or (b) the applicable mortality table and (I) if the Participant's Benefit Commencement Date occurs in a Plan Year beginning in 2004 or 2005, an interest rate of five and five-tenths percent (5.5%), except that, the amount payable to a Participant on a Benefit Commencement Date occurring

during the Plan Year that begins in 2004 and before December 31, 2004 shall not, solely by reason of this provision, be less than the amount that would have been payable to the Participant had the amount been determined using the interest rate described in Paragraph 1(b) of Exhibit I in effect as of the last day of the last Plan Year beginning before January 1, 2004, or (II) if the Participant's Benefit Commencement Date occurs in a Plan Year beginning after 2005, the interest rate shall equal the greater of five and five-tenths percent (5.5%) or the rate that provides a benefit of not more than one hundred five percent (105%) of the benefit that would be provided if the interest rate described in Paragraph 1(b) of Exhibit I were used.

(3) <u>Minimum Benefit</u>.  The limitations in this Section 15.1 shall not apply to the annual benefit otherwise accrued or payable to a Participant who:

(A) has not at any time participated in any defined contribution plan maintained by an Employer; and

(B) has total annual benefits payable or accrued under the Plan and all other defined benefit plans required to be aggregated with the Plan under section 415 of the Code that do not exceed

$10,000, multiplied by the ratio described in Subparagraph (1)(B), above, if applicable.

(b)  The limitation imposed by this Article 15 shall be applied after taking into account (1) the transition rules prescribed in section 1106(i) of the Tax Reform Act of 1986 and Treasury Regulations section 1.415(a)-1(g)(4) (and any other transition rule that preserved the Participant's current Accrued Benefit under the Plan as of the effective date of an amendment to section 415 of the Code or Treasury Regulations issued thereunder), and (2) any cost-of-living adjustment that may be taken into account pursuant to regulations or other guidance issued under section 415(d) of the Code.

(c)  In the event that the limitations provided in this Article 15 become applicable to a Participant who is entitled to benefits under more than one defined benefit plan maintained by the Employer, the benefits under such other plan or plans shall be reduced so that the benefits provided under such other plan or plans and the benefit provided under the Plan do not, in the aggregate, exceed the limitations imposed by this Article 15.

15.2    Intent of Article 15.  This Article 15 is intended to satisfy the requirements imposed by section 415 of the Code and shall be construed in a manner that will effectuate this intent.  Except as specified by the proviso at the end of the first sentence of Section 15.1(a) and Sections 15.1(a)(1)(C) and (D) hereof, this Article 15 shall not be construed in a manner that would impose limitations that are more stringent than those required by section 415 of the Code.

ARTICLE 16

TOP-HEAVY REQUIREMENTS

16.1    Determination of Top-Heavy Status.

(a)  As soon as practicable after the first day of each Plan Year, the Committee shall determine whether the Plan is Top-Heavy with respect to an Employer in accordance with this Article 16.  A Plan shall be deemed to be Top-Heavy with respect to an Employer if

(1) the Plan is not part of an Aggregation Group of the Employer and, as of the Determination Date, the present value of the cumulative Accrued Benefits under the Plan for Key Employees of the Employer exceeds sixty percent (60%) of the present value of the cumulative Accrued Benefits under the Plan for all Employees of the Employer, where such ratio is computed in accordance with the provisions of section 416(g) of the Code and any Treasury Department regulations prescribed thereunder; or

(2) the Plan must be included in an Aggregation Group of the Employer and such Group is a Top-Heavy Group.

For purposes of Section 16.1(a)(1) and 16.2(h), only the Accrued Benefit of a Participant under the Plan that is attributable to Years of Credited Service completed with the Employer shall be taken into account.

(b) If the Plan is Top-Heavy with respect to an Employer as of any Determination Date, the provisions of Sections 16.4 through 16.6 shall become effective as of the first day of the Plan Year next following that Determination Date and shall

continue in effect until (and including) the first subsequent Determination Date as of which the Plan no longer is Top-Heavy with respect to that Employer.

16.2    Definitions.  For purposes of this Article 16, the following definitions shall apply, and shall be interpreted in accordance with the provisions of section 416 of the Code and the Treasury Department Regulations promulgated thereunder:

(a)  "Aggregation Group" or "Group" means --

(1)    each Employer Plan in which a Key Employee is a participant;

(2)    each other Employer Plan that enables an Employer Plan described in the preceding clause to meet the nondiscrimination requirements imposed by section 401(a)(4) of the Code or the participation requirements imposed by section 410(b) of the Code; and

(3)    if the Employer so elects, any other Employer Plan, if, after the inclusion of such plan in the Aggregation Group, such Group would continue to meet the nondiscrimination requirements imposed by section 401(a)(4) of the Code and the participation requirements imposed by section 410(b) of the Code.

(b)  "Average Compensation" means the Participant's average compensation for the period of consecutive years (not exceeding five) during which the Participant had the greatest aggregate compensation from the Employer, excluding (i) years ending before April 1, 1984, and (ii) years commencing after the close of the last

- 130 -

Plan Year in which the Plan was Top-Heavy, and adjusted, in accordance with section 416(c)(1)(D)(ii) of the Code, for years not included in a Year of Service.

(c) "Determination Date" shall mean the March 31 immediately preceding the Plan Year for which the determination is made.

(d) "Employer Plan" shall mean any stock bonus, pension, or profit-sharing plan of the Employer intended to qualify under section 401(a) of the Code.

(e) "Key Employee" means any employee or former employee (including any deceased employee) who at any time during the Plan Year that includes the Determination Date was an officer of the Employer having annual compensation greater than $130,000 (as adjusted under section 416(i)(1) of the Code for Plan Years beginning after December 31, 2002), a 5% owner of the Employer, or a 1% owner of the Employer having annual compensation of more than $150,000.  For this purpose, annual compensation means "Compensation" within the meaning of Section 2.1(k) hereof.  The determination of who is a Key Employee shall be made in accordance with section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability thereunder.

(f) "Non-Key Employee" means any Employee who is not a Key Employee.

(g) "Top-Heavy" describes a plan that is deemed to be Top-Heavy in accordance with Subsection 16.1(a) hereof.

(h) "Top-Heavy Group" means any Aggregation Group if, as of the Determination Date, the sum of the present value of the cumulative accrued benefits

for Key Employees under all defined benefit plans included in such Group, and the aggregate of the accounts of Key Employees under all defined contribution plans included in such Group, exceeds sixty percent (60%) of the analogous sum determined for all Employees.  The present value of the cumulative accrued benefits for any Employee and the value of the account of any employee shall be computed in accordance with the provisions of section 416(g) of the Code and the regulations prescribed thereunder.

Unless otherwise specified herein, other terms used in this Article 16 have the respective meanings ascribed thereto by the other provisions of the Plan.

16.3    Determination of Present Value of Accrued Benefit.  The following provisions of this Section 16.3 shall apply for purposes of determining the present values of accrued benefits and the account balances of Employees as of the Determination Date.

(a) For purposes of determining whether the plan is Top-Heavy, the present value of an accrued benefit as of a Determination Date with respect to any participant who then is an Employee shall be determined as of the most recent valuation date that is within a twelve-month period ending on the Determination Date and shall be determined as if the participant voluntarily terminated employment as of such valuation date.  Unless, as of such valuation date, the plan provides for a nonproportional subsidy, the present value of the accrued benefit shall reflect a benefit payable at Normal Retirement Age (or attained age, if later).  If, as of such valuation date the plan provides for a nonproportional subsidy, the benefit shall be assumed to commence at the age at which the benefit is most valuable.

(b) The present value of such accrued benefit shall be determined on the basis of the actuarial assumptions set forth in Exhibit I hereto; provided that, for purposes of determining the present value of a qualified joint and survivor annuity (as defined in section 417(b) of the Code) as a normal form of benefit, the participant's spouse shall be assumed to be the same age as the participant.

(c) The present value of accrued benefits and the amounts of account balances of an employee as of the Determination Date shall be increased by the distributions made with respect to the employee under the Plan and any plan aggregated with the Plan under section 416(g)(2) of the Code during the one-year period ending on the Determination Date.  The preceding sentence shall also apply to distributions under a terminated plan that, if had not been terminated, would have been aggregated with the Plan under section 416(g)(2)(A)(i) of the Code.  In the case of a distribution made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting "five-year period" for "one-year period."

(d) The accrued benefits and accounts of any individual who has not performed services for the Employer during the one-year period ending on the Determination Date shall not be taken into account.

16.4    Minimum Benefit Requirements.

(a) In any Plan Year for which the Plan is Top-Heavy with respect to an Employer, each Participant who is a Non-Key Employee of the Employer shall be entitled to a benefit that, when expressed as a single life annuity (with no ancillary benefits) of Equivalent Actuarial Value, is at least two percent (2%) of the Participant's Average Compensation for each of the Participant's first ten Years of Service completed

with the Employer beginning after 1983 during which the Plan was Top-Heavy.  The annual benefit described in the preceding sentence shall not be adjusted to take into account the availability of pre-retirement ancillary benefits under the Plan.

(b) The benefit required by Section 16.4(a) hereof shall be determined, and the requirements of Section 16.5 hereof shall be satisfied, without taking into account contributions or benefits under chapter 21 of the Code (relating to the Federal Insurance Contributions Act), Title II of the Social Security Act, or any other Federal or state law.

(c)  For purposes of this Section 16.4, in determining Years of Service with the Employer, any service with the Employer shall be disregarded to the extent that such service occurs during a Plan Year in which the Plan benefits (within the meaning of section 410(b) of the Code) no Key Employee or former Key Employee.

(d) The requirements imposed by this Section 16.4 shall not apply to any Participant to the extent that such Participant is covered by any other Employer Plan or Plans and the Employer provides in the Club Modification Certificate that it will meet the minimum benefit requirement of section 416(c) of the Code, if applicable to the Plan, in the other Employer Plan or Plans.

16.5   Vesting Requirements.  The provisions of this Section 16.5 shall become effective as of the first day of any Plan Year for which the Plan is Top-Heavy with respect to an Employer.

(a) The vested percentage in the Accrued Benefit of a Participant who completes at least one (1) Hour of Service after the Plan becomes Top-Heavy with

respect to the Employer shall be no less than the percentage determined in accordance with the following schedule:

| Number of Years of Service With The Employer | Vested Percentage |
|---|---|
| Less than 2 | 0 |
| 2 but less than 3 | 20 |
| 3 but less than 4 | 60 |
| 4 but less than 5 | 80 |
| 5 or more | 100 |

(b) Any minimum benefits provided pursuant to the requirements of Section 16.4(a) hereof that are nonforfeitable pursuant to the provisions of Section 16.5(a) hereof shall not be forfeitable under provisions that otherwise would be permitted by section 411(a)(3)(B) (relating to suspension of benefits upon reemployment) or 411(a)(3)(D) (relating to forfeitures upon withdrawal of mandatory contributions) of the Code.  However, the benefits described in the preceding sentence shall be suspended during a period of Active Service, pursuant to Section 4.2 or 13.2 hereof, and, upon termination of the Participant's Active Service, his resumed benefit shall be increased actuarially (on the basis of the actuarial assumptions set forth in Exhibit I hereto) to reflect the benefits that were not paid during his Active Service.

16.6    Termination of Top-Heavy Status.  If, for any Plan Year after the Plan has been Top-Heavy with respect to an Employer, the Plan is not Top-Heavy with respect to the Employer, the provisions of Sections 16.4 and 16.5 hereof shall not apply (except as otherwise provided in Section 16.5 hereof) with respect to the Employer with respect to that Plan Year; provided that (1) the Accrued Benefit of any Participant shall not be reduced on account of the operation of this Section 16.6, (2) any portion of a Participant's Accrued Benefit that was nonforfeitable before the Plan ceased to be Top-

- 135 -

Heavy with respect to the Employer shall remain nonforfeitable, (3) any Participant who was a Participant in a year in which the Plan was Top-Heavy with respect to the Employer and has completed at least three (3) Years of Service as of the first day of the Plan Year in which the Plan is no longer Top-Heavy with respect to the Employer shall remain subject to the provisions of Section 16.5(a) hereof, and (4) if the Plan ceases to be Top-Heavy after August 9, 2006, with respect to benefits accrued as of the date the Plan ceases to be Top-Heavy, the vested percentage of each Participant who was a Participant in a year in which the Plan was Top-Heavy will be determined under the vesting schedule in Section 16.5(a).

16.7    Intent of Article 16.  This Article 16 is intended to satisfy the requirements imposed by section 416 of the Code and shall be construed in a manner that will effectuate this intent.  The provisions of this Article 16 shall not be construed in a manner that would impose requirements on the Plan that are more stringent than the requirements imposed by section 416 of the Code.

- 136 -

## ARTICLE 17

## PARTICIPATION BY LEAGUE EMPLOYERS

17.1   Participation Automatic.  Any new Employer admitted to the League automatically shall become a party to the Plan and the Trust Agreement, and shall assume all of the obligations imposed on Employers by the Plan and the Trust and shall be subject to the provisions thereof.

17.2   Club Modification Certificates.  Subject to Section 12.3 hereof, any Club Modification Certificate previously executed by an Employer shall continue in effect with respect to the Plan as amended and restated effective April 1, 2002, without executing a new Club Modification Certificate.  An Employer, however, may amend its previously executed Club Modification Certificate, including (but not limited to) an amendment to provide that, for purposes of Section 16.4(d) hereof, the minimum benefit requirement imposed by section 416(c) of the Code, if applicable to the Plan with respect to the Employer, shall be met by another, specified plan of the Employer.

The undersigned, Chair of the NFL Employee Benefit Committee,

pursuant to Section 10.1 of the National Football League Club Employees Pension Plan

(the "Plan"), has affixed her signature hereto this __26__ day of __December__

2012, as evidence of the adoption of the foregoing amendment and restatement of the

Plan, effective April 1, 2002.

Rita Benson LeBlanc, Chair
NFL Employee Benefit Committee

EXHIBIT I

Actuarial Assumptions

1.    Generally.    The Equivalent Actuarial Value of a benefit that

commences on or after April 1, 2002, shall be determined on the basis of (a) the

Applicable Mortality Table and (b) the Applicable Interest Rate.  Notwithstanding the

preceding sentence, and except as otherwise provided by Section 4.5(b)(4) hereof, the

1971 Group Annuity Table, assuming a population evenly distributed between males and

females, and a six percent (6%) interest assumption shall be used to determine the

Equivalent Actuarial Value of a nondecreasing annuity payable over a period not less

than the Participant's life (including an annuity that decreases solely to reflect Social

Security payments or qualified disability payments (as defined in section 411(a)(9) of the

Code)), a qualified joint and survivor annuity as defined in section 417(b) of the Code, or

a qualified preretirement survivor annuity as defined in section 417(c) of the Code, or in

other circumstances permitted by Treasury Department regulations issued pursuant to

section 417 of the Code.  For purposes of this paragraph:

(a) For determinations before April 1, 2000, the term "Applicable

Mortality Table" shall mean the 1971 Group Annuity Table, assuming a population

evenly distributed between males and females, and the term "Applicable Interest Rate"

shall mean (i) the interest rate or rates that would be used (thirty (30) days before the

Benefit Commencement Date) by the Pension Benefit Guaranty Corporation for purposes

of determining the present value of a lump sum distribution on plan termination if the

Participant's vested Accrued Benefit does not exceed $25,000 or (ii) one hundred twenty

percent (120%) of the rate specified by clause (i) if the present value of the Participant's

- E-2 -

vested Accrued Benefit (determined using the Applicable Interest Rate) exceeds $25,000; provided that in no event shall the Equivalent Actuarial Value determined on the basis of clause (ii) be less than $25,000.

(b) For determinations after March 31, 2000, and before April 1, 2008, the term "Applicable Mortality Table" shall mean the mortality table prescribed by the Internal Revenue Service for purposes of section 417(e)(3) of the Code, and the term "Applicable Interest Rate" shall mean the annual rate of interest on 30-year Treasury securities for the third month preceding the month in which the Benefit Commencement Date for the benefit occurs; provided that for distributions with a Benefit Commencement Date between April 1, 2000, and March 31, 2002, paragraph (a) shall apply if it would produce a larger distribution.

(c) For determinations after March 31, 2008, the term "Applicable Mortality Table" shall mean the "applicable mortality table" under section 417(e)(3) of the Code that applies as of the Benefit Commencement Date for the benefit and the term "Applicable Interest Rate" shall mean the "applicable interest rate" under section 417(e)(3) of the Code for the third month preceding the month in which the Benefit Commencement Date for the benefit occurs.

2. <u>Equivalent Actuarial Value of Benefits Earned Before April 1, 1990</u>.  The Equivalent Actuarial Value of a Participant's Accrued Benefit under the Plan shall not be less than the actuarially equivalent value of such Participant's normal retirement benefit accrued as of March 31, 1990 (if any) under the Coaches Plan or the Minimum Plan, determined in accordance with the actuarial assumptions set forth in the Coaches Plan or the Minimum Plan, whichever is applicable.

- E-3 -

3. <u>Equivalent Actuarial Value of Benefits Earned Before April 1, 2002</u>. The Equivalent Actuarial Value of a Participant's Accrued Benefit under the Plan shall not be less than the actuarially equivalent value of such Participant's Normal Retirement Benefit accrued under the Plan as of March 31, 2002, determined in accordance with the actuarial assumptions set forth in the Plan as of March 31, 2002.

4. <u>Equivalent Actuarial Value of Benefits Earned Before April 1, 2000</u>. In no event shall the amount of any lump-sum distribution be less than the Equivalent Actuarial Value of the Participant's Accrued Benefit under the Plan as of March 31, 2000, using the "Applicable Mortality Table" and the "Applicable Interest Rate" in effect on April 1, 2000, pursuant to paragraph 1(a), above.

SCHEDULE I
SPECIAL PROVISIONS RELATING
TO COACHES

1.    <u>Introduction</u>

(a)    This Schedule I prescribed the special treatment of Coaches, as defined in Paragraph 4(a) of this Schedule I, with respect to benefits payable under the Plan.

(b)    A Coach shall receive credit under the Plan for service performed and compensation earned prior to April 1, 1989, to the extent provided in Section 4.1(b)(1)(B)(ii)(I) of the Plan.

(c)    Except as otherwise expressly provided in this Schedule I, the provisions of each Article of the Plan (including, but not limited to, provisions governing notice and consent, methods of payment, limitations on benefits, suspension of benefits, and the calculation of compensation and service) shall apply to a Coach subject to any of the provisions of this Schedule I in the same manner and to the same extent as such provisions apply under any of the Articles of the Plan.

2.    <u>Service and Compensation Prior to April 1, 1989</u>

(a)    <u>Participation</u> - A Coach who was a participant in the Coaches Plan on March 31, 1989, and who completes one (1) Hour of Service on or after April 1, 1989, shall be a Participant in the Plan.

(b)    <u>Compensation and Final Average Compensation</u>. - A Coach's Compensation and Final Average Compensation under the Plan shall include Compensation earned, if any, prior to April 1, 1989.

- I-2 -

(c)      Years of Service - A Coach's Years of Service under the Plan shall include Years of Service credited under the Coaches Plan, if any.

3.      Vested Percentage

A Coach's vested percentage under the Plan as of April 1, 1989, shall not be less than his vested percentage under the Coaches Plan as of March 31, 1989.

4.      Definitions

The definitions set forth in Article 2 of the Plan shall apply for purposes of this Schedule I; provided that solely for purposes of this Schedule I, the following terms shall be defined as follows:

(a)      Coach. - Any person actively employed by an Employer in a coaching capacity as a head coach and/or an assistant coach, but only so long as he is employed by an Employer in such a capacity.  An assistant coach is any person employed exclusively to perform football instructional duties under the direction of the head coach and who is required to be present for all practice sessions and games of the Employer. Personnel directors, special instructors, such as strength coaches, and scouts who coach on a part-time basis shall not be considered assistant coaches under the Plan.

(b)      1976 Plan - The National Football League Coaches Pension Plan, as amended, constituting a separate plan for each Employer effective April 1, 1976, before its merger into the 1982 Plan effective as of April 1, 1982.

(c)      1982 Plan - The National Football League Coaches Pension Plan, as amended, as it existed and remained in force from April 1, 1982, until March 31, 1985.

- I-3 -

(d)     <u>Pre-Amended Pension Plan</u> - Any pension plan of an adopting

Employer for the benefit of its Employees that was in effect immediately before April 1,

1976.

5.     <u>Notice and Consent</u>

The provisions of Section 4.5(a)(3)(B) through (G) of the Plan shall apply

to any Coach who is credited with at least one (1) Hour of Service with an Employer on

or after August 23, 1984, and shall be effective as of January 1, 1985, as if they had been

adopted as part of the 1982 Plan in effect on that date.  In addition, any former Coach

described in the following sentence may elect, before his Benefit Commencement Date,

to have his benefits paid in accordance with Section 4.6 of the 1982 Plan.  A former

Coach may make such an election if he was (i) credited with at least one (1) Hour of

Service under the Pre-Amended Pension Plan on or after September 2, 1974, (ii) not an

active participant in the Pre-Amended Pension Plan, the 1976 Plan, the 1982 Plan, the

Coaches Plan, or the Plan in a plan year commencing after December 31, 1975, and (iii)

alive and not receiving benefits on August 23, 1984.  Every former Coach eligible to

make such election shall be notified of this right at such time and in such manner as the

Secretary of the Treasury may prescribe.

6.     <u>Benefit Payment Options</u>

In addition to the optional forms of benefit provided in Section 4.5(b) of

the Plan, a Coach who had an accrued benefit under the Coaches Plan as of March 31,

1989, also may elect, (i) solely with respect to the portion of his benefit represented by

his accrued benefit under the Coaches Plan, and (ii) if he begins receiving his benefit

before his Normal Retirement Date, a monthly benefit payable before his Normal

- I-4 -

Retirement Date and a reduced monthly benefit for life beginning on his Normal

Retirement Date, so that the monthly benefit before his Normal Retirement Date shall be

approximately equal to the sum of his monthly benefit and his Primary Social Security

Benefit after his Normal Retirement Date, in accordance with Section 4.6(b)(3) of the

Coaches Plan.

       7.     <u>Method of Distribution</u>

The provisions of Section 4.6 of the Plan shall not apply to any method of

distribution designated in writing by a Coach under the terms of the 1982 Plan before

January 1, 1984, in accordance with section 242(b)(2) of the Tax Equity and Fiscal

Responsibility Act of 1982 (as in effect before the amendments made by the Tax Reform

Act of 1984).

       8.     <u>Death Benefits</u>

The provisions of Section 5.2 of the Plan shall apply to any Coach who

       (a)     is credited with at least one (1) Hour of Service with an Employer

on or after August 23, 1984, or

       (b)     has completed at least ten (10) Years of Service, and at least one

(1) Hour of Service with an Employer in any plan year beginning after 1975 under the

Pre-Amended Pension Plan, the 1976 Plan, the 1982 Plan, or the Coaches Plan, and was

alive but not yet receiving benefits under the Plan as of August 23, 1984.

SCHEDULE II

SPECIAL PROVISIONS RELATING
TO FRONT OFFICE EMPLOYEES

1.      <u>Introduction</u>

(a)      This Schedule II prescribes the treatment of Front Office

Employees, as defined in Paragraph 4(a) of this Schedule II, with respect to benefits

payable under the plan.

(b)      A Front Office Employee shall receive credit under the Plan for

service performed and compensation earned prior to April 1,1989, to the extent provided

in Section 4.1(b)(1)(B)(ii)(I) of the Plan.

(c)      Except as otherwise expressly provided in this Schedule II, the

provisions of each Article of the Plan (including, but not limited to, provisions governing

notice and consent, methods of payment, limitations on benefits, suspension of benefits,

and the calculation of compensation and service) shall apply to a Front Office Employee

subject to any of the provisions of this Schedule II in the same manner and to the same

extent as such provisions apply under any of the Articles of the Plan.

2.      <u>Service and Compensation Prior to April 1, 1989</u>

(a)      <u>Participation</u> - A Front Office Employee who was a participant in

the Minimum Plan on March 31, 1989, and who completes one (1) Hour of Service on or

after April 1, 1989, shall be a Participant in the Plan.

(b)      <u>Compensation and Final Average Compensation</u> - A Front office

Employee's Compensation and Final Average Compensation under the Plan shall include

Compensation earned, if any, prior to April 1, 1989.

- II-2 -

        (c)    <u>Years of Service</u> - A Front Office Employee's Years of Service under the Plan shall include Years of Service credited under the Minimum Plan, if any.

        (d)    <u>Years of Credited Service</u> - A Front Office Employee's Years of Credited Service under the Plan shall include Years of Credited Service credited under the Minimum Plan, if any, solely with respect to the pension benefit described in Section 4.1(b) hereof.

        3.    <u>Vested Percentage</u>

A Front Office Employee's vested percentage under the Plan as of April 1, 1989, shall not be less than his vested percentage under the Minimum Plan as of March 31, 1989.

        4.    <u>Definitions</u>

The definitions set forth in Article 2 of the Plan shall apply for purposes of this Schedule II; provided that solely for purposes of this Schedule II, the following terms shall be defined as follows:

        (a)    <u>Front Office Employee</u> - A participant in either the Prior Plan or the Minimum Plan.

        (b)    <u>Prior Plan</u> - The National Football League Front Office Minimum Reciprocal Benefit Plan as it existed and remained in force from the effective date of its adoption by the Employer until March 31, 1985.

        5.    <u>Notice and Consent</u>

The provisions of Section 4.5(a)(3)(B) through (G) of the Plan shall apply to any Front Office Employee who is credited with at least one (1) Hour of Service with an Employer on or after August 23, 1984, and shall be effective as of January 1, 1985, as

- II-3 -

if they had been adopted as part of the Prior Plan in effect on that date.  In addition, any former Front Office Employee described in the following sentence may elect, before his Benefit Commencement Date, to have his benefits paid in accordance with Section 3.05 of the Prior Plan.  A former Front Office Employee may make such an election if he was credited with at least one (1) Hour of Service under a predecessor plan to the Minimum Plan (from which assets were transferred directly to the Minimum Plan), (ii) section 401(a)(11) of the Code, as in effect on August 22, 1984, and Sections 3.05 and 4.02 of the Minimum Plan would not otherwise apply to the former Employee, and (iii) he was alive and not receiving benefits on August 23, 1984.  Every former Front Office Employee eligible to make such election shall be notified of this right at such time and in such manner as the Secretary of the Treasury may prescribe.

6.    <u>Benefit Payment Options</u>

In addition to the optional forms of benefit provided in Section 4.5(b) of the Plan, a Front Office Employee who had an accrued benefit under the Minimum Plan as of March 31, 1989, also may elect, solely with respect to the portion of his benefit represented by his accrued benefit under the Minimum Plan,

(a)    if he begins receiving his benefit before his Normal Retirement Date, a monthly benefit payable before his Normal Retirement Date and a reduced monthly benefit for life beginning on his Normal Retirement Date, so that the monthly benefit before his Normal Retirement Date shall be approximately equal to the sum of his monthly benefit and his Primary Social Security Benefit after his Normal Retirement date, in accordance with Section 3.05(b)(3) of the Minimum Plan; or

- II-4 -

(b) any benefit payment option provided in a Club Modification Certificate executed by the Participant's Employer and in effect on March 31, 1990.

       7.    <u>Method of Distribution</u>

       The provisions of Section 4.6 of the Plan shall not apply to any method of distribution designated in writing by a Front Office Employee under the terms of the Prior Plan before January 1, 1984, in accordance with section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act of 1982 (as in effect before the amendments made by the Tax Reform Act of 1984).

       8.    <u>Death Benefits</u>

       The provisions of Section 5.2 of the Plan shall apply to any Front Office Employee who

       (a)    is credited with at least one (1) Hour of Service with an Employer on or after August 23, 1984, or

       (b)    has completed at least ten (10) Years of Service, and at least one (1) Hour of Service with an Employer in any plan year beginning after 1975, and was alive but not yet receiving benefits under the Prior Plan as of August 23, 1984.

SCHEDULE III

SPECIAL PROVISIONS RELATING TO
CHANGE IN COMPENSATION LIMIT

1.      <u>Introduction</u>.  This Schedule III shall apply solely to a Participant
if his Accrued Benefit as of a date on or after April 1, 1994, is based on Compensation
for a Plan Year beginning before April 1, 1994, that exceeded $150,000.

2.      <u>Accrued Benefit</u>.  If a Participant is described in Section 1 of this
Schedule III, his Accrued Benefit shall be equal to the greater of:

(a)      The Participant's Accrued Benefit determined under the Plan's
benefit formula applicable to the Plan Year beginning on April 1, 1994, as applied to his
total Years of Credited Service taken into account under the Plan; or

(b)      The sum of:

(1)      The Participant's Accrued Benefit as of March 31, 1994,
frozen in accordance with Treasury Regulation section 1.401(a)(4)-13 (as adjusted, if
applicable, in accordance with Section 3, below), and

(2)      The Participant's Accrued Benefit determined under the
Plan's benefit formula applicable for the Plan Year beginning on April 1, 1994, as applied
solely to the Years of Credited Service completed by the Participant for Plan Years
beginning on or after April 1, 1994.

3.      In determining a Participant's Accrued Benefit in any Plan Year
beginning on or after April 1, 1994, in accordance with Section 2, above, the Participant's
Adjusted Frozen Accrued Benefit shall be adjusted by multiplying it by a fraction (not
less than 1), the numerator of which is the Participant's Final Average Compensation
determined for the given Plan Year (as limited by section 401(a)(17) of the Code), using

- III-2 -

the Plan's definition of Compensation and Final Average Compensation in effect as of March 31, 1994, and the denominator of which is Participant's Final Average Compensation as of March 31, 1994, using the Plan's definition of Compensation and Final Average Compensation in effect as of March 31, 1994.  However, this adjustment may be made only if the adjustment will not cause the Plan to fail to satisfy the consistency requirement of Treasury Regulations section 1.401(a)(4)-13(c), as modified by Treasury Regulations section 1.401(a)(17)-l(e).  For purposes of this Section 3 of Schedule III, "Adjusted Frozen Accrued Benefit" shall mean a Participant's Accrued Benefit as of March 31, 1994, frozen in accordance with Treasury Regulations section 1.401(a)(4)-13, less the Participant's accrued benefit, if any, as of March 31, 1989, under either the Minimum Plan or the Coaches Plan, whichever is applicable.

SCHEDULE IV

SCHEDULE OF EFFECTIVE DATES

This Schedule sets forth the effective dates of those provisions of the Plan that have been amended to reflect changes in applicable law since April 1, 1989. Amendments to the Plan that are not identified in this Schedule (including amendments that are not legally required) shall be effective as of the dates set forth in the instruments adopting the amendments or in the particular provisions of the Plan that are affected by the amendments, and otherwise as of April 1, 2002.

**Provisions Added or Amended Effective January 1, 1993**

| | |
|---|---|
| **Plan § 4.11** | New section added to provide for the direct rollover of eligible rollover distributions from the Plan to an eligible retirement plan. |

**Provisions Added or Amended Effective August 3, 1993**

| | |
|---|---|
| **Plan §§ 2.11** | Compliance with the Family and Medical Leave Act. |

**Provisions Added or Amended Effective April 1, 1994**

| | |
|---|---|
| **Plan §§ 2.1(k), Schedule III** | Definition of Compensation amended to reflect the reduction in the annual limit from $200,000 (indexed) to $150,000 (indexed). Fresh-start date of March 31, 1994, and fresh-start formula with extended wear-away and compensation adjustments elected. |
| **Plan § 2.1(1)** | Definition of Covered Compensation amended to reflect the final regulations under Code section 401(l) and the elimination of the table set forth in Proposed Treasury |
| **Plan §§ 4.5(a), 4.10(a)** | Permit waiver of 30-day advance notice requirement |

IV - 2 -

**Provisions Added or Amended Effective December 12, 1994**

Plan § 13.10           Compliance with the Uniformed Services Employment and Reemployment Act

**Provisions Added or Amended Effective April 1, 1995**

Plan § 14.8           Restrictions on distributions to top 25 highly compensated employees amended to permit the distribution of a restricted amount provided that the Plan requires adequate security to guarantee repayment of the restricted amount upon Plan termination.

**Provisions Added or Amended Effective January 1, 1997**

Plan § 2.1(k)           Addition of elective contributions to compensation for purposes of Code § 415

**Provisions Added or Amended Effective April 1, 1997**

Plan § 2.1(k)           Repeal of family aggregation rule and addition of elective contributions to compensation for purposes of Code § 415

Plan § 2.1(q)           Revised definition of "leased employee"

Plan § 4.6           Revised minimum distribution requirements

IV - 3 -

### Provisions Added or Amended Effective January 1, 1998

**Plan § 2.1(k)** — Addition of non-taxable transportation fringe benefit amounts to compensation for purposes of Code section 415

### Provisions Added or Amended Effective April 1, 1998

**Plan §§ 4.5(a), 4.5(c), 4.10(a), 13.9** — Increase in mandatory cash-out limit to $5,000

### Provisions Added or Amended Effective January 1, 1999

**Plan § 4.11** — Exclusion of hardship distributions from definition of "eligible rollover distribution"

**Plan § 15.1** — Repeal of combined plan limit under Code § 415(e)

### Provisions Added or Amended Effective October 1, 2001

**Plan § 4.6** — Reliance on proposed regulations under Code § 401(a)(9)

### Provisions Added or Amended Effective January 1, 2002

**Plan § 4.11** — Changes to direct rollover rules

**Plan § 15.1(a)** — Reflect that pre-EGTRRA limitations under Code §§ 415(b)(2)(C) and (D) remain in effect

### Provisions Added or Amended Effective April 1, 2002

**Plan § 2.1(k)** — Increase in annual compensation limit under Code § 401(a)(17)

**Plan §§ 16.2(e), 16.3(c) and (d), and 16.4(c)** — Changes to top-heavy rules

### Provisions Added or Amended Effective January 1, 2003

**Plan § 4.6** — Compliance with final regulations under Code § 401(a)(9)

IV - 4 -

**Provisions Added or Amended Effective August 9, 2006**

**Plan § 16.6**          Compliance with final Treasury Regulations § 1.411(d)-3(a)(3)

**Provisions Added or Amended Effective March 28, 2005**

**Plan § 4.5(c)**          Decrease mandatory cash-out limit to $1,000

**Provisions Added or Amended Effective January 1, 2007**

**Plan § 13.10(b)**          Add survivor benefit provision for Participants who die during qualified military service as required by Code § 401(a)(37)

**Provisions Added or Amended Effective April 1, 2007**

**Plan § 4.10**          Add notice of consequences of failing to defer required under Code § 411(a)(11)

**Provisions Added or Amended Effective for Limitation Years Beginning On or After July 1, 2007**

**Plan §§ 2.1(k) and 15.1**          Compliance with final regulations under Code § 415

**Provisions Added or Amended Effective January 1, 2008**

**Plan § 4.11**          Provide for direct rollover to Roth IRA under Code § 408A(e)

IV - 5 -

**Provisions Added or Amended Effective April 1, 2008**

| | |
|---|---|
| **Plan § 4.5(b)(5)** | Add qualified optional survivor annuity required by Code § 417(g) |
| **Plan § 4.12** | Add direct rollover right for non-spouse beneficiary pursuant to Code § 402(c)(11) |
| **Plan § 4.13** | Compliance with funding-based benefit limits under Code §§ 401(a)(29) and 436 |
| **Exhibit I, §1(c)** | Change applicable interest rate and applicable mortality table as required by Code § 417(e)(3) |

**Provisions Added or Amended Effective January 1, 2009**

| | |
|---|---|
| **Plan § 13.10(c)** | Compliance with requirements for participants receiving differential wage payments under Code § 414(u)(12) |